MHN

**FILED**

APR 1 0 2008 *aew*
4-10-2008
**MICHAEL W. DORBINS**
**CLERK, U.S. DISTRICT COURT**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

United States of America ex rel.

**MILTON JONES - R29598**
(Full name and prison number)
(Include name under which convicted)

PETITIONER

vs.

**TERRY McCANN - WARDEN,**
(Warden, Superintendent, or authorized
person having custody of petitioner)

RESPONDENT, and

(Fill in the following blank only if judgment
attacked imposes a sentence to commence
in the future)

ATTORNEY GENERAL OF THE STATE OF

(State where judgment entered)

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C

**08CV2057**
**JUDGE BUCKLO**
**MAG. JUDGE ASHMAN**

Case Number of State Court Conviction:
**01 CR 18654 (01)**

PETITION FOR WRIT OF HABEAS CORPUS -- PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: **Circuit Court Of Cook County,**
    **2650 S. California, Chicago, Illinois, 60608**

2.  Date of judgment of conviction: **April 21, 2004**

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
    **3 counts of first degree murder and 2 counts of aggravated kidnapping**

4.  Sentence(s) imposed: **25 years for the murder, 2 concurrent terms of 6 years**

5.  What was your plea? (Check one)   (A) Not guilty      ( **x** )
                                       (B) Guilty          (   )
                                       (C) Nolo contendere (   )

    If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:
    **DOES NOT APPLY**

## PART I – TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):          Jury ( **x** )          Judge only (  )

2. Did you testify at trial?    YES ( **x** )          NO       (  )

3. Did you appeal from the conviction or the sentence imposed?   YES ( **x** )   NO (  )

    (A)  If you appealed, give the

        (1) Name of court:   Illinois Appellate, 1st District

        (2) Result:   Conviction Affirmed

        (3) Date of ruling:   June 9, 2006

        (4) Issues raised:   Trial Court Erred in Failure to Appoint new counsel
after claim of ineffectiveness, Trial Court erred in Failure
to conduct fitness hearing, Improper Statements By Prosecutor

    (B)  If you did not appeal, explain briefly why not:

        DOES NOT APPLY

4. Did you appeal, or seek leave to appeal, to the highest state court?   YES ( **x** )      NO (  )

    (A)  If yes, give the

        (1) Result    Leave to appeal denied

        (2) Date of ruling:

        (3) Issues raised: Trial Court erred in Failure to Appoint new counsel,
_____

    (B)  If no, why not:

5. Did you petition the United States Supreme Court for a writ of *certiorari*?   Yes (  )   No ( **x** )

    If yes, give (A) date of petition: _____   (B) date *certiorari* was denied: _____

## PART II -- COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES ( x )   NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A.   Name of court: Cook County Circuit Court

    B.   Date of filing: June 4, 2007

    C.   Issues raised: Ineffective Assistance Of Trial Counsel

    D.   Did you receive an evidentiary hearing on your petition?   YES ( )  NO (x)

    E.   What was the court's ruling? Summarily Dismissed

    F.   Date of court's ruling: August 8, 2007

    G.   Did you appeal from the ruling on your petition?   YES ( )  NO (X)

    H.   (a) If yes,   (1) what was the result?   DNA

                     (2) date of decision:   DNA

        (b) If no, explain briefly why not: Did Not Know How To Appeal

    I.   Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES ( )  NO ( x )

        (a) If yes,   (1) what was the result?   DNA

                     (2) date of decision:   DNA

        (b) If no, explain briefly why not: DID Not Know How To Appeal

3

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?   YES ( )        NO (X)

 A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

  1. Nature of proceeding  _____

  2. Date petition filed  _____

  3. Ruling on the petition  _____

  3. Date of ruling  _____

  4. If you appealed, what was the ruling on appeal?  _____

  5. Date of ruling on appeal  _____

  6. If there was a further appeal, what was the ruling ?  _____

  7. Date of ruling on appeal  _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?   YES ( )   NO (X)

 A. If yes, give name of court, case title and case number: _____

_____

 B. Did the court rule on your petition?  If so, state

  (1) Ruling: _____

  (2) Date: _____

## 4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?

**YES ( )   NO (X)**

If yes, explain: _____

_____

# PART III -- PETITIONER'S CLAIMS

1.  State briefly every ground on which you claim that you are being held unlawfully.  Summarize briefly the facts supporting each ground.  You may attach additional pages stating additional grounds and supporting facts.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A)  Ground one  Trial Court's failure to inquire into ineffective claim
Supporting facts (tell your story briefly without citing cases or law):

The Petitioner challenges the presumption of correctness of the

State Courts' findings, where such findings resulted in a decision

contrary to clearly established Federal law, as determined by the

Supreme Court of the United States, where the trial court failed

to adequatedly inquire into the Petitioner's allegations of his

trial counsel's ineffectiveness and neglect before proceeding on

the post-trial motion without appointing new counsel.

**(Continued on Page 5-A)**

(B)  Ground two  Trial Court's failure to conduct a fitness hearing
Supporting facts:

The Petitioner challenges the presumption of correctness of the

State Courts' finding, where such findings resulted in a decision

contrary to clearly established Federal law, as determined by the

Supreme Court of the United States, where the trial court failed

to conduct a fitness hearing after the petitioner raised a bonafide

doubt of his fitness when he revealed that he was not taking his

medication as prescribed, which were necessary to his fitness.

**(Continued on Page 5-C)**

The Petitioner filed a pro-se post-trial motion for a new trial and/or appoint new counsel , alleging several instances of ineffective assistance of counsel and neglect, including but not limited to a contention that trial counsel failed to contact certain individuals who would have been able to clear petitioner of any participation in the crime (See Page   of Appendix). Specifically, Petitioner informed the trial court that his attorney failed to investigate witnesses, including the occupants of the Suburban which allegedly was used to transport eyewitnesses M.C. Jones and Lolita Sierra to the site of the beating of Patrick Banks (See Page    of Appendix). Petitioner told the trial court that these witnesses would have changed the outcome of the case (See Page    of Appendix). However, the trial court failed to take any actions which could reasonably have constituted an "adequate inquiry" into these allegations.

The trial court, after first rebuffing petitioner's attempts to speak about his allegations of ineffectiveness, and forcing the petitioner to proceed on the post-trial motion with the attorney whom petitioner was complaining, did eventually allow petitioner some latitude to explain his allegations , did not constitute an adequate inquiry , where the trial court did not elicit information which would have determined whether petitioner's allegations were potentially meritorious, before denying petitioner's request for a new attorney.

(Continued On Page 5-B)

5-A

The trial court simply allowed the petitioner to state his allegations, and dismissed the allegations, without asking a single question aimed at confirming or debunking those allegations which does not meet the adequate inquiry requirement.

Trial counsel . was duty bound to investigate those potentially exculpatory witnesses , and the trial court was duty bound to evaluate whether trial counsel's failure to investigate eyewitnesses to the offense for the defense could have been a matter of trial strategy .

The United States Supreme Court has reiterated in reviewing a claim of ineffective assistance of counsel, the professed "tactical decision" of trial counsel "must be directly assessed for reasonableness in all the circumstances."

A forensic Clinical Services' Staff Psychiatrist determined that Petitioner was fit for trial, subject to his use of his prescribed medication (See page    of Appendix). At the hearing on post-trial motions and sentencing, petitioner and his attorney informed the court that petitioner had not been taking his medication as prescribed (See page    of Appendix). Because petitioner's failure to take his medication as prescribed raised a bonafide doubt to his fitness, the trial court erred by not conducting a fitness hearing before proceeding on post-trial motion and sentencing.

On September 20, 2001, the trial court was informed that the petitioner had attempted to commit suicide by hanging himself, and the trial court ordered that he be evaluated for fitness (See page    of Appendix). Forensic Clinical Services' Staff Psychiatrist Philip Pan, M.D. examined the petitioner and submitted a report to the court, dated November 20, 2001 (See page    of Appendix). In Dr. Pan's report, petitioner>s additional suicide attempts in jail were documented (See page    of Appendix). Dr. Pan diagnosed petitioner as having alcohol dependence and learning disorder, and stated he could not rule out a diagnosis of psychotic disorder (See page    of Appendix). Dr. Pan noted that petitioner was being medicated with Risperdal (an antipsychotic), 1 mg in the morning and 2 mg at night, Cogentin (for side effects of antipsychotics),1 mg twice per day, Depakote (a mood stabilizer), 250 mg in the morning and 500 mg at night, Trazadone (an antidepressant),100 mg at night ,

**(Continued on Page 5-D)**

5-C

Effexor (an antidepressant), 100 mg twice per day, and Thorazine (an antipsychotic) 50 mg if needed (See page    of Appendix). Dr. Pan concluded that petitioner was fit for trial with medication (See page    of Appendix).

On April 21, 2004, when the petitioner's case was called for post-trial and sentencing proceedings, petitioner requested to address the court "before anything further" (See page    of Appendix). After being initially rebuffed by the court, petitioner informed the court that he was not taking the prescribed doses of his medication, and defense counsel Breen objected to the continuation of the proceedings, noting that petitioner was only fit when on his medication (See pages    of Appendix). The trial court responded by stating "I'm going to ask Mr. Jones to bring his argument to a conclusion." (See page    of Appendix). The court then denied petitioner's request for a new trial and/or new counsel, and continued sentencing, without addressing the matter of petitioner's fitness (See page    of Appendix).

5-D

(C) Ground three  **IMPROPER ARGUMENTS BY PROSECUTOR**
Supporting facts:

The Petitioner challenges the presumption of correctness of the State

Courts' findings, where such findings resulted in a decision contrary

to clearly established Federal law, as determined by the Supreme Court

of the United States : When in an attempt to impeach the Petitioner's

testimony with personal opinion and alleged facts not properly in evi-

dence , and when the prosecutor asked the jurors to put themselves in

the victims' position and imagine their "worst nightmare" denying

**(Continued on Page 6-A)**

(D) Ground four
Supporting facts:

_____

_____

_____

_____

_____

_____

_____

2   Have all grounds raised in this petition been presented to the highest court having jurisdiction?
YES ( )   NO (X)

3.  If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:
Grond Two and Three were not raised to the Illinois Supreme Court

because Appellate Counsel dropped those issues, and the Petitioner

was not capable of raising them himself, where he is mentally incompetent
and medicated as diagnosed in Ground Two.

Petitioner a fair trial.

In the instant case, Petitioner testified that he had been pulled over by the police and shown to witnesses of a residential break-in, and that he was then subsequently released (See page of Appendix). After Petitioner wondered aloud, "They should have it on record, shouldn't they ?" Prosecutor Farmakis said,"No, we don't." (See page       of Appendix) Then , when Petitioner stated he couldn't give a description of the people to whom police had shown him, pro-secutor Farmakis responded, "Because it didn't happen, right ? That's why you don't know what they look like, because it didn't happen ?" (See page       of Appendix) The court sustained Defense counsel's objection to the prosecutor's argumentative interrogation, but never instructed the jury to disregard the prosecutor's improper testimony alleging that the police had no record of the show-up (See page of Appendix).

Petitioner testified that his anger after discovering the theft was between three and five on a scale of one to ten. Prosecutor Far-makis responded by opining, "I would hate to see if it was a ten." (See page       of Appendix)  The court sustained defense counsel's objection to this statement . (See page       of Appendix)

During closing arguments in the instant case, prosecutor Arthur Heil asked the jury to

... take a minute and picture something in your mind. Picture in your mind your own home ; where you live with your family and your friends. Now think of your worst nightmare a violent intruder breaks down the

(Continued on Page 6-B)

6-A

door of your home. He forces his way into your home, armed with a handgun. Giving orders...to nine or ten other intruders. Nine- giving orders to nine or ten other intruders, ordering them to get you (See page      of Appendix).

Defense counsel objected to the personalization of the argu-ment, and the court overruled the objection (See page      Appendix)

Prosecutor Heil then continued :

Ordering them to get you and your loved ones. You may try to run or hide , but this person, this leaderwho comes in ordering people around, grabs you, pulls you back, puts ropes around your neck. And- or otherwise forces you out of your own home against your will. And he forces you to be taken to another place against your will. And the place he takes you to is an unknown, unfamiliar building where you are forced into a hallway. And inside there, there are more ruffians inside waiting for you to confront you, to threaten you. And by the orders of this boss man, the leader of the pack, you are beaten, or one of your loved ones is beaten, beaten to death (See pages      of Apendix).

These statements by the prosecutor clearly were improper and prejudicial appeals to the fears and passions of the jury, thus denying Petitioner his Constitutional right to a fair trial. The State court erred in failing to grant relief.

6-B

## PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing ___CHARLES K. PIET_____

(B) At arraignment and plea ___CHARLES K. PIET_____

(C) At trial ___RAYMOND L. PRUSAK, AND JOE BREEN_____

(D) At sentencing ___RAYMOND L. PRUSAK, AND JOE BREEN_____

(E) On appeal ___STEPHEN L. GENTRY_____

(F) In any post-conviction proceeding ___NONE_____

(G) Other (state): ___NONE_____

## PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( )

Name and location of the court which imposed the sentence: ___Court of Cook County, Ill.___

Date and length of sentence to be served in the future ___29 years_____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _____            _____
                    (Date)                            Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_Welton Jones_
(Signature of petitioner)
___R29598_____
(I.D. Number)
___P.O. BOX 112 JOLIET IL. 60434___
(Address)

REVISED 01/01/2001

7

**APPENDIX**

1      THE CLERK:  Milton Jones.

2      MR. BREEN:  Joe Breen from the office of Raymond

3  Prusak.  This is Milton Jones in custody of the

4  sheriff.  We are still in the status mode.  I believe

5  the State is going to have a death review on this

6  case.

7      MS. O'CONNOR:  Yes, we need to do that.  We

8  haven't done it yet.  We need to get one scheduled.

9      THE COURT:  There was a B.C.X.  He came back fit?

10      MS. O'CONNOR:  That's from last year.  November of

11  2001.

12      THE COURT:  Fit to stand trial with medication.

13  Sane at the time of the offense.

14      MS. O'CONNOR:  What date is that one dated, Judge?

15      THE COURT:  November 26, 2001.

16      MR. BREEN:  11-25, Judge, by agreement?

17      THE COURT:  All right.

18      MR. BREEN:  Thank you.  Have a good day.

19              (Whereupon, the matter was continued

20               until November 25, 2002.)

21                  *  *  *  *  *

22

23

24

1           THE CLERK:  Milton Jones.

2           THE COURT:  He should be sentenced on 4, 6, 9,

3    12 and 13.

4           THE COURT:  State, you may proceed with

5    aggravation.

6           MS. FARMAKIS:  I believe there is a motion for

7    a new trial.

8           MR. BREEN:  There is, Judge.  It was filed on

9    the last court date.

10          THE DEFENDANT:  I would like to address the

11   Court before anything further.

12          THE COURT:  You'll get an opportunity.

13          MR. BREEN:  I have nothing in addition to

14   what's on the motion, Judge.

15          THE COURT:  Motion for judgment

16   notwithstanding the verdict and for a new trial is

17   denied.

18          THE DEFENDANT:  I have my own motion I want to

19   present.

20          THE COURT:  I'll give you an opportunity to

21   state it.

22          State, any aggravation?

23          MS. FARMAKIS:  Yes, Judge.

24          We do have three witnesses to present to the

1    outrageous.  It was violent.  And it caused death.

2            We ask your Honor to sentence him to more than

3    the minimum, and to make your findings on the record

4    that the sentences will run consecutively.

5            Thank you.

6            THE COURT:  Mitigation?

7            THE DEFENDANT:  Can I talk?

8            MR. BREEN:  Sir, there is no evidence to

9    present, just argument.

10            THE COURT:  I'll give you an opportunity after

11    your lawyer finishes.

12            MR. BREEN:  Judge, I'm not here today to

13    re-litigate any of the issues of the trial certainly.

14    The verdict from the jury found the defendant not guilty

15    of actually possessing a weapon.

16            Now, whether the verdict was something of a

17    compromise or it was the jurors' decision that in fact

18    maybe Milton Jones wasn't the leader of the pack as the

19    state asserted.  Maybe Milton Jones wasn't the guy who

20    was the first one in the door with the gun in his hand

21    as you heard testimony from some of the witnesses in

22    this case.  And in fact, maybe Milton Jones is a guy who

23    made a phone call.

24            Judge, the law of the State of Illinois more

1    than allows for the punishment of Milton Jones.  There

2    is no free ticket.  You're bound to give him a sentence

3    that will even at its minimum put him in jail for the

4    large majority, if not the rest of his natural life,

5    simply by the time credits that are allowed or not

6    allowed, rather, in cases like these and by the numbers

7    involved in this case.

8         Judge, Milton Jones is himself a father, a

9    son, and a brother, and everything that Patrick Banks

10   was.

11        And you've been given information in the

12   pre-sentence investigation.  We ask you to take that

13   into consideration.  He does have a family.  You learned

14   during the trial that he moved out of Chicago because he

15   was afraid of the crime in the city.  He was living in

16   Iowa at the time that he returned to Chicago and was

17   arrested on this case, living with his wife and three

18   children.

19        I think, Judge, that you have probably taken

20   notice of the fact that his family has regularly been

21   here with him.  His mother, sister, wife have all been

22   here, and his family is here today.

23        Judge, there is no easy sentence in a case

24   like this.  As you know, the law allows for a stern

1    taking so much medication today.  300 milligrams of

2    Zelquil (phonetic), 200 of Travenol (phonetic) and 150

3    milligrams of Zoloft a day.  So you know, I have been,

4    for these three years I have been incarcerated I have

5    been taking this medication, depending on my lawyer to

6    take my cause, when my family, he stuck my family up for

7    their money.

8         This thing could have been resolved the way it

9    really happened.  The truth about what really happened.

10        I gave specific instructions to my attorney

11   when he came to see me once or twice in 2002, the truth

12   about everything.  I gave him proof that I was not

13   present in that Suburban, that I did not put my hand on

14   Patrick Banks, that I did not order no one to kill

15   Patrick Banks.

16        During trial, the State, they used evidence --

17   it was five or six exhibits they used during trial,

18   Judge, and I asked my attorney for these exhibits,

19   because I had questions about them and I wanted to know,

20   you know, more information about them.  He ignored me

21   three times.  The fourth time he answered me, and he

22   said, "I have to subpoena them."

23        Right now, I ask if my attorney would put my

24   discovery on the desk, since I never seen my discovery,

1    Suburban.  Who got the pictures?  I heard Lolita had the

2    pictures.  From what my wife told me, she said Lolita

3    had the pictures from a meeting she had with you in

4    2002, with my attorney in 2002.  And I want to know what

5    Lolita do with these pictures?  Why wasn't it mentioned

6    at trial?

7           Lolita also stated that I said I was going to

8    stick a knife up her p-u-s-s-y.  (Inaudible) this is the

9    same person that kinaps them, the same person that is in

10   the Suburban.

11          I also wanted to know, did I match the

12   description that Lolita Sierra and M.C. Jones gave to

13   the detectives?  That's -- that wasn't mentioned in

14   trial either.

15          Lolita Sierra also stated she don't know how

16   the defendant looked that walked up to her and put a

17   rope around her neck and M.C. Jones' neck and put her in

18   the Suburban and who took the rope off her neck.  Do

19   they know that?  Do M.C. Jones know that?

20          If this case was investigated, it would show

21   that I never seen Lolita face-to-face in my life.  In

22   trial, Lolita Sierra stated that her and Patrick Banks

23   stayed in the same building with Patrick's Banks' mother

24   and sees his mother every day.  Patrick's mother got on

1    the stand and disagreed.  But my lawyer told me in the

2    back on April 6 that it was no grounds for me to have a

3    new trial.

4           That's when I knew it was time for me to bring

5    my medication I have and start taking half of it instead

6    of all of it.  Because something is wrong here.  No

7    investigation had in this case, no visits from my

8    attorney at all.  Never seen him.  The only time I seen

9    my attorney is right here in front of you, Judge Bowie.

10          He did send his assistant twice in 2002, and

11   again in January.  I was trying to get the file, but I

12   need a court order to get that.  When he did come to see

13   me he tried to terminate me.  He tried to terminate me

14   back there when I asked him why didn't he investigate me

15   and getting some character witnesses up here.  He

16   couldn't answer that.  Because he didn't investigate it.

17          And he wasn't returning anybody's phone calls.

18   I made sure my mom called every day and my sister is off

19   on Monday so I called three-way at the lawyer's office

20   to leave a message myself.

21          But I'm not trying to throw the weight all off

22   my lawyer.  I want a fair trial, and no one needs to

23   die, and the people that is responsible for this, they

24   need to step forward, and that's why I gave him the

1   evidence, to bring forth.  Instead he wants to trick the
2   Court to believe that Dion played a certain part in it,
3   that he didn't put Dion where he was and put me where I
4   was, and it will show I did not put a rope around no
5   one's neck, and I did not kill no one, and I did not
6   order no one to kill no one.

7          I did not own a gun.  I moved out of Chicago
8   to get away from this.  I come to Chicago to do business
9   and see my family on holidays and do that only.

10         I'm raising five kids and a wife.  I go back
11  home.  I only come here to do what I have to do and
12  leave.  I never ever would take a life.

13         I have a little brother that is mentally
14  retarded.  Mentally retarded.  My mom has to take care
15  of him.  Instead, instead of my lawyers investigating,
16  the only thing they investigate is one, they pick my mom
17  up from work, pick a check up from her and threw her out
18  at the el station.

19         Sentencing time, the last payment, how my
20  sister at her job all morning and go pick a check from
21  her for the last payment and never did an investigation?
22  Could he put out an investigator's name and investigate
23  if he's up there?  No, he cannot.

24         If I asked him about discovery when I do see

1    Where is my attorney?

2          I'm just asking for mercy, help.  I mean, I

3    don't want to kill nobody.  I don't mean to kill nobody,

4    I didn't kill nobody.  I just want mercy.  Just a fair

5    trial.  A fair trial.

6          I mean, when I did find out somebody was dead,

7    it just drove me crazy.  It drove me so crazy I had to

8    take all this medication and -- when I asked my lawyer

9    could I go to the law library to help, he told me to,

10   "Take your medication and stay out of trouble."  Okay.

11   I take my medication, but I'm in trouble because

12   everybody I'm around is on medication and the officers

13   treat them like dogs because they beat on them and treat

14   them like trash.  So I sent him a letter about it.  Did

15   he respond to it?  No, no response.

16         MR. BREEN:  Judge, at this time, I am going to

17   to object.  The defendant is only fit to stand trial

18   with medication.

19         THE DEFENDANT:  Exactly.

20         MR. BREEN:  He said today that he is refusing

21   to take his medication as ordered.  And I don't know if

22   any more of this is proper until he is --

23         THE DEFENDANT:  Oh, my God.

24         THE COURT:  I'm going to ask Mr. Jones to

1    bring his argument to a conclusion.

2        THE DEFENDANT:  I'm asking for a retrial and

3    bring the other guys that was involved in this case to

4    justice and clear me from kidnapping.  I did not kidnap

5    no one.

6        And again, I want to apologize to the family.

7    I'm very sorry.  Whatever I can do to help, I'll give

8    the information to whoever I need to to get these people

9    put to justice.  Because this man don't need to die and

10    nobody charged with it.

11        I know I didn't do it.  That's why I'm here

12    today.

13        If I didn't take my medication I'd probably be

14    dead myself.

15        And I'm asking for a retrial and a new

16    attorney.

17        Thank you.

18        THE COURT:  The reason I'm pausing at the

19    moment, I was just reviewing the defendant's medical and

20    psychological history.  And apparently, he did not start

21    having these problems until he was arrested on this

22    case.

23        Mr. Jones' motion for a new trial is denied,

24    as it was previously when his attorney made the

1    arguments.  I believe Mr. Jones received a very fair

2    trial.  I believe the evidence was overwhelming, and I

3    think his attorney did a good job in defending him to

4    the best of his ability with what he had to work with.

5             Mr. Jones in arguing to the Court appears to

6    be trying to shift the blame to his attorneys for their

7    lack of investigating the case.

8             But as I see it, the Court and the jury heard

9    proper evidence.  The jury reached their verdict, I

10   believe it was a just verdict.

11            And as the defendant said, all he wants is

12   justice.  I believe the defendant has received justice.

13   And the jury found him guilty beyond a reasonable doubt

14   of first degree murder and aggravated kidnapping of M.C.

15   Jones and Lolita Sierra.

16            It's unfortunate that a situation like this

17   has to occur.  The defendant, the victim in this case

18   died of such a violent death brought on by Mr. Jones'

19   actions.

20            I'm aware there were many people involved who

21   were solicited by Mr. Jones for their assistance in

22   carrying out this murder.  There was such great bodily

23   harm inflicted, the defendant knew or should have known

24   as the results of that beating that there was a great

1    probability of death which did actually occur on the

2    victim in this case.

3              It's unclear from the evidence just how much

4    of the beating was done by Mr. Jones.  But I think it's

5    also clear that the beating was done under his complete

6    supervision and control.  And there's just no excuse for

7    that.

8              Regardless of what the victim did, which I do

9    believe he did break in his truck, steal his equipment,

10   I also believe from the testimony that the victim was a

11   drug addict, spent most of his time stealing or doing

12   whatever he had to to get drugs.  And I can understand

13   Mr. Jones' anger.

14             But regardless of what the victim did to

15   Mr. Jones does not justify his murder.

16             I understand Mr. Jones is on medication.  But

17   he has not really expressed any remorse except

18   apologizing to the family, but maintaining his

19   innocence, that he had nothing to do with it whatsoever.

20   And I think the evidence was overwhelming.  The

21   testimony was clear.  There were numerous witnesses that

22   testified that pointed Mr. Jones out.

23             The issues regarding the truck, the white

24   truck and which van was which does not cloud the

1    don't know nothing about it.  If he's able to put that

2    out right now, even the evidence I gave him, can he

3    please show the Court that he has this, that he didn't,

4    he didn't use in court that would have made a different

5    result in trial, could he please open up my discovery

6    and see if the information is in there?

7             THE COURT:  You may make, continue to make

8    your, whatever you'd like to say.

9             THE DEFENDANT:  The reason why I asked --

10            THE COURT:  Your attorney is not at issue at

11   this point.

12            THE DEFENDANT:  He's a big issue.  Because I

13   didn't have a fair trial because I received ineffective

14   assistance of counsel, because he didn't hire an

15   investigator.  He didn't do nothing for me to help me.

16            Right now, he didn't put witnesses on my

17   behalf because he failed to investigate.  When I asked

18   about it in the room, he start cursing me out, telling

19   me I don't need -- he told me he's tired of my F'ing

20   stuff, because he's tired of me and this case, and it's

21   nothing I can do to -- wait.  He cursed me out back

22   there about it, and then came back later and told me

23   that he know for a fact that I'm going to get twenty

24   years for the murder, six for the aggravated kidnap, six

1    years for the aggravated kidnap and cop out (inaudible)

2    years for the other case I have.  Okay.  He's the judge,

3    now.  Now he placed himself in your seat and told me

4    what I'm going to get.

5          Also I want to bring up a point.  April 6th I

6    came here.

7          THE COURT:  We'll, you you don't have to plead

8    guilty to anything.  That is your decision.

9          THE DEFENDANT:  I understand that.

10          THE COURT:  And your other pending case, if

11    you want to go to trial on that case, you have that

12    opportunity.  That is your decision.

13          You do understand that?

14          THE DEFENDANT:  If I don't know that, he's not

15    going to tell me, because I don't see him.

16          THE COURT:  I'm telling you now.  You don't

17    have to plea of guilty on your other case.  You can go

18    to trial.

19          THE Defendant:  You also told me on April 6

20    that he was to come to see me and show me that

21    discovery.  Ever since April 6, my family been calling

22    him.  No phone calls returned.

23          He showed up two days before court with no

24    discovery, nothing, no questions.  He couldn't answer no

1    questions.  I asked him where is my attorney at.  He

2    couldn't make it.  No excuse why my attorney couldn't

3    make it.

4            And I asked him why is it that I can't see

5    this discovery?  What is you hiding from me?  He got all

6    in my face, "You can't see the discovery.  I'm denying

7    you discovery."  Okay, you are denying me.  This means

8    it's over.  I left.

9            This is the last time I seen him in the

10   bullpen, when he got upset with me.

11           I want to present this motion for post-trial

12   relief.

13           May I?

14           THE COURT:  You may hand it to me.

15           THE DEFENDANT:  It's a copy in there for the

16   Judge, the State, and a copy for me.  The truth about

17   everything.  Everything that happened.  I mean, evidence

18   that's in there right now that he did not use that I

19   gave him from the beginning.  He has it.

20           I was not found guilty beyond a reasonable

21   doubt.  After two years the police put me in the lineup.

22   I was pointed out in the lineup.

23           After that, the police started stating

24   information about the case, that they already had on the

1   case.  After, after the lawyers left and told him he

2   couldn't take the case, they started forcing me to

3   confess to things that was about the case.  I never knew

4   I made any statements to the statements.  Where is the

5   questions to the statements?  I was not offered to make

6   a written video or audio statement.  It was not written

7   in the police report that I know of, that I was offered

8   to make these statements.

9         During trial I understand that the kidnapper

10   that kidnapped M.C. Jones and Lolita Sierra was present

11   in the Suburban.  Lolita Sierra stated the defendant,

12   me, was in the passenger seat of the Suburban.  M.C.

13   Jones stated I was the driver of the Suburban.  What

14   happens with Dion Boyd and Allan Shakler (phonetic)

15   stands trial in this case and the truth comes out?  I

16   wasn't in the Suburban.  After I have been convicted of

17   this crime.  Boyd has knowledge of who was in that

18   Suburban, his Suburban, when I gave evidence to my

19   attorney.  He didn't never use.  He got it right now.

20   My truck was broken into.  I don't know who broke into

21   it.  I never pointed a finger and said who broke into

22   it.

23         There was pictures of me in my Suburban.  No

24   one said nothing about these pictures that was in my

1    taking all of them back, you can discuss it.

2         MR. BREEN:  I haven't seen them.

3         THE COURT:  Why don't you get those and show them

4    to him now.

5         MR. BREEN:  I don't think we have problems with

6    any of the other things.

7         THE COURT:  I saw them.  You can just show them

8    to them.

9                                    (SHORT PAUSE.)

10        MR. PRUSAK:  You are going to rest?

11        MS. FARMAKIS:  Yes.

12        MR. PRUSAK:  We are going to make a motion for

13   directed finding.

14        THE COURT:  You want to make it now?

15        MR. PRUSAK:  Sure

16                MOTION FOR DIRECTED FINDING

17                    BY MR. PRUSAK:

18             Judge, in the light most favorable to the

19   State, you've got two admitted drug addicts who were

20   caught -- at least the first one, Lolita Sierra, was

21   boldface lying to you from what the mother of the

22   decedent said that she hadn't seen her son.  She sleeps

23   there once a week, every two weeks.

24             Lolita Sierra on the stand right off she

1    tells you a lie.  Right off, she tells you, "We live

2    above his mother.  We saw her every day."

3         Judge, this whole case is built around the

4    words of two admitted drug addicts whose opportunity to

5    observe at the time was clouded by the use of the drugs

6    they were just ingesting at least a half hour or less

7    right before the incident occurred.

8         Now they picked him out of the lineups, they

9    picked him out of photo arrays, our client, but that

10    could be attributed to the fact that they had just seen

11    him just moments before when his car or moments after

12    his truck got broken into.

13         He was the only photograph that they showed

14    any of these folks.  They didn't show any other

15    photographs or any of the other nine or ten people

16    involved or fifteen people involved.  Milton Jones was

17    the only photograph they showed, and they picked him

18    out based upon he was the guy that was outside looking

19    at his truck.  His name was all over his equipment,

20    Judge.

21         This whole prosecution is based upon these

22    two low-lifes.  There is nothing else.  No evidence was

23    presented that our client made any admission that he

24    was guilty, that he took part in this, that he did

1    anything.

2         The only evidence you've got before you are

3    from these two witnesses, and even in the light most

4    favorable to the State, this is a classic case of a

5    directed verdict, your Honor.

6         I can't think of any other case that would

7    come closer, as close as this, even with two eyeballs,

8    but they are both addicts then and even now probably.

9         You saw Mr. Jones's demeanor on the stand

10   yesterday.  He was a completely incompetent witness,

11   and you heard Lolita Sierra lie about facts that we all

12   knew weren't true in court.

13        So we are asking for a directed finding or

14   directed verdict.

15        THE COURT:  State?

16        MR. BREEN:  I did want to add one other point to

17   our stats, even if witnesses are to be believed, at

18   this point, the burden being what it is, then they have

19   testified to kidnapping, but each of their testimony

20   ends off with Patrick Banks still alive, Patrick Banks

21   going to a different location than where they are, they

22   are taken away, and no other testimony as to what may

23   have happened in whatever intervening time there was.

24        MR. PRUSAK:  There is no -- there is not a single

1       Q.   All right.  Now after -- on this day after

2  your car had been broken into, were you still driving

3  around in that car?

4       A.   Yeah.

5       Q.   Okay.  So it was still drivable?

6       A.   Yes, it was.

7       Q.   And you said that the police officers pulled

8  you over?

9       A.   Yes, they did.

10      Q.   All right.

11      A.   They should have it on record, shouldn't

12  they?

13      Q.   No, we don't.

14            What did they tell you when they pulled you

15  over?

16      A.   He pulled me out the car and had me put my

17  hands on the back of the glass on the back of the car

18  and asked me did I know about somebody breaking into a

19  house or something, a burglary, or whatever.

20      Q.   And they didn't even know your name, did

21  they?

22      A.   No, he ran my plates and knew my name.

23            He said, "Somebody pointed out this white

24  truck."  That's why he pulled me over.

1          Q.    And you are saying they just let you go?

2          A.    No, he took me to 72nd and Constance which

3    was right down the street, and it was two people

4    standing there on the corner on the sidewalk, and he

5    got out and talked to them, and they walked up to the

6    car; and once they had left -- I mean, once he got back

7    in the car, he drove me back to my vehicle and then --

8          Q.    Could you tell us what did this police

9    officer look like?

10          A.    It's a black male.

11          Q.    What else?

12          A.    I don't know.

13          Q.    You don't know anything about this guy who

14    stopped you and was questioning you?

15          A.    No.   No.

16          Q.    What did these other people look like that

17    were standing on this corner?

18          A.    It was a male and a female.

19          Q.    What did they look like?

20          A.    I don't know.

21          Q.    Because it didn't happen, right?   That's why

22    you don't know what they look because it didn't happen?

23          MR. BREEN:   Objection, Judge.

24          THE WITNESS:   A.   Well, wouldn't the --

1          MR. HEIL:  Yes, your Honor.

2          THE COURT:  You may proceed.

3              OPENING ARGUMENT BY MR. HEIL:

4          Ladies and gentlemen, I am going to ask you

5  to take a minute and picture something in your mind.

6  Picture in your mind your own home; where you live

7  with your family and your friends.  Now think of your

8  worse nightmare.  A violent intruder breaks down the

9  door of your home.  He forces his way into your home,

10  armed with a handgun; giving orders; giving orders to

11  nine or ten other intruders.  Nine -- giving orders to

12  nine or ten other intruders, ordering them to get you.

13          MR. BREEN:  Judge, I object to the

14  personalization of this argument.

15          THE COURT:  Overruled.

16          MR. HEIL:  Ordering them to get you and your

17  loved ones.  You play try to run or hide, but this

18  person, this leader who comes in ordering people

19  around, grabs you; pulls you back; puts ropes around

20  your neck.  And -- or otherwise forces you out of your

21  own home against your will.  And he forces you to be

22  taken to another place against your will.  And the

23  place he takes you to is an unknown, unfamiliar

24  building where you are forced inside to a hallway.

1   And inside there, there are more ruffians inside

2   waiting for you to confront you.  To threaten you.

3   And by the orders of this boss man, the leader of the

4   pack, you are beaten; or one of your loved ones is

5   beaten, beaten to death.

6        Now, ladies and gentlemen, that is what

7   happened in this case before you today.  That is what

8   happened to the true victims in this case today; not

9   someone who got their car broken into.  The victims in

10  this case, MC Jones, Lolita Sierra, and

11  Patrick Banks.  And because of that, Patrick Banks is

12  dead.  He was murdered.

13        And, ladies and gentlemen, it is this man,

14  right here (indicating) who did it.  It is this man,

15  the defendant, Milton L. Jones who made that happen.

16  It is this man here, Milton L. Jones who felt he was

17  wronged, and wanted revenge.  It is the defendant who

18  made a plan.  It is the defendant, Milton Jones, who

19  went and got other people to help him execute that

20  plan, the muscle.  And when he did that, he executed

21  Peter -- I am sorry -- Patrick Banks.

22        Now I want you to ask yourself another

23  question.  If you were, for lack of a better word,

24  fortunate enough to have been one of the people who

1    lived through such a horrendous experience, are you

2    ever going to forget the face of the person who did

3    that to you?  The answer is, no.  You are not.  And

4    that is what you heard in this case from this witness

5    stand, ladies and gentlemen.

6         MC Jones told you, and Lolita Sierra told you

7    they lived through this experience, and they never

8    forgot the face of the person who put them through it.

9    It was Milton L. Jones, the defendant in this case.

10        Now you, the jury, today, and you are sworn

11   to uphold your duties as a jury.  And we are going to

12   ask you to consider the evidence you have heard in

13   light of all of your own personal experiences; in

14   light of your life experiences.

15        In other words, to use your common sense.

16   Use your individual common sense; and use your

17   collective common sense.  This is not a who-done-it.

18   There is the person that did it, right here

19   Milton L. Jones.  Two people lived through this

20   nightmare, and they told you who did it.

21        Ladies and gentlemen, you heard the evidence

22   in the case.  You are the jury.  You heard the facts.

23   And it is going to be your job as the jury to apply

24   those facts to the law as Judge Bowie will instruct

## STATEMENT OF FACTS

My name is Milton Jones #R29598 I have been a Disc-Jockey for over 14 years I would work events all over the country but mostly in Chicago. In 1998 I moved to Cedar Rapids Iowa with my wife and five children. On June 24 1999 Me and a friend Ricky Chambers that lives in Iowa, we went on a Business trip to Lombard to pick up some Hot-Mix tapes and CD's "Sox Park Mob 19" so me and my Business Partner who lives in chicago name Deeon Boyd can sell them to the Record Stores. Disc-Jockey names is "DJ Milton" and "DJ Deeon" I intended to pick up and distribute the newest Recorded Release, however, due to an unexpected delay in Production, Me and Ricky had to spend the night over my sister who lives at 72nd and Constance street in Chicago. On June 25, 1999 I awoke to find that the passenger side window to my 1996 white 2 door blazer had been broken and all the Hot-Mix tapes and CD's had been stolen. I contacted Deeon because me and Deeon owned the Hot-Mix tapes and CD's that was stolen. Deeon came over to 72nd and Constance in his 1993 white 4 door suburban with black trim and tinted windows with 9 others guys. Allen Shanklin took a rope and tied one end around Lolita's neck and the other end around M.C. Jones neck, and place them in the back seat of Deeon white 4 door Suburban. Deeon was the driver and Allen was in the passenger seat, and the other guys took Patrick Banks and put him in a blue 4 door car where he was taking to 35th and state where he was beaten to death. I met up with Deeon at 37th and federal street in Chicago. Deeon introduced me to M.C. Jones

1

and indicated that M.C. would lead me to the stolen Mix tapes and
CD's, M.C. told me that an individual name "Black Ant" had the
Mix tapes, me and M.C. went to "black ant" apartment and spoke
to an unknown person who indicated that "black ant" was at a
nearby liquor store. M.C. willingly accompanied me to the liquor
store and searched for "black ant" but we did not find him. As we
left the liquor store "black ant" and others were seen leaving an
apartment behind the liquor store. I spoke to "black ant" briefly
and agreed to pay him approximately $150.00 for the return of the
Mix tapes. Patrick Banks broke the window of my vehicle and with
help from his friend Leo Johnson, Carried the Hot-Mix tapes to
M.C. Jones apartment. M.C. Jones is not related to me Milton jone
s Banks found a purchaser for the MIx-tapes "black ant" the Mix-
tapes was sold and taken out of the back door of M.C. Jones
apartment. Banks returned with six bags of crack cocaine he
received in exchange for the Hot-Mix tapes. Lolita stated that
she, M.C. Jones, Johnson, and another individual name Joyce
smoked the crack cocaine in M.C. Jones apartment. Both M.C. and
Lolita testified in court to using drugs and that their drug use
may have affected their ability to remember certain aspects of
the incident. As I was going to pickup the Hot-Mix tapes from
"black ant" I was stopped by a police officer who was investigat-
ing a residential break-in the police officer ran my license
plates and took me to 72nd and Constance street near my sister's
apartment. Two witnesses were waiting on the curb on 72nd street

2

when the officer arrived with me and viewed me through the window of the police car, the witnesses indicated that I was not the perpetrator. I was allowed to leave. On February 27, 2004 following a jury trial in the circuit court of cook county, I was convicted of three counts of first degree Murder and two counts of aggravated kidnapping, the trial court sentence me to 25 years imprisonment on the murder convictions (to run concurrently with each other) and to six years imprisonment on each of the Aggravated Kidnapping conviction (to run consecutively with each other, but consecutively to the 25 year sentence on the murder convictions).

UNITED STATES OF AMERICA
STATE OF ILLINOIS

### A F F I D A V I T
### OF
### MILTON L. JONES

I, MILTON L. JONES, AFTER FIRST BEING DULY SWORN UPON HIS OATH
DO STATE AS FOLLOW:

1.  I Milton Jones was not able to control what had happin on the
day on June 25, 1999.

2.  I had to inform my business Partner, Deeon Boyd about the
SOX PARK MOB 19 Hot-mix Tapes that was stoling out of my 1996
white 2 door Blazer.

3.  I Milton Jones witness ALLEN SHANKLIN put victims LOLITA
SIERRA, and M.C. JONES in the back seat of Deeon Boyd white 4 door
suberban while held with a rope. ALLEN SHANKLIN than got into the
front seat of Deeon Boyd truck. Deeon Boyd was the driver of his
white 4 door suberban on June 25,1999.

4.  FRom the beginning, I told my Retained Attorney Assistant
what had happin and who did what. Doing trial my Attorney told me
to take the stand and I agreed, Doing trial my Attorney did not
bring out the truth and use the Evidence that I gave to his
Assistant.

5.  When it was time for me to take the stand, and not knowing
what the state was to bring forth, Because I never had access to
review the Evidence against me, I look up and seen that my family
was in danger, Because of people that had Knowledge of the crime
was in the court at the time that I took the stand.

6.  If my Retained Attorney would have Brought out the Evidence
in trial, the truth, I think I wouldn't been so Afraid to tell the
hold truth of what Happin, and who did what.

7.  Before trial, I requested that my family move to another
location, and they did so. I believed that my retained Attorney
was going to use the evidence that I presented to him in 2002.
That was the only short time I was able to Communicate with my
Attorney assistant. I never met with my Retained Attorney Raymond
L. Prusak.

8.  Doing Sentencing, I told the victims family that I will bring
this case to justice. From that day on I have been investigating
this case.

### MOTIVE OF THE MURDER OF PATRICK BANKS

1.  **Me and my business partner Deeon Boyd items have been stoling
out of my truck.** SOX PARK MOB 19 Hot-mix Tapes was taking out of
my truck on June 25,1999.

2.  Deeon Boyd had full control of what had happin that day, and
Brought Beer as a payment for the crime that was committed.

UNITED STATES OF AMERICA

STATE OF ILLINOIS

# A F F I D A V I T
## ( CONT'D)

3.  In June 1999 SOX PARK MOB 19 Original Dat tape was Mailed
next day Express From Deeon Boyd, on east 47th street, to (me)
Milton Jones 317 16th Street n.e. Cedar Rapids IOWA, By the
U.S. Post Office, So that SOX PARK MOB 19 can be Edit and sent to
Jordan Milevski at A.V.T. 704 Oak Creek DR. Lombard,Ill. 60148
to be copy and pick up.

4.  I Milton Jones have been over medicated in the cook county
Jail, and have been beaten very bad by officers. Now that I'm in
prison my medication has been adjusted, and I have been working
on and Investigating this case every day getting Evidence up with
the help of my family and access to the Law library. Now I'm
looking for a lesser charge or time severed with bringing this
case to justice.

I MILTON JONES, So aver and declare that the foregoing is true
and correct in both substance and fact and to the best of this
Affiant's knowledge and Experiences. Affiant has not been
threatened for the making of this statement,Such being of his own
volition, as is here Evidenced by this Affiant's true and correct
signature as is hereby affixed hereto under the penalty of
perjury, pursuant to 28. U.S.C 1746.

---

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of
perjury, that everything contained herein is true and accurate to the best of my knowledge
and belief. I do declare and affirm that the matter at hand is not taken either frivolously or
maliciously and that I believe the foregoing matter is taken in good faith.

Signed on this _22_ day of _ JAN, ___, 200_ 7_.

UNITED STATES OF AMERICA
STATE OF ILLINOIS

## E X H I B I T S
## OF OTHER PEOPLE INVOLVE IN CASE NO. 01CR1865401

I **MILTON JONES,** after first being duly sworn upon his oath do
state as follows:

**EXHIBIT NO. #1** : The one with the x over his head is **ALLEN**
**SHANKLIN.** Allen is the one that put the rope around **M.C. JONES,**
**AND LOLITA SIERRA** Neck, and place then in **DEEON** White 4 door
suburban on june 25,1999. where Allen then got in the front seat
of the white suburban.

**EXHIBIT NO. #1:**



I, **MILTON JONES,** so aver and declare that the foregoing is true
and correct in both substance and fact and to the best of my
knowledge and experiences.

Dated: 10/11 ,2004                        BY:/S/ _Milton Jones_

UNITED STATES OF AMERICA
STATE OF ILLINOIS

# E X H I B I T S
## OF OTHER PEOPLE INVOLVED IN CASE NO. 01CR1865401

I, <u>MILTON JONES</u>, after being duly sworn upon his oath do state as follow:

**EXHIBIT NO.#2:** The one with the x above his head is Deeon Boyd, (Dj Deeon) Deeon made all the orders,and was the driver of his white 4 door suburban on June 25,1999. that kidnaped **M.C. JONES AND LOLITA SIERRA**. Other Information on Deeon, **SSN: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** address: 2128 w. 72pl. chicago ill. **PHONE:773-434-4364** Deeon has loss over 200 pounds over the last three years,and he may be armed with his register firearm, that he used doing the crime of kidnaping on June 25,1999.

**EXHIBIT NO.#2**



I, <u>MILTON JONES</u>, so aver and declare that the foregoing is true and correct in both substance and fact and to the best of my knowledge and experiences.

Dated 10/11       2004.                    BY:/s/ *Milton Jones*

STATE OF ILLINOIS

## E X H I B I T S
### OF OTHER PEOPLE INVOLVED IN CASE NO. 01CR1865401

I,<u>MILTON JONES</u>, after being duly sworn upon his oath do state
as follow:

**EXHIBIT NO.#3:**

Is Ricky chambers he was living in Cedar Rapids IOWA, at
the time defendant(Milton Jones) was living in IOWA, the two
was going on a business trip on June 24,25,1999. Ricky also
was present in Deeon white 4 door suburban at the time of the
kidnaping of M.C.JONES AND LOLITA SIERRA. Ricky has knowledge of
who all was present in Deeon truck on June 25,1999.

**EXHIBIT NO.#3**



I,<u>MILTON JONES</u>, so aver and declare that the foregoing is true
and correct in both substance and fact and to the best of my
knowledge and experiences.

Dated___10/11_____2004                    BY:/S/ Milton Jones

UNITED STATES OF AMERICA
STATE OF ILLINOIS

## E X H I B I T S

### OF OTHER PEOPLE INVOLVED IN CASE NO. 01CR1865401

I, <u>MILTON JONES</u>, after being duly sworn upon his oath do state
as follow:

**EXHIBIT NO. #4**

    The one with the glasses on his name is Draino D. he is the
one that was involved in the kidnaping of **Patrick Banks**, draino
also was the driver of the blue car that kidnaped, and murder,
**PATRICK BANKS**, Draino has knowledge of every person that was in
his car on June 25,1999. Standing next to him is Kenneth King
that was driving the other blue car.

**EXHIBIT NO. #4**



I, <u>MILTON JONES</u>, so aver and declare that the foregoing is true
and correct in both substance and fact and to the best of my
knowledge and experiences.

Dated <u>10/11</u>  2004                    BY: /s/ _Milton Jones_