$\mu \mu b$

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | JUN 2 7 2008 **TC** |
| MILTON JONES, | ) | 6-27-2008 |
| | ) | **MICHAEL W. DOBBINS** |
| Petitioner, | ) | **CLERK, U.S. DISTRICT COURT** |
| | ) | |
| v. | ) | No. 08 C 2057 |
| | ) | |
| TERRY McCANN, | ) | The Honorable |
| | ) | Elaine E. Bucklo, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE DISTRICT COURT

Pursuant to 28 U.S.C. §2254, Rule 5 following, the below-named exhibits to

respondent's Answer to the Petition for Writ of Habeas Corpus are filed under separate

cover in this case:

Exhibit A:   Petitioner's pro se post-trial motion, *People v. Jones*, No. 01
CR 18654-01;

Exhibit B:   Petitioner's brief on direct appeal, *People v.
Jones*, No. 1-04-1359;

Exhibit C:   State's brief on direct appeal, *People v. Jones*,
No. 1-04-1359;

Exhibit D:   Petitioner's reply brief on direct appeal, *People v.
Jones*, No. 1-04-1359;

Exhibit E:   Ruling of the Illinois Appellate Court in petitioner's direct appeal,
*People v. Jones*, No. 1-04-1359, filed 6/9/06 (unpublished order
under Illinois Supreme Court Rule 23);

1

Exhibit F:    Petitioner's PLA on direct appeal, *People v. Jones*, No. 103294;

Exhibit G:    Order of the Illinois Supreme Court denying petitioner's PLA on direct appeal, *People v. Jones*, No. 103294, filed 11/29/06;

Exhibit H:    Petitioner's postconviction petition, *People v. Jones*, No. 01 CR 18654-01;

Exhibit I:    Order dismissing petitioner's postconviction petition, *People v. Jones*, No. 01 CR 18654-01;

Exhibit J:    Docket order denying petitioner's late notice of appeal, *People v. Jones*, No. 01 CR 18654-01; and

Exhibit K:    Cook County Docket Sheet in *People v. Jones*, No. 01 CR 18654-01

June 27, 2008                    Respectfully submitted,

                               LISA MADIGAN
                               Attorney General of Illinois

                         By:   S/JAY PAUL HOFFMANN
                               JAY PAUL HOFFMANN, Bar # 6203142
                               100 West Randolph Street, 12th Floor
                               Chicago, Illinois 60601-3218
                               PHONE: (312) 814-3421
                               FAX: (312) 814-5166
                               E-MAIL: jhoffmann@atg.state.il.us

2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT - CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )

PLAINTIFF )

- V - )  CASE NO. I 01 CR 18654

MILTON L. JONES )

DEFENDANT )  HONORABLE Presiding Judge

Presten L. Bowie Room 203

ENTERED

TIME ___ AM PM

Judge ___

Dorothy Brown
Clerk of the Circuit Court
Criminal Division

## MOTION FOR POST - TRIAL RELIEF

Now comes the defendant MILTON L. JONES, PRO SE, After A finding of Guilty AND Before Sentence AND Respectfully moves This honorable Court to Set Aside The Verdic of Guilty IN The Above Entitled Cause of Action AND GRANT him A New Trial, It's Being Expressly understood That defendant is No longer Represented By Counsel's of Record, Raymond L PRUSAK, for The Reasons Listed INFRA AND Defendant PRO SE has Not Been furnished with An official Transcript of The Trial AND makes his motion without Prejudice to or waiving The Later Discovery of ERROR IN The Record

IN SUPPORT WHERE, DEFENDANT STATES AS Follows:

1. Defendant Alleges INEFFECTIVE ASSISTANCE of Counsel's;

2. Counsel's failure to Investigate The case do to INFORMATION missing from The Discovery doing Trial which Surprised me AND MY LAWYER;

3. The defendant was Denied equal Protection of The Law do to Counsel's failure To Retain AN Investigator to Interview witnesses or other Statements IN The Police Reports;

4. Counsel's failure to visit with defendant to Prepare him for Trial, Defendant only has Access to Attorney IN front of The Judge;

5. Counsel's failure to give ANY meaningful Consultation during The Two(2) Years He Represented defendant IN The Above entitled Cause of Actions;

EXHIBIT A

C-172

5. (B) Counsel's never showed this defendant any discovery or went over any discovery at any time in the period of representation or prior to trial.

(C) Counsel's failure to visit with defendant after trial to investigate and present character witnesses for sentencing and to inform defendant that he had no grounds for a new trial;

6. Counsel's failure to keep defendant informed of the current status and scheduled matters about the case or inform family about cas. Supreme court of Illinois Rules of Professional Conduct Article v

A.) Rule. 1.4 (communication) a lawyer shall keep a client reasonabl informed about the status of a matter and promptly comply with reasonable requests for information.

B.) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation

7. Counsel's failure to prepare and file pretrial motions even though he was asked to do so by defendant and the filing was in order as the defendant's constitution rights were violated under the 4th, 5th, 6th, and 14th amendment to the constitution of the united states and the applicable articles and sections of the ILL constitutions.

8. Counsel's failure to investigate or interview any witnesses for the defense or the statements from the witnesses set forth in the case supplementary reports for the prosecution;

9. The state failed to prove defendant guilty of the charges beyond a reasonable doubt and to prove material allegation of the indict -ment beyond a reasonable doubt;

C-173

10) Counsel failed to return phone calls from material witnesses for the defense

11) Counsel failed to visit defendant to prepare him for trial to discuss a defense strategy or to prepare him to take the stand in his own behalf. Defendant was left at a serious disadvantage during trial as he knew nothing of what the state was to bring forth nor had any idea of any of the information to be used against him or any of the poaaible statements to be u sed against h im.

12) Counsel failed to subpoena and/or contact other people involved in the case to appear in court at any time or at trial.

13) Counsel failed to use evidence and information that was given by defendant to be used in motions and or a  trial.

14) Counsel failed to investigate facts and circumstances surrounding the charges; or the pro's and con's of a plea agreement or going to trial.

15) Counsel failed to keep the defendant's family informed about the case.


Wherefore defendant prays that the honorable court will grant him a new trial for the aforementioned facts and allegations of ineffective asssistnace of counsel, and asks that the court appoint this defendant legal representation from the Public Defender's Murder Task Force Division.


Respectfully  submitted

*Milton Jones*

Milton L. Jones  #20010051213
Div. 11-AC - C.C.D.O.C
P. O. Box 089002
Chicago, IL  60608

Signed and ~~sworn~~ Affirmed To Before me
this 12th day of April, 2004

*Carmella K. Richardson*

"OFFICIAL SEAL"
CARMELLA K. RICHARDSON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/21/2006

C-174

Information That Counsel's failure to use Doing Trial That Would have Produced A Different Result At Trial.

| Witnesses | Evidence | Information | Relevant |
|---|---|---|---|
| Deeon Boyd<br><br>Counsel's failure To Subpoena | Pictures of Him AND Pictures of The Truck That was Used to Kidnap the Victims | 2128 W. 72PL Phone:(773-434-4364) SSN: 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<br><br>Also firearm Registered To Deeon Boyd HERE In Chicago Ill. | Deeon Boyd was The Driver of The white Truc ON June 25. 1999 AND have J Knowledge of who was In The Truck with Him. |
| Allan Shanklin<br><br>Counsel's failure To Subpoena | (1) One Picture of Him That was Not used In Trial | That HE's on Probation AND HE Lives on The Streets | Allan was The One Tha Put The Rope Around Lolita AND M.C. Jones AND Place Them In The Trac Allan Also was Present In The Passeger Seat of The Truck. |
| Draino (No Full Name) | (1) One Picture of Him That was Not used In Trial | No Information | Driver of The CAR That Patrick Banks was Kidnap In. |
| Malinda Latham AND (3) More Witnesses | She was At THE Location were The Victim was Beaten | 6444 So king Dr. Apt 46 Counsel's failure to call Malinda Back. | Proof That Defendant was Not Present Doing The Beatin of Patrick Banks |
| Ketrena Jones | Defendant's sister | 457 Green Bay Ave Calument City | Ketrena was Living At The Buildins were The Kidnaping Took Place |

Doing Trial Both Victim Stated The Defendant milton L. Jones was Present In Deeon Truck on June 25.1999 with This Evidence It will Show The Truth That I was Not Present In That Truck AND will Prove my Innocents In Case No. I01CR18654

Respectfully Submitted
Milton Jones

C-175

# ATTORNEY REGISTRATION AND DISCIPLINARY COMMISSION



ONE PRUDENTIAL PLAZA
130 EAST RANDOLPH DRIVE, SUITE 1500
CHICAGO, ILLINOIS 60601-6219
(312) 565-2600

## REQUEST FOR INVESTIGATION
## OF A LAWYER

1. Person Making Request: __MILTON L. JONES #2001-005-1215__

Street __COOK COUNTY JAIL - P.O.BOX 089002 - DIV-11-AA__ Apt. __L-9__

City __CHICAGO__ State __Ill__ Zip __60608__

Home Phone __( - ) DNA -__ Business Phone __( ) - DNA -__

2. Name of Lawyer: __RAYMOND L. PRUSAK + JOSEPH GREEN__

Street __1021 WEST ADAMS SUITE 102__ City __CHICAGO__

State __ILLINOIS__ Zip __60607__ Phone __(312) 226-0540__

3. Did/does the lawyer represent you? ☒ Yes ☐ No
   If yes, when was the lawyer hired? __JANUARY 2002__

4. Did you pay a fee? ☒ Yes ☐ No   If yes, how much? __$10,000.00__

5. Is there a related court case? ☐ Yes ☐ No
   If yes, what is the name of the case, the case number and the location of the court?

   _____

   _____

Please describe what the lawyer did or failed to do that you believe may have been improper. Include information such as dates, times, places, names and telephone numbers of witnesses and names and telephone numbers of other persons involved. Attach copies of any papers that support your charge such as fee agreements, letters, receipts and court papers.

ATTORNEY'S RAYMOND L. PRUSAK + JOSEPH GREEN WERE PAID TO REPRESENT

ME IN CASE no. 1010018654 I was Charged with first degree murder and

aggravated Kidnapping. In January of 2002 I retained the services

of the Aforementioned Attorney's. I had one or two visits from my Attorneys

from the day I retained them to my trial date of 2-3-04 thru 2-7-04

The ATTORNEYS never did any type of investigation never went over the

(over) __C-171.0__

case discovery with me, he filed no pretrial motions nor discussed a
reason why. Counsel returned no phone calls made by me or my family.
Counsel never showed or gave me any discovery. Counsel did not interview or
or send a investigator to interview any witnesses. counsel did no investagation of
this case at all. Counsel faild to use any information I gave him at trial to prove
my innocents. Counsel failed to keep defendant apprised or informed of the
current status and scheduled matters about his case. Counsler failed to
subpeona and contact witnesses and other persons involved in the case.
Counsel failed to keep defendants family informed about case. Counsel failed to
disscussie possible defence strategies with client or the facts surrounding his
charges. Counsel never talked to defendant prior to trial and did not prepare
defendant to take the stand. Counsel faild to use evidence in trial that
was given by defendant. Counsel faild to visit defendant after trial. Defendant
was found guilty on all charges! Attorney Prusak did absolutly nothing during
my trial or prior to my trial having him for counsel was like having no counsel
at all. He has violated my right to counsel and the oath he has sowen to
he is a disspace to his preffesion. This man has asked me nothing has done
nothing but took my hard earned money and provide me no services. I intend
to file a legal malpractice suite in civil court as soon as time allows and after
I recieve a responce from your orginazation!

APRIL 15, 2004          _Milton Green_
_____          _____
     Date                  Signature

C-177

STATE OF ILLINOIS)
COUNTY OF COOK    ) SS

* Judge Bowie copy

# IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS

## COUNTY DEPARTMENT — CRIMINAL DIVISION

People of the state of Illinois
                    Plaintiffs

                              CASE NO. 101CR18654

   - V S -

                              Honorable: Preston L. Bowie

Milton L. Jones
            Defendant

# NOTICE OF FILING

Please take notice that Defendant Milton L. Jones Pro-se found cause to File his motion Attached intitle'r'd Motion For Post-Trial Relief by Placing it in the mail At Cook county Jail with Adequate Postage Per Jail regulations and Prays that the Honorable court of Judge Preston L Bowie hears and grants his motion For Relief on his next schudoled court or the Honorable court rites him to court Prior to sentoncing to hear And Argue his motion. ONE CD COPY for the Hon Judge Preston L. Bowie RM 203. ONE copy to the states ATTORNEY For case 101CR18654 And one copy to be returned to defendant stamped filed At Address listed sures

**FILED**
203
TIME _____ AM
                 PM
APR 2 ? 2009
Dorothy Brown
Clerk of the Circuit Court
Criminal Division
Deputy Clerk Signature

ON the 15th day of APRIL
            DATED

RESPECTFULLY Submitted
Milton Jones

MILTON L. JONES # 2001-005-1213
DIV-11-AC- C.C.D.O.C.
P.O. Box 089002
CHGO IL 60608

C-178

No. 1-04-1359

FILED APPELLATE COURT
1ST DIST.

2005 MAR 30 AM 10: 22

STEVEN M. RAVID
CLERK OF COURT

**IN THE**

**APPELLATE COURT OF ILLINOIS**

**FIRST DISTRICT**

---

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 01 CR 18654 (01). |
| | ) | |
| MILTON JONES, | ) | Honorable |
| | ) | Preston L. Bowie, |
| Defendant-Appellant. | ) | Judge Presiding. |

---

**BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

---

MICHAEL J. PELLETIER
Deputy Defender

STEPHEN L. GENTRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

**ORAL ARGUMENT REQUESTED**

EXHIBIT B

## POINTS AND AUTHORITIES                    Page

I.    MILTON JONES WAS DENIED A FAIR TRIAL (A) WHEN THE PROSECUTOR
ATTEMPTED TO IMPEACH HIS TESTIMONY WITH PERSONAL OPINION
AND ALLEGED FACTS NOT PROPERLY IN EVIDENCE, AND (B) WHEN THE
PROSECUTOR ASKED THE JURORS TO PUT THEMSELVES IN THE
VICTIMS' POSITION AND IMAGINE THEIR "WORST
NIGHTMARE." ............................................................ 13

U.S. Const. Amends. VI, XIV ............................................ 13

*People v. Weathers*, 62 Ill. 2d 114, 338 N.E.2d 880 (1975) .................... 13

*People v. Lyles*, 106 Ill. 2d 373, 478 N.E.2d 291 (1985) ...................... 13

*People v. Clark*, 114 Ill. App. 3d 252, 448 N.E.2d 926 (1st Dist. 1983) ............ 13

*People v. Saunders*, 288 Ill. App. 3d 523, 680 N.E.2d 790 (4th Dist. 1997) ......... 13

*People v. Turner*, 128 Ill. 2d 540 (1989) ................................... 14

*People v. Rogers*, 172 Ill. App. 3d 471 (2nd Dist. 1988) ....................... 14

*People v. Caballero*, 126 Ill. 2d 248, 533 N.E.2d 1089 (1989) .................. 14

*People v. Smith*, 141 Ill. 2d 40, 565 N.E.2d 900 (1990) ....................... 14

*People v. Tiller*, 94 Ill. 2d 303, 447 N.E.2d 174 (1982) ....................... 14

*People v. Ford*, 83 Ill. App. 3d 57, 403 N.E.2d 512 (3rd Dist. 1980) .............. 14

*People v. Bernette*, 30 Ill. 2d 359, 197 N.E.2d 346 (1964) ..................... 16

*People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000) ........................ 16

*People v. Spreitzer*, 123 Ill. 2d 1, 525 N.E.2d 30 (1988) ....................... 16

S. Ct. Rule 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Nelson*, 193 Ill. 2d 216, 737 N.E.2d 632 (2000) . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Scaggs*, 111 Ill. App. 3d 633, 444 N.E.2d 674 (1st. Dist. 1982) . . . . . . . . . 17

*People v. Sanders*, 168 Ill. App. 3d 295, 522 N.E.2d 715 (1st. Dist. 1988) . . . . . . . . . 17

*People v. Roach*, 213 Ill. App. 3d 119, 571 N.E.2d 515 (3rd Dist. 1991) . . . . . . . . 17, 18

*People v. Thomas*, 37 Ill. App. 3d 320, 346 N.E.2d 190 (3rd Dist. 1976) . . . . . . . . . . . 19

*People v. Monroe*, 32 Ill. App. 3d 482, 335 N.E.2d 783 (3rd Dist. 1975),
*aff'd* 66 Ill.2d 317, 362 N.E.2d 295 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Moore*, 279 Ill. App. 3d 152, 663 N.E.2d 490 (5th Dist. 1996) . . . . . . . . . . 19

II.  **THE TRIAL COURT ERRED WHEN IT DID NOT APPOINT NEW COUNSEL
TO REPRESENT MILTON JONES ON HIS POST-TRIAL MOTION AFTER
MR. JONES ALLEGED A COLORABLE CLAIM OF HIS TRIAL COUNSEL'S
INEFFECTIVENESS AND NEGLECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20**

*People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998) . . . . . . . . . . . . . . . . . . . . 20

*In re D.G.*, 144 Ill. 2d 404, 581 N.E.2d 648 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Johnson*, 159 Ill. 2d 97, 636 N.E.2d 485 (1994) . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984) . . . . . . . . . . . . . . . . . . . . 22

*People v. Sanchez*, 329 Ill. App. 3d 59, 786 N.E.2d 99 (1st Dist. 2002) . . . . . . . . . 22, 24

*People v. Moore*, 207 Ill. 2d 68, 797 N.E.2d 631 (2003) . . . . . . . . . . . . . . . . . . . . . . . 22

*People v. Nitz*, 143 Ill. 2d 179, 705 N.E.2d 895 (1991) . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v. Parsons*, 222 Ill. App. 3d 823, 584 N.E.2d 442 (1st Dist. 1991) . . . . . . . . . 22

*People v. Brandon*, 157 Ill. App. 3d 835, 510 N.E.2d 1005 (1st Dist. 1987) . . . . . 22, 24

*Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v. Corder*, 103 Ill. App. 3d 434, 431 N.E.2d 701 (1982) . . . . . . . . . . . . . . . . 22

*People v. Jarnagan*, 154 Ill. App. 3d 187, 506 N.E.2d 715 (1987) . . . . . . . . . . . . . . . 23

*People v. Finley*, 222 Ill. App. 3d 571, 584 N.E.2d 276 (1st Dist. 1991) . . . . . . . . . . 24

*People v. Robinson*, 157 Ill. 2d 68, 623 N.E.2d 352 (1993) . . . . . . . . . . . . . . . . . . . . 24

III.　THE TRIAL COURT ERRED BY FAILING TO CONDUCT A FITNESS

　　　HEARING AFTER MILTON JONES RAISED A *BONA FIDE* DOUBT OF HIS

　　　FITNESS WHEN HE REVEALED THAT HE WAS NOT TAKING HIS

　　　PRESCRIBED MEDICATIONS, WHICH WERE NECESSARY TO HIS

　　　FITNESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

　　　*In re D.G.*, 144 Ill. 2d 404, 581 N.E.2d 648 (1991)　26

　　　*People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063 (1998) . . . . . . . . . . . . . . . . . . . 26

　　　*West v. Adelmann*, 260 Ill. App. 3d 455, 630 N.E.2d 846 (1st Dist. 1993) . . . . . . . . . 26

　　　*Pate v. Robinson*, 383 U.S. 162 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

　　　*Medina v. California*, 505 U.S. 437 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

　　　U.S. Const., amends. VI, XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

　　　*Drope v. Missouri*, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

　　　725 ILCS 5/104-10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

　　　725 ILCS 5/104-11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

　　　*People v. Jones*, 349 Ill. App. 3d 255, 812 N.E.2d 32 (3rd Dist. 2004) . . . . . . . . . . . 28

## NATURE OF THE CASE

Milton Jones was convicted of 3 counts of first degree murder and 2 counts of aggravated kidnaping after a jury trial and was sentenced to 3 concurrent terms of 25 years consecutive to 2 concurrent terms of 6 years in prison.

This is a direct appeal from the judgment of the court below. No issue is raised challenging the charging instrument.

## ISSUES PRESENTED FOR REVIEW

1.    Whether Milton Jones was denied a fair trial (A) when the prosecutor attempted to impeach his testimony with personal opinion and alleged facts not in evidence, and (B) when the prosecutor asked the jurors to put themselves in the victim's position and imagine their "worst nightmare."

2.    Whether the trial court erred when it did not appoint new counsel to represent Mr. Jones on his post-trial motion after Mr. Jones alleged a colorable claim of his trial counsel's ineffectiveness and neglect.

3.    Whether the trial court erred by failing to conduct a fitness hearing after Milton Jones raised a *bona fide* doubt of his fitness when he revealed that he was not taking his prescribed medications, which were necessary to his fitness.

## JURISDICTION

Milton Jones appeals from a final judgment of conviction in a criminal case: He was sentenced on April 21, 2004. (C. 170) Notice of appeal was timely filed on April 21, 2004. (C. 182) Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rules 603 and 606.

## STATEMENT OF FACTS

Milton Jones was charged with the first degree murder of Patrick Banks and the aggravated kidnaping of Patrick Banks, Lolita Sierra, and M.C. Jones, based on events that occurred on June 25, 1999. (C. 18-33) After a jury trial, Milton Jones was found guilty of first degree murder of Patrick Banks and aggravated kidnaping of Lolita Sierra and M.C. Jones, and he was sentenced to consecutive terms of 25 years, 6 years, and 6 years, respectively. (C. 170)

After being notified on June 28, 2001, that he was being sought by police, Milton Jones turned himself in on June 29, 2001. (R. 40, C. 10) On September 20, 2001, the court was informed that Milton Jones had attempted to hang himself, and the court ordered that he be evaluated. (R. 47) Forensic Clinical Services' report of November 20, 2001, prepared by Staff Psychiatrist Philip Pan, M.D., stated that Mr. Jones was fit for trial with medication. (C. 72)

At trial, the State relied on the eyewitness identification testimony of Lolita Sierra and M.C. Jones. The State first presented the testimony of Roberta Banks, who testified that she was the decedent Patrick Banks' mother, and that Patrick Banks was not living with her at the time of his death. (R. 332-335) Rather, he was moving around at that time. (R. 335)

Lolita Sierra testified that, in June 1999, she was Patrick Banks' fiancé. (R. 339) Sierra testified that, in June of 1999, she and Patrick Banks were living in an apartment above that of his mother, who Patrick Banks saw every day. (R. 371, 401) Sierra and Patrick Banks spent the couple of days prior to the incident in a hotel Sierra described as a "pit," smoking crack cocaine. (R. 375) Sierra testified that, although both she and Patrick Banks were unemployed, she only smoked crack on the weekends. (R. 372) Patrick Banks broke into people's cars and stole their

## JURISDICTION

Milton Jones appeals from a final judgment of conviction in a criminal case. He was sentenced on April 21, 2004. (C. 170) Notice of appeal was timely filed on April 21, 2004. (C. 182) Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rules 603 and 606.

## STATEMENT OF FACTS

Milton Jones was charged with the first degree murder of Patrick Banks and the aggravated kidnaping of Patrick Banks, Lolita Sierra, and M.C. Jones, based on events that occurred on June 25, 1999. (C. 18-33) After a jury trial, Milton Jones was found guilty of first degree murder of Patrick Banks and aggravated kidnaping of Lolita Sierra and M.C. Jones, and he was sentenced to consecutive terms of 25 years, 6 years, and 6 years, respectively. (C. 170)

After being notified on June 28, 2001, that he was being sought by police, Milton Jones turned himself in on June 29, 2001. (R. 40, C. 10) On September 20, 2001, the court was informed that Milton Jones had attempted to hang himself, and the court ordered that he be evaluated. (R. 47) Forensic Clinical Services' report of November 20, 2001, prepared by Staff Psychiatrist Philip Pan, M.D., stated that Mr. Jones was fit for trial with medication. (C. 72)

At trial, the State relied on the eyewitness identification testimony of Lolita Sierra and M.C. Jones. The State first presented the testimony of Roberta Banks, who testified that she was the decedent Patrick Banks' mother, and that Patrick Banks was not living with her at the time of his death. (R. 332-335) Rather, he was moving around at that time. (R. 335)

Lolita Sierra testified that, in June 1999, she was Patrick Banks' fiancé. (R. 339) Sierra testified that, in June of 1999, she and Patrick Banks were living in an apartment above that of his mother, who Patrick Banks saw every day. (R. 371, 401) Sierra and Patrick Banks spent the couple of days prior to the incident in a hotel Sierra described as a "pit," smoking crack cocaine. (R. 375) Sierra testified that, although both she and Patrick Banks were unemployed, she only smoked crack on the weekends. (R. 372) Patrick Banks broke into people's cars and stole their

-4-

property for a living, so that he could buy cocaine. (R. 379)

On the morning of June 25, 1999, Sierra and Patrick Banks left the hotel to go to Patrick Banks' mother's house, but then decided instead to go to the home of M.C. Jones to get more cocaine. (R. 377) Upon their arrival at M.C. Jones' home, Patrick Banks saw a parked white sport utility vehicle full of disk jockey equipment. (R. 341) Using a tool he carried for such purposes, Patrick Banks broke a window in the SUV and, with help from his friend Leo Johnson, carried the equipment up to the apartment of M.C. Jones. (R. 342-343, 379) Leo Johnson testified that he assisted Banks in moving the equipment. (R. 473)

M.C. Jones testified that on June 25, 1999, after he woke up and found some disk jockey equipment and compact discs in his home which he had not seen before, he went outside. (R. 417, 435) Outside he saw a man he did not know, who M.C. Jones identified in court as Milton Jones. (R. 418) Milton Jones asked M.C. Jones who had broken into his vehicle and taken his things. (R. 418) Milton Jones then drove off in his vehicle. (R. 418)

Lolita Sierra testified that, with the assistance of an individual called "Black Ant," Patrick found a buyer for the stolen equipment, and the equipment was taken out the back door of M.C. Jones' home. (R. 343-344) Sierra further testified that, at 9:00 or 10:00 a.m., Patrick Banks returned with six bags of cocaine he had received in exchange for the equipment, and Banks and Sierra, along with M.C. Jones, Leo, and Joyce, smoked the cocaine. (R. 381-384) M.C. Jones testified that Banks returned with eight bags of cocaine, and also testified that he and the others smoked it. (R. 455-456) M.C. Jones also testified that he did not get high. (R. 455)

Sierra and M.C. Jones testified that after they smoked the cocaine, approximately ten men, including Milton Jones, each armed with a gun, kicked in the front door and entered the

apartment. (R. 345, 420) Sierra stated that she had not seen Milton Jones before, but identified him in court as one of the men. (R. 346-347) According to Sierra, Milton Jones, said, "get those motherfuckers that broke into [my] truck." (R. 348) Both Sierra and M.C. Jones testified that Milton Jones tied a rope to each of their necks in the apartment. (R. 348, 420-422, 447) On cross-examination, Sierra admitted that she had previously told detectives that the rope had been placed around her neck in the truck, rather than the apartment. (R. 396) Leo Johnson testified that, upon his return that morning from the liquor store, he saw Sierra and M.C. Jones being held by a black man who had rope around their necks and was accompanied by five or six other men armed with bats or sticks. (R. 475-476) Johnson also stated that none of the men had guns. (R. 481) Sierra and M.C. Jones testified that they were taken downstairs to a vehicle which Sierra described as a white Blazer and which M.C. Jones noted was white and had a broken window. (R. 348, 420-422, 447) Sierra testified that the vehicle was occupied by a driver and another unknown individual. (R. 351)

Sierra testified that Milton Jones asked Sierra and M.C. Jones who took the DJ equipment, and they said that Patrick Banks had done so. (R. 354) They drove off and arrived at a parking lot at the Chicago Housing Authority projects at 35th and State. (R. 355) Sierra testified that, after their arrival at 35th and State, a brown Buick arrived carrying Patrick Banks and some other individuals who were hitting Banks. (R. 355-356) Sierra testified that Banks started to run, and Milton Jones said, "Get that motherfucker." (R. 356) Sierra further testified that some other men caught Banks and, along with Milton Jones, began kicking him in the head. (R. 356) M.C. Jones also testified that Milton Jones and the others were beating Banks. (R. 423) Sierra and M.C. Jones both testified that the men then led Banks, Sierra, and M.C. Jones to the

-6-

second or third floor of the projects, where M.C. Jones stated the men continued to beat Banks. (R. 358-359, 423) Sierra testified that Milton Jones told the others to let Sierra and M.C. Jones go, and the man who drove them to the projects drove them to 71st and Jeffrey in a second white truck. (R. 360-361) M.C. Jones likewise testified that they were then allowed to leave. (R. 427)

Detective Allen Szudarski testified that he interviewed Lolita Sierra on July 18, 1999, at which time he observed a ligature mark on her neck. (R. 522-523) On August 3, 1999, Sierra picked Milton Jones as the man who kidnaped her out of a series of photos she was shown at the police station. (R. 363, 366, 524-526) On June 29, 2001, she picked Milton Jones out of a lineup at the police station. (R. 364-365, 549-550) Sierra stated that her use of cocaine may have affected her memory. (R. 397)

On June 7, 2001, M.C. Jones picked Milton Jones out of a series of photographs he was shown at the police station and identified him as the man who had kidnaped Sierra and him and who had beat Patrick Banks. (R. 428-431) On June 30, 2001, M.C. Jones picked Milton Jones out of a lineup. (R. 540-541, 552-553) M.C. Jones admitted that he used drugs, most recently one month before the trial, and he stated that he had trouble remembering what happened on the day of the incident. (R. 439, 446)

Milton Jones testified that prior to his arrest he lived in Cedar Rapids, Iowa, with his wife and three children. (R. 568) He worked at the local Boys and Girls Club, and also as a disk jockey for weddings, parties, radio broadcast, and on recorded releases. (R. 569) He frequently performed and sold tapes and compact discs in Chicago, where he had previously grown up and lived. (R. 569-571) He had his own recording equipment, and had a partner named Dion Boyd, who shared an interest in a sound system. (R. 569) He also had a three-way partnership with

-7-

Boyd and a record company, which produced Milton Jones' albums, which were manufactured in

Lombard. (R. 572)  On June 24, 1999, Milton Jones drove to Chicago in a 1996 Blazer loaded

with $10,000 worth of recording equipment, planning to pick up and distribute the his newest

recorded release. (R. 571-576)  On account of a delay in the manufacturing, he unexpectedly had

to wait an extra day to distribute a shipment of tapes and compact discs, and he stayed at his

sister's home at 72nd and Constance, parking the Blazer in front. (R. 576-577)

On the morning of June 25, 1999, Milton Jones observed that the passenger-side door

window was broken and his recording equipment, tapes, and compact discs had been stolen. (R.

580). He telephoned his partner Dion Boyd, as well as his mother and sister. (R. 581)  He then

cleaned the glass out of his car and asked passers-by if they knew about the stolen items. (R. 582)

He later met Dion Boyd at 37th and Federal, where Boyd introduced him to M.C. Jones, who

Boyd said would be able to lead him to the stolen items. (R. 582-584)  M.C. Jones had a rope

around his neck at the time. (R. 585)  In the vehicle, M.C. Jones seemed scared, but Milton Jones

did not know why. (R. 608)

On the way to picking up the equipment, Milton Jones was pulled over by police who

were investigating a residential break-in. (R. 598-599)  The police showed Milton Jones to a

witness and was then allowed to go. (R. 599)  Before leaving, Milton Jones told the officer about

theft from his car, and informed the officer that he was going to retrieve the equipment. (R. 599)

On cross-examination, prosecutor Athena Farmakis stated that police had no record of this

exchange. (R. 634)  After Milton Jones stated, "They should have it on record, shouldn't they?"

Farmakis said, "No, we don't." (R. 634)  When Milton Jones stated he couldn't give a

description of the people to whom police had shown him, Farmakis responded, "Because it didn't

happen, right? That's why you don't know what they look [like], because it didn't happen?" (R. 635) The court sustained defense counsel's objection. (R. 635)

Milton Jones and M.C. Jones then located Black Ant, who returned Milton Jones' recording equipment in exchange for approximately $150 from Milton Jones. (R. 589-590) Black Ant told Milton Jones that he had purchased the equipment in exchange for crack cocaine. (R. 589)  Having been unable to find the missing tapes and compact discs, Milton Jones went to 35th and Dearborn to again meet with Dion Boyd and arrange to replace the tapes and compact discs. (R. 590)  At the time, Boyd mentioned that someone had been beaten up. (R. 594)  After meeting with Boyd, Milton Jones returned to his home in Iowa. (R. 594)

Milton Jones denied that he had carried a gun, ridden with anyone carrying a gun, or put a noose around anyone's neck, on June 25, 1999. (R. 595-596) He denied having seen M.C. Jones on the street near where his car had been parked outside his sister's home. (R. 606)  When Milton Jones found out from his mother-in-law that the police were looking for him regarding this case, he made arrangements to meet with police in Chicago the next day. (R. 604)  Milton Jones related that when he met with police, Detective Claeson wanted him to say that he had a cousin who was a ranking member of the gangster disciples, but there was no such cousin. (R. 629-630) Milton Jones told the police that he felt bad to hear about and be accused of the murder. (R. 640)

On cross-examination, Milton Jones testified that his anger after discovering the theft was between three and five on a scale of one to ten. (R. 617-618)  The prosecutor, Ms. Farmakis, then stated, "I would hate to see if it was a ten." (R. 618)  The court sustained defense counsel's objection. (R. 618)

Sergeant Dean Claeson testified in rebuttal that he interviewed Milton Jones on June 29,

2001. (R. 648) Claeson related that Milton Jones told him that the beating and kidnapings were

his fault and that he was responsible for a man's death. (R. 649) Claeson further related that

Milton Jones had stated that he called a cousin who was a ranking member of the gangster

disciples. (R. 650) Claeson denied telling Milton Jones what to say. (R. 651) Claeson related

that Milton Jones had stated that he saw Patrick Banks on the street, and asked him what had

happened to his car, but that Banks ignored him. (R. 663) Claeson further stated that Milton

Jones told him that he was present outside when Dion Boyd and his associates arrived and

brought the three victims down the stairs. (R. 664) On cross-examination, Claeson stated that

Milton Jones did not tell him that he beat or killed Patrick Banks, that he kidnaped Banks, Sierra,

or M.C. Jones, that he had a gun, or that he told anyone else to do any of these things. (R. 653)

Claeson stated that Milton Jones was offered the chance to make a written statement, but he

declined. (R. 653) Claeson stated that this should have been put in his police report, but that it

was not. (R. 654) Claeson also stated that he made no attempt to locate the cousin of Milton

Jones. (R. 660)

In the State's closing argument, Arthur Heil asked the jury to

> ...take a minute and picture something in your mind. Picture in your mind your own
> home; where you live with your family and your friends. Now think of your worst
> nightmare. A violent intruder breaks down the door of your home. He forces his way
> into your home, armed with a handgun, giving orders ... to nine or ten other intruders.
> Nine – giving orders to nine or ten other intruders, ordering them to get you.

(R. 692) Defense counsel objected to the personalization of the argument, and the court

overruled the objection. (R. 692) Heil continued:

> Ordering them to get you and your loved ones. You may try to run or hide, but this
> person, this leader who comes in ordering people around, grabs you, pulls you back, puts
> ropes around your neck. And – or otherwise forces you out of your own home against

-10-

your will. And he forces you to be taken to another place against your will. And the place he takes you to is an unknown, unfamiliar building where you are forced inside to a hallway. And inside there, there are more ruffians inside waiting for you to confront you. To threaten you. And by the orders of this boss man, the leader of the pack, you are beaten, or one of your loved ones is beaten, beaten to death.

(R. 692-693)

The jury returned a verdict of guilty of first degree murder of Patrick Banks and aggravated kidnaping of Lolita Sierra and M.C. Jones. (R. 803-804) The jury also found that Milton Jones was not armed with a firearm during the commission of the first-degree murder. (R. 803)

On April 6, 2004, the case came up for post-trial motions, and Milton Jones informed the court that he wished to present a motion alleging ineffective assistance of counsel. (R. 812) Mr. Jones stated that he had eighteen issues involving counsel's failure to prepare for the trial which Mr. Jones believed would have changed the outcome of the case. (R. 813) The court informed Mr. Jones that he could file that motion on the next date. (R. 812)

The post-trial motion was continued to April 21, 2004, at which time Mr. Jones again requested to address the court "before anything further." (R. 816) The court told Mr. Jones that he would be given an opportunity to address the court at a later time. (R. 816) After defense counsel rested on his motion, which alleged that Mr. Jones had not been proven guilty beyond a reasonable doubt and the erroneous denial of the motion for a directed verdict, the court denied the motion. (R. 816, C. 169) Mr. Jones twice again attempted to present his own motion to the court, and the court proceeded to sentencing, telling Mr. Jones, "Your attorney is not at issue at this point." (R. 816, 837) Mr. Jones stated that his attorney had failed to hire an investigator or investigate witnesses, including the occupants of the Suburban allegedly used to transport M.C.

-11-

Jones and Lolita Sierra to the site of the beating of Patrick Banks. (R. 837, 840)

Mr. Jones also stated that he was not taking the prescribed doses of his medication, and defense counsel Breen objected to the proceedings, stating that Mr. Jones is only fit when on his medication. (R. 845) The trial court responded by stating, "I'm going to ask Mr. Jones to bring his argument to a conclusion." (R. 846) The court then denied Mr. Jones' request for a new trial and/or new counsel. (R. 846) The court stated that defense counsel did a good job with what he had to work with, and found that the evidence was overwhelming. (R. 847) The court then sentenced Mr. Jones to consecutive terms of 25, 6, and 6 years. (R. 849) The court denied defense counsel's oral motion to reconsider sentence. (R. 850) .  .

## ARGUMENT

I.    **MILTON JONES WAS DENIED A FAIR TRIAL (A) WHEN THE PROSECUTOR
ATTEMPTED TO IMPEACH HIS TESTIMONY WITH PERSONAL OPINION
AND ALLEGED FACTS NOT PROPERLY IN EVIDENCE, AND (B) WHEN THE
PROSECUTOR ASKED THE JURORS TO PUT THEMSELVES IN THE
VICTIMS' POSITION AND IMAGINE THEIR "WORST NIGHTMARE."**

Milton Jones was denied a fair trial when the prosecutor impeached his testimony with

personal opinion and facts not properly in evidence and when the prosecutor asked the jurors to

put themselves in the victims' position and imagine experiencing their "worst nightmare." In so

doing, the State injected prejudicial improper impeachment backed up by the weight of the office

of the State's attorney, as well as inflammatory and prejudicial argument which served only to

appeal to the fears and passions of the jury. This egregious misconduct deprived Mr. Jones of a

fair trial. This case must therefore be reversed and remanded for a new trial.

Every defendant is constitutionally entitled to a fair and impartial trial. U.S. Const.

Amends. VI, XIV; *People v. Weathers*, 62 Ill.2d 114, 119, 338 N.E.2d 880 (1975). A conviction

cannot be secured through unfair or improper methods. *People v. Lyles*, 106 Ill.2d 373, 412, 478

N.E.2d 291 (1985). Prosecutorial arguments which exceed the boundaries of fairness and

impartiality inherent in our system of adversary justice require reversal. *People v. Clark*, 114

Ill.App.3d 252, 448 N.E.2d 926 (1st Dist. 1983). The issues addressed in this argument are legal

ones. For this reason, a *de novo* standard of review applies. *People v. Saunders*, 288 Ill.App.3d

523, 525, 680 N.E.2d 790 (4th Dist. 1997). The allegations of prosecutorial misconduct in this

case, taken individually, are sufficient to constitute reversible error. Viewing the misconduct as a

whole, it is clear that the State violated Milton Jones' right to a fair trial, and a new trial is thus

required.

## A. IMPROPER PROSECUTORIAL TESTIMONY

Though prosecutors may argue facts and reasonable inferences drawn from the evidence, it is improper to argue assumptions or facts not based on the evidence. *People v. Turner*, 128 Ill. 2d 540, 559-60 (1989); *People v. Rogers*, 172 Ill. App. 3d 471, 477 (2nd Dist. 1988). It is improper for a prosecutor to state his opinion as to the guilt or innocence of a defendant or to otherwise to get before the jury that which amounts to his own testimony. *People v. Caballero*, 126 Ill.2d 248, 533 N.E.2d 1089 (1989); *People v. Smith*, 141 Ill. 2d 40, 60, 565 N.E.2d 900 (1990). It is likewise improper for a prosecutor to state an opinion that the defendant is lying where that statement is not based on the evidence. *People v. Tiller*, 94 Ill. 2d 303, 319, 447 N.E.2d 174 (1982).

The reason a prosecutor may not state his opinion is because it places the prestige of the office behind the assertion, places before the jury the prosecutor's own unsworn testimony, and implies special knowledge by the prosecutor. *People v. Ford*, 83 Ill. App. 3d 57, 71, 403 N.E.2d 512 (3rd Dist. 1980). By injecting personal opinion into the case, the State distracted the jury from the relevant issues, and brought the weight and prestige of the prosecutor's opinion to bear on the jury's determination of guilt.

In the instant case, Milton Jones testified that he had been pulled over by police and shown to witnesses of a residential break-in, and that he was then subsequently released. (R. 599) After Milton Jones wondered aloud, "They should have it on record, shouldn't they?" prosecutor Farmakis said, "No, we don't." (R. 634) Then, when Milton Jones stated he couldn't give a description of the people to whom police had shown him, Farmakis responded, "Because it didn't

-14-

happen, right? That's why you don't know what they look [like], because it didn't happen?" (R. 635) The court sustained defense counsel's objection to the prosecutor's argumentative interrogation, but never instructed the jury to disregard the prosecutor's improper testimony alleging that the police had no record of the show-up. (R. 635)

Likewise, on cross-examination, after Milton Jones testified that his anger after discovering the theft was between three and five on a scale of one to ten, prosecutor Farmakis responded by opining, "I would hate to see if it was a ten." (R. 618) The court sustained defense counsel's objection to this statement. (R. 618)

At trial, the prosecution relied on the eyewitness identification testimony of Lolita Sierra and M.C. Jones, each of whom admitted to having impaired their memories by smoking crack cocaine on the morning of the incident. (R. 345, 381-384, 397, 439, 446, 456) Lolita Sierra was impeached with her prior inconsistent statement concerning the incident, and M.C. Jones' testimony contradicted itself on the matter of whether or not he was high on cocaine at the time of the incident. (R. 396, 455) Milton Jones testified on his own behalf that he did not commit the alleged offenses. The case thus came down to the jury's determination of the credibility of the witnesses. The prosecutor's statements, particularly those concerning the show-up identification and release of Milton Jones on the day of the incident, improperly placed the prestige and credibility of the prosecutor's office behind the prosecutor's improper and unsworn testimony, erroneously asserted that Mr. Jones' was lying despite a dearth of evidence to support the assertion, and unfairly attacked the credibility of Milton Jones' testimony.

## B. IMPROPER APPEAL TO THE FEARS AND PASSIONS OF THE JURY

It is axiomatic that a defendant's guilt may be proved only by "legal and competent facts,

-15-

uninfluenced by bias or prejudice raised by irrelevant evidence." *People v. Bernette*, 30 Ill.2d

359, 371, 197 N.E.2d 346 (1964). Generally, argument which serves no purpose other than to

inflame the jury is error. *People v. Blue*, 189 Ill.2d 99, 128, 724 N.E.2d 920 (2000). Statements

which urge the jurors to "put themselves in the shoes" of a victim are highly improper. *See,*

*People v. Spreitzer*, 123 Ill.2d 1, 37-38, 525 N.E.2d 30 (1988) (holding that the State was not free

to invite the jurors to enter into some sort of empathetic identification with the complainants).

During closing arguments in the instant case, prosecutor Arthur Heil asked the jury to

> ...take a minute and picture something in your mind. Picture in your mind your own
> home; where you live with your family and your friends. Now think of your worst
> nightmare. A violent intruder breaks down the door of your home. He forces his way
> into your home, armed with a handgun, giving orders ... to nine or ten other intruders.
> Nine – giving orders to nine or ten other intruders, ordering them to get you.

(R. 692) Defense counsel objected to the personalization of the argument, and the court

overruled the objection. (R. 692) Heil then continued:

> Ordering them to get you and your loved ones. You may try to run or hide, but this
> person, this leader who comes in ordering people around, grabs you, pulls you back, puts
> ropes around your neck. And – or otherwise forces you out of your own home against
> your will. And he forces you to be taken to another place against your will. And the
> place he takes you to is an unknown, unfamiliar building where you are forced inside to a
> hallway. And inside there, there are more ruffians inside waiting for you to confront you.
> To threaten you. And by the orders of this boss man, the leader of the pack, you are
> beaten, or one of your loved ones is beaten, beaten to death.

(R. 692-693)

This lengthy argument echoed an earlier prosecutorial statement, during Milton Jones

cross-examination, which likewise appealed to the fears and passions of the jury. After Milton

Jones testified that his anger after discovering the theft was between three and five on a scale of

one to ten, prosecutor Farmakis, then stated, "I would hate to see if it was a ten." (R. 617-618)

These statements by the prosecution clearly were improper and prejudicial appeals to the fears and passions of the jury. The prejudice created by the prosecutor's improper argument was compounded by the trial court, which, while sustaining defense counsel's objection to the comment about Mr. Jones' level of anger, overruled defense counsel's objection to the lengthy improper closing remarks. (R. 618, 692) In overruling this objection, the trial court thwarted Mr. Jones' attempt to correct the improper argument and lent judicial approval to the prosecutor's message that the jury should place themselves in the complainants' position when reaching their verdict in this case.

## C. PLAIN ERROR

Defense counsel objected to the prosecutor asking the jury to place themselves in the victims' position, and to the prosecutor's argumentative interrogation of Mr. Jones concerning his account of being shown at a show up identification and subsequently being released by police on the day of the incident. (R. 635, 692) However, defense counsel did not object to the improper prosecutorial testimony regarding the existence of records of the identification, nor did he include these issues in his post-trial motion. (R. 634, C. 169) Milton Jones requests that this court review these allegations under the plain error doctrine. S. Ct. Rule 615.

Illinois courts have applied the plain error rule in several cases where the record reveals a pattern of prosecutorial misconduct. *See, e.g., People v. Nelson*, 193 Ill.2d 216, 737 N.E.2d 632 (2000), *People v. Scaggs*, 111 Ill. App.3d 633, 636, 444 N.E.2d 674 (1st. Dist. 1982), *People v. Sanders*, 168 Ill. App.3d 295, 301, 522 N.E.2d 715 (1st Dist. 1988). Improper prosecutorial arguments that result in substantial prejudice to the defendant can be reviewed as plain error. *People v. Roach*, 213 Ill.App.3d 119, 571 N.E.2d 515 (3rd Dist. 1991). In *Roach*, the court found

-17-

that the prosecutor had argued his personal opinions as to the veracity of the witnesses, including the defendant, based not on the record, but rather upon "the sort of intuitive judgments that lie within the province of the jury." 213 Ill.App.3d at 124, 571 N.E.2d at 518. The court found the evidence closely balanced, and reversed defendant's convictions for first degree murder and aggravated battery. 213 Ill.App.3d at 125, 571 N.E.2d at 518.

In the instant case, the errors are similarly obvious. The State's comments and argument injected inflammatory and improper material into the jury's deliberations. Prosecutor Farmakis tainted the nature of Milton Jones' defense by improperly impeaching Mr. Jones testimony by herself testifying that the State had no record of the show-up identification and release. Prosecutor Heil further tainted the jury's deliberation of the case by asking that the jury place themselves in the victims' situation when evaluating the evidence presented.

The evidence against Milton Jones was certainly not overwhelming. The State's case relied on the identification testimony of two eyewitnesses, Lolita Sierra and M.C. Jones, each of whom admitted to having impaired their memories by smoking crack cocaine on the morning of the incident, which took place over four years prior to the trial. (R. 345, 381-384, 397, 439, 446, 456) Lolita Sierra was impeached with her prior inconsistent statement concerning the incident, and M.C. Jones testified inconsistently about whether or not he was high on cocaine at the time of the incident. (R. 396, 455) Milton Jones testified that, although he did seek out the return of his stolen equipment with the assistance of his partner Dion Boyd, as well as M.C. Jones, he did not participate in any kidnapings or beatings in the course of so doing. (R. 581, 589-590, 595-596) The case was thus closely balanced.

This court, in adhering to the principle that every defendant is entitled to a fair trial, has not

-18-

hesitated to reverse criminal convictions because of improper comments by a prosecutor which served to deny a fair trial. *See People v. Thomas*, 37 Ill.App.3d 320, 346 N.E.2d 190 (3rd Dist. 1976); *People v. Monroe*, 32 Ill.App.3d 482, 335 N.E.2d 783 (3rd Dist. 1975), *aff'd* 66 Ill.2d 317, 362 N.E.2d 295 (1977). In view of the serious prosecutorial misconduct, it cannot be stated with confidence that Milton Jones received a fair trial.

If this court declines to review this issue as plain error, then Milton Jones asserts that he is entitled to a new trial because his defense counsel at trial rendered ineffective assistance for failing to object to the improper prosecutorial testimony concerning the existence of any record of the show-up identification and release on the day of the incident, or to otherwise preserve this issue for review. Effective assistance of counsel encompasses the use of established rules of evidence and procedures to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts. *People v. Moore*, 279 Ill.App.3d 152, 159, 663 N.E.2d 490 (5th Dist. 1996). In the instant case, defense counsel failed to object to improper prosecutorial testimony which served to impeach Milton Jones' testimony. Where the case came down to a determination of credibility between the State's eyewitnesses, each of whom admitted to being high on crack cocaine at the time of the incident, and the defendant, defense counsel's failure to properly preserve this issue below prejudiced Milton Jones.

There is little doubt that the misconduct outlined above deprived Milton Jones of a fair trial. Accordingly, this court should review the prosecutorial misconduct issues raised herein as plain error, reverse Milton Jones' convictions, and remand this cause for a new trial.

-19-

**II.    THE TRIAL COURT ERRED WHEN IT DID NOT APPOINT NEW
COUNSEL TO REPRESENT MILTON JONES ON HIS POST-TRIAL
MOTION AFTER MR. JONES ALLEGED A COLORABLE CLAIM OF
HIS TRIAL COUNSEL'S INEFFECTIVENESS AND NEGLECT.**

On April 6, 2004, at proceedings on post-trial motions, Milton Jones informed the court

that he wished to present a motion alleging eighteen instances of ineffective assistance of

counsel, including failure to prepare for trial. (R. 812-813) The court told Mr. Jones that he

could raise these issues on the next court date, and on April 21, 2004, Mr. Jones again requested

to address the court. (R. 816) Although the court again rebuffed him, Mr. Jones stated that his

attorney had failed to hire an investigator or investigate the case himself. (R. 837) Even though

Mr. Jones's claims suggested neglect by counsel and were not facially insufficient, the trial court

did not inquire into the allegations or appoint new counsel, but rather tried to convince Mr. Jones

that the allegations were unfounded. (R. 847) The failure to adequately inquire into the

allegations and appoint counsel was error and demands that the cause be remanded for inquiry,

appointment of counsel, and a new hearing on the motion for a new trial.

In the instant case, the issue is whether Mr. Jones's allegations were sufficient to compel

the trial court to inquire further and appoint counsel. Because the sufficiency of Mr. Jones's

allegations is a purely legal issue, it must be reviewed *de novo*. *See, e.g., People v. Coleman,*183

Ill. 2d 366, 701 N.E.2d 1063 (1998)(finding that sufficiency of allegations in a post-conviction

petition is a purely legal issue and reviewed de novo); *In re D.G.,* 144 Ill. 2d 404, 408-09; 581

N.E.2d 648, 649 (1991).

On April 6, 2004, at proceedings on post-trial motions, Milton Jones informed the court

that he wished to present a motion alleging ineffective assistance of counsel. (R. 812) Mr. Jones

-20-

stated that he had eighteen issues involving counsel's failure to prepare for the trial which would have changed the outcome of the case. (R. 813)  The court informed Mr. Jones that he could file that motion on the next date. (R. 812)  The post-trial motion was continued to April 21, 2004, at which time Mr. Jones again requested to address the court "before anything further." (R. 816) The court told Mr. Jones that he would be given an opportunity to address the court at a later time. (R. 816)  After defense counsel rested on his motion, which alleged that Mr. Jones had not been proven guilty beyond a reasonable doubt and erroneous denial of the motion for a directed verdict, the court denied the motion. (R. 816, C. 169)  Mr. Jones twice again attempted to present his motion to the court, but the court again rebuffed him and proceeded to sentencing, telling Mr. Jones, "Your attorney is not at issue at this point." (R. 816, 837)  Mr. Jones expressed disagreement and stated that his attorney had failed to hire an investigator or investigate witnesses, including the occupants of the Suburban. (R. 837, 840)  Rather than inquiring about Mr. Jones allegations, the court instead stated, "I'm going to ask Mr. Jones to bring his argument to a conclusion." (R. 846)

The court did not address Mr. Jones' specific allegations of ineffectiveness, and denied Mr. Jones' request for a new trial and/or new counsel. (R. 846)  The court instead stated that defense counsel did a good job with what he had to work with, and found that the evidence was overwhelming. (R. 847)  The court then sentenced Mr. Jones to consecutive terms of 25, 6, and 6 years. (R. 849)

When a defendant claims in a post-trial motion that his counsel provided ineffective trial assistance, the reviewing court must determine whether the trial court conducted an adequate inquiry into the *pro se* defendant's allegations of ineffective assistance of counsel. *People v.*

-21-

*Johnson,* 159 Ill. 2d 97, 125, 636 N.E.2d 485, 197 (1994). First, the trial court should examine the factual matters underlying the defendant's claims. *People v. Krankel,* 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). "[T]he trial court should afford a defendant the opportunity to specify and support his complaints." *People v. Sanchez,* 329 Ill. App. 3d 59, 786 N.E.2d 99 (1st Dist. 2002). Based on the defendant's examination, a trial court must then determine whether the claims lack merit, pertain only to matters of trial strategy, or whether the claims show possible neglect, requiring the appointment of new counsel. *People v. Moore,* 207 Ill. 2d 68, 78-79, 797 N.E.2d 631 (2003); *People v. Nitz,* 143 Ill. 2d 179, 705 N.E.2d 895 (1991). While the trial court is not required to appoint counsel in every case, a sufficient showing of a conflict of interest requires that trial counsel withdraw, and that new counsel be appointed. *Krankel,* 102 Ill. 2d at 188-89, 464 N.E.2d at 1084-49; *People v. Parsons,* 222 Ill. App. 3d 823, 584 N.E.2d 442 (1st Dist. 1991). Counsel should be appointed if the defendant's claim of ineffectiveness has "potential merit." *People v. Brandon,* 157 Ill. App. 3d 835, 847, 510 N.E.2d 1005 (1st Dist. 1987).

In the instant case, Milton Jones' allegation that his attorney failed to investigate witnesses, including the occupants of the Suburban, raised an colorable claim of his trial counsel's failure to investigate. In *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), the United States Supreme Court held that with respect to claims that counsel was ineffective as a result of a failure to investigate, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. Defense counsel may be ineffective for failing to subpoena witnesses and evidence tending to corroborate the defense presented at trial. *People v. Corder,* 103 Ill. App. 3d 434, 431 N.E.2d 701 (1982) (finding defense counsel ineffective where

-22-

he failed to present evidence contradicting the State's eyewitness). Whether a failure to investigate is incompetence depends upon the value of the evidence and the closeness of the case. *People v. Jarnagan*, 154 Ill. App. 3d 187, 506 N.E.2d 715 (1987).

Here, the State's case relied on the identification testimony of two eyewitnesses, Lolita Sierra and M.C. Jones, each of whom admitted to having impaired their memories by smoking crack cocaine on the morning of the incident, which took place over four years prior to the trial. (R. 345, 381-384, 397, 439, 446, 456) Lolita Sierra was impeached with prior her inconsistent statement concerning the incident, and M.C. Jones testified inconsistently about whether or not he was high on cocaine at the time of the incident. (R. 396, 455) Milton Jones testified that, although he did seek out the return of his stolen equipment with the assistance of his partner Dion Boyd, as well as M.C. Jones, he did not participate in any kidnapings or beatings in the course of so doing. (R. 581, 589-590, 595-596) The case was thus closely balanced. Although the court discouraged Milton Jones from detailing his allegations of ineffective assistance of counsel, Milton Jones nevertheless informed the court that his attorney had failed to investigate witnesses, including the occupants of the Suburban which was allegedly used to transport M.C. Jones and Lolita Sierra to the site of the beating of Patrick Banks. (R. 837, 840) Milton Jones told the court that these witnesses would have changed the outcome of the case. (R. 813)

To investigate these potentially exculpatory witnesses would have been the duty of Mr. Jones' counsel. And while it was the trial court's duty to ascertain Mr. Jones' exact contention, it was not the trial court's place to speculate as to the possible outcome of such investigation, but rather to evaluate whether the failure to investigate eyewitnesses to the offense for the defense could have been a matter of trial strategy. In the instant case, the judge's comments regarding

-23-

Milton Jones' allegations were dismissive and designed to dissuade Mr. Jones from claiming his counsel's ineffectiveness, and were thus not sufficient to establish that the eyewitnesses Mr. Jones wanted his trial counsel to contact were not worth contacting. To the contrary, from Mr. Jones' account, the information was potentially exculpatory, and there is no suggestion that not contacting the witness was a reasonable strategic choice on defense counsel's part. The trial court asked defense counsel no questions about his failure to contact potential witnesses.

This court has said that where defendant alleges counsel's ineffectiveness "the trial court should afford a defendant the opportunity to specify and support his complaints." *Sanchez*, 329 Ill. App. 3d at 66. Importantly, the *pro se* defendant does not have to show that he would succeed on an ineffective assistance of counsel claim, but rather that such a claim has "potential merit." *Brandon*, 157 Ill. App. 3d at 847. Accordingly, in *Finley*, this court remanded a case for a proper hearing on a defendant's ineffective assistance claim, where the trial counsel's failure to contact witnesses "who could have had a serious impact on a case could conceivably support an ineffective assistance claim." *People v. Finley*, 222 Ill. App. 3d 571, 584, 584 N.E.2d 276 (1ª Dist. 1991). In the instant case, the trial court, while appearing to give the defendant a limited opportunity to explain his claims, then dissuaded Mr. Jones from further raising a colorable claim, based on the court's unfounded speculations about the actions of defense counsel. (R. 837, 847) Instead of his attempts to dissuade Mr. Jones, the trial court should have appointed counsel for Mr. Jones' motion for a new trial, after he raised a colorable claim of his trial counsel's neglect and ineffectiveness. *See People v. Robinson*, 157 Ill. 2d 68, 86, 623 N.E.2d 352 (1993) (holding that if allegations suggest "possible neglect" of the case, new counsel should be appointed). Accordingly, Milton Jones respectfully requests that this court remand the cause for

-24-

appointment of counsel and an inquiry into Mr. Jones' claims of ineffective assistance of trial counsel.

III. **THE TRIAL COURT ERRED BY FAILING TO CONDUCT A FITNESS HEARING AFTER MILTON JONES RAISED A *BONA FIDE* DOUBT OF HIS FITNESS WHEN HE REVEALED THAT HE WAS NOT TAKING HIS PRESCRIBED MEDICATIONS, WHICH WERE NECESSARY TO HIS FITNESS.**

A forensic Clinical Services' staff psychiatrist determined that Milton Jones was fit for trial, subject to his use of his prescribed medication. (R. 72) At the hearing on post-trial motions and sentencing, Milton Jones and his attorney informed the court that he was not taking his medication as prescribed. (R. 842, 845) Because Mr. Jones failure to take his medication as prescribed raised a *bona fide* doubt of his fitness, the trial court erred by not conducting a fitness hearing before proceeding on post-trial motions and sentencing. This court should therefore vacate the trial court's dismissal of Mr. Jones' post-trial motion and the sentencing order, and remand this cause for a hearing on Mr. Jones fitness.

Because this issue does not involve assessing the credibility of witnesses and because the underlying facts are not in dispute, the standard of review on appeal is *de novo*. *See In re D.G.*, 144 Ill.2d 404, 408-09, 581 N.E.2d 648 (1991). Moreover, the question of whether a particular set of facts meets a particular legal threshold is a legal one. *See e.g., People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063, 1074-75 (1998) (holding that a determination of whether facts asserted in a post-conviction petition justify an evidentiary hearing is legal question that is reviewed *de novo*); *West v. Adelmann*, 260 Ill. App. 3d 455, 630 N.E.2d 846, 849 (1st Dist. 1993) (holding that determination of whether a genuine issue of material fact exists so as to justify allowing case to go to jury is a question of law that is reviewed *de novo*).

On September 20, 2001, the court was informed that Milton Jones had attempted commit suicide by hanging himself, and the court ordered that he be evaluated for fitness. (R. 47)

Forensic Clinical Services' Staff Psychiatrist Philip Pan, M.D., examined Mr. Jones and submitted to the court a report, dated November 20, 2001. (C. 64) In Dr. Pan's report, Jones' additional suicide attempts in jail were documented. (C. 71) Dr. Pan diagnosed Mr. Jones as having alcohol dependence and a learning disorder, and stated he could not rule out a diagnosis of psychotic disorder. (C. 72) Dr. Pan noted that Mr. Jones was being medicated with Risperdal (an antipsychotic), 1 mg in the morning and 2 mg at night, Cogentin (for side effects of antipsychotics), 1 mg twice per day, Depakote (a mood stabilizer), 250 mg in the morning and 500 mg at night, Trazodone (an antidepressant, usually used as a sleep agent), 100 mg at night, Effexor (an antidepressant), 100 mg twice per day, and Thorazine (an antipsychotic), 50 mg if needed. (C. 73) Dr. Pan concluded that Mr. Jones was fit for trial with medication. (C. 72)

On April 21, 2004, when the instant case was called for post-trial and sentencing proceedings, Mr. Jones requested to address the court "before anything further." (R. 816) After being initially rebuffed by the court, Mr. Jones informed the court that he was not taking the prescribed doses of his medication, and defense counsel Breen objected to the continuation of the proceedings, noting that Mr. Jones was only fit when on his medication. (R. 842, 845) The trial court responded by stating, "I'm going to ask Mr. Jones to bring his argument to a conclusion." (R. 846) The court then denied Mr. Jones' request for a new trial and/or new counsel, and continued with sentencing, without addressing the matter of Mr. Jones' fitness. (R. 846)

The due process clause of the Fourteenth Amendment prohibits the criminal prosecution of an incompetent defendant. *Pate v. Robinson*, 383 U.S. 162 (1966); *Medina v. California*, 505 U.S. 437, 439 (1992); U.S. Const., amends. VI, XIV. A defendant has a constitutional right "not to be tried while legally incompetent," and a State's "failure to observe

-27-

procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope v. Missouri*, 420 U.S. 162, 172 (1975). A defendant is presumed fit to stand trial, unless he cannot understand the nature and purpose of the proceedings against him or assist in his own defense. 725 ILCS 5/104-10. If there is a *bona fide* doubt about the defendant's fitness to stand trial, then the trial court must hold a fitness hearing before proceeding further. 725 ILCS 5/104-11(a).

Where Mr. Jones was determined by the examining psychiatrist to be fit with medication, he could very likely have been unfit without this medication. *See People v. Jones*, 349 Ill. App. 3d 255, 812 N.E.2d 32 (3rd Dist. 2004) (defendant fit with medication may be unfit without medication). Where the court was informed that Mr. Jones was not taking his medication at the prescribed dose, and where Mr. Jones ineffective assistance of counsel concerns indicated that the attorney-client relationship had broken down, there was a *bona fide* doubt of Mr. Jones' fitness, and the court should have held a fitness hearing before proceeding on sentencing and Mr. Jones' motion for a new trial. The fact that Mr. Jones' mental problems preceded his trial, and were not something that only arose at the post-trial hearing, further supports Mr. Jones' contention that a *bona fide* doubt existed of his fitness at the hearing on post-trial motions and sentencing.

Because there was a *bona fide* doubt of Mr. Jones' fitness at the hearing on post-trial motions and sentencing, the trial court's failure to conduct a hearing on Mr. Jones fitness requires that this court vacate the trial court's rulings on post-trial motions and the trial court's sentencing order, and remand the cause for a hearing on Mr. Jones' fitness.

-28-

## CONCLUSION

For the foregoing reasons, Milton Jones, Defendant-Appellant, respectfully requests that this court reverse his convictions and remand this cause for a new trial, or that it remand this cause for hearings on Mr. Jones' fitness and/or ineffective assistance of counsel claims.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

STEPHEN L. GENTRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

# APPENDIX TO THE BRIEF

Index to the Record .......................................................... A-1

Judgment Order .............................................................. A-6

Notice of Appeal ............................................................. A-7

# INDEX TO THE RECORD

## Common Law Record ("C")

Page

Memorandum of Orders ("Half Sheet") ................................................. C2

Complaint for Preliminary Examination (June 8, 2001) ............................. C9, C11

Arrest Report (June 29, 2001) ................................................... C10, C14

Appearance (July 20, 2001)(July 27, 2001)(August 16, 2001) ................. C15, C34, C35

Indictment /Information (August 8, 2001) ............................................ C17

Defendant's Motion for Discovery (August 16, 2001) ................................. C36

Motion for Reduction of Bond (August 16, 2001) .................................... C40

Notice of intent to Seek the Death Penalty (October 22, 2001) ......................... C46

State's Motion for Discovery (August 21, 2001) ..................................... C44

Motion for Capital Case Hearing Discovery Pursuant to Amended Supreme Court Rule
411 (October 22, 2001) ........................................................... C48

Letter from Forensic Clinical Services (October 21, 2001)(January 31, 2002)
(April 6, 2004) ........................................................ C50, C54, C60, C180

Letter from the Alternate Juror #3 to Judge of the Court Room (February 2, 2004) .......... C56

Motion in Limine (February 23, 2004) ............................................. C57

Presentence Investigation Report (April 6, 2004) ................................... C79

Jury Instructions ............................................................... C131

Jury Verdict Form Signed () ................................................ C164-C168

Motion for New Trial (March 24, 2004) ............................................ C169

Sentencing Order (April 21, 2004) ................................................ C170

Order for Defendant to Submit Blood Specimens to the Illinois Department of State Police for
Genetic Analysis ............................................................... C171

Defendant's Pro Se Motion for Post Trial Relief (April 21, 2004) ...................... C172

Request for Investigation of a Lawyer ............................................. C176

Defendant's Pro Se Notice of Appeal (April 21, 2004) ............................... C178

Defendant's Answer to Discovery .................................................. C179

Notice of Appeal (April 21, 2004) ................................................. C182

**Report of Proceedings ("R")**

|                                        | Direct | Cross | Redir. | Recr. |
|----------------------------------------|--------|-------|--------|-------|
| **Volume I**                           |        |       |        |       |
| August 21, 2001 - Continuance          |        |       |        |       |
| Motion to Reduce Bail - Continuance    |        |       |        | 44    |
| September 20, 2001 - Continuance       |        |       |        | 48    |
| October 22, 2001 - Continuance         |        |       |        | 52    |
| November 26, 2001 - Continuance        |        |       |        | 56    |
| January 22, 2002 - Continuance         |        |       |        | 59    |
| January 28, 2002 - Continuance         |        |       |        | 62    |
| January 31, 2002 - Continuance         |        |       |        | 66    |
| March 11, 2002 - Continuance           |        |       |        | 69    |
| May 23, 2002 - Continuance             |        |       |        | 73    |
| April 4, 2002 - Continuance            |        |       |        | 76    |
| June 24, 2002 - Continuance            |        |       |        | 80    |
| June 28, 2002 - Continuance            |        |       |        | 83    |
| August 6, 2002 - Continuance           |        |       |        | 86    |
| October 15, 2002- Continuance          |        |       |        | 89    |
| January 7, 2003 - Continuance          |        |       |        | 93    |
| February 10, 2003 - Continuance        |        |       |        | 95    |
| February 25, 2003 - Continuance        |        |       |        | 99    |
| April 1, 2003 - Continuance            |        |       |        | 102   |
| May 30, 2003 - Continuance             |        |       |        | 105   |
| June 25, 2003 - Continuance            |        |       |        | 108   |

|  | | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|---|
| **Volume II** | | | | | |
| August 5, 2003 - Continuance | | | | | 116 |
| September 8, 2003 - Continuance | | | | | 119 |
| September 10, 2003 - Continuance | | | | | 123 |
| November 3, 2003 - Continuance | | | | | 129 |
| January 26, 2003 - Continuance | | | | | 132 |
| February 23, 2004 | | | | | |
| **Jury Trial** | | | | | |
| Motions in Limine | | | | | 136 |
| Jury Selection | | | | | 156 |
| **Volume III** | | | | | |
| Judge's Preliminary Remarks | | | | | 311 |
| Opening Statements | | | | | |
| | Ms. Farmakis | | | | 314 |
| | Mr. Prusak | | | | 319 |
| State Witnesses | | | | | |
| | Roberta Banks | 331 | 335 | | |
| | Lolita Sierra | 338 | 368 | 406; 410 | 409; 412 |
| | MC Jones | 415 | 432 | | |
| | Leo Johnson | 470 | 479 | | |
| | Chaplain Capatoria Wilson | 485 | | | |
| **Volume IV** | Dr. Donoghue | 502 | 518 | | |
| | Det. Allen Szudarski | 521 | 529 | | |
| | Det. Daniel McNally | 536 | 544 | | |
| | Off. Dean Cleason | 546 | 555 | | |

A-3

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |  |
|---|---|---|---|---|---|---|
| State Rests |  |  |  |  |  | 556 |
| Motion for Directed Verdict - Denied |  |  |  |  |  | 561 |
| Motion in Limine |  |  |  |  |  | 566 |
| Defense Witnesses |  |  |  |  |  |  |
|  | Milton Jones | 567 | 609 | 640 | 646 |  |
| Defense Rests |  |  |  |  | 646 |  |
| State's Rebuttal Witness |  |  |  |  |  |  |
|  | Sgt. Dean Cleason | 648 | 651 | 661 | 666 |  |
| **Volume V** |  |  |  |  |  |  |
| Instructions Conference |  |  |  |  |  | 673 |
| State's Witness (cont.) |  |  |  |  |  |  |
|  | Yolanda Richards | 685 | 687 | 689 | 690 |  |
| Opening Arguments |  |  |  |  |  |  |
|  | Mr. Heil |  |  |  |  | 692 |
|  | Mr. Breen |  |  |  |  | 721 |
| Closing Argument | Ms. Farmakis |  |  |  |  | 750 |
| Juror Instructions |  |  |  |  |  | 766 |
| Juror Notes |  |  |  |  |  | 791 |
| Verdict of Guilt |  |  |  |  |  | 803 |
| Jury Polled |  |  |  |  |  | 804 |
| April 6, 2004 - Continuance |  |  |  |  |  | 809 |
| April 21, 2004 |  |  |  |  |  |  |
| Motion for New Trial - Denied |  |  |  |  |  | 816 |
| State's Witness in Aggravation |  |  |  |  |  |  |
|  | Roberta Banks | 817 |  |  |  |  |

A-4

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|---|
|  | Joyce Diaz | 820 |  |  |  |
|  | Garlean Banks | 824 |  |  |  |
| Sentencing Hearing | Argument in Aggravation |  |  |  | 828 |
|  | Argument in Mitigation |  |  |  | 833 |
| Defendant's Pro Se Motion for New Trial - Denied |  |  |  |  | 835 |
|  | Allocution |  |  |  | 835 |
| Imposition of Sentence |  |  |  |  | 846 |
| State Motion for DNA Analysis - Granted |  |  |  |  | 849 |
| Appeal Rights |  |  |  |  | 849 |
| Motion to Reconsider Sentence - Denied |  |  |  |  | 850 |

**Supplemental Report of Proceedings ("SR.I")**

December 18, 2002 - Continuance ............ 2

**Supplemental Report of Proceedings ("SR.II")**

Order of Sentencing ............ 2

**Supplemental Report of Proceedings (SR.III)**

Amended Notice of Appeal ............ 3

**Supplemental Report of Proceedings (SR.IV)**

4 Volume of Exhibits

IN THE CIRCUIT COURT OF COOK COUNTY

PEOPLE OF THE STATE OF ILLINOIS )
                v.                         )
... TON        JONES                  )
... dant

CASE NUMBER    01CR1865401
DATE OF BIRTH  08/01/73
DATE OF ARREST 06/29/01
IR NUMBER 0981556   SID NUMBER 030673610

## ORDER OF COMMITMENT AND SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS
==============================================

The above named defendant having been adjudged guilty of the offense(s) enumerated below
hereby sentenced to the Illinois Department of Corrections as follows:

| Statutory Citation | Offense | Sentence | | Class |
|---|---|---|---|---|
| 720-5/9-1(A)(1) | MURDER/INTENT TO KILL/INJ | YRS. 025 | MOS.00 | M |
| and said sentence shall run concurrent with count(s) | | | | |
| 720-5/9-1(A)(2) | MURDER/STRONG PROB KILL/I | YRS. 025 | MOS.00 | M |
| and said sentence shall run concurrent with count(s) | | | | |
| 720-5/9-1(A)(3) | MURDER/OTHER FORCIBLE FEL | YRS. 025 | MOS.00 | M |
| and said sentence shall run concurrent with count(s) | | | | |
| 720-5/10-2(A)(5) | AGGRAVATED KIDNAPING/ARME | YRS. 006 | MOS.00 | X |
| and said sentence shall run concurrent with count(s) | | | | |
| 720-5/10-2(A)(5) | AGGRAVATED KIDNAPING/ARME | YRS. 006 | MOS.00 | X |
| and said sentence shall run concurrent with count(s) | | | | |

On Count ___ defendant having been convicted of a class _ offense is sentenced as
... ss x offender pursuant TO 730 ILCS 5/5-5-3(C)(8).

On Count ___ defendant is sentenced to an extended term pursuant to 730 ILCS 5/5-8-2.

The Court finds that the defendant is entitled to receive credit for time actually served
... custody for a total credit of 1028 days as of the date of this order

IT IS FURTHER ORDERED that the above sentence(s) be concurrent with
... sentence imposed in case number(s) _____
consecutive to the sentence imposed under case number(s) _____

IT IS FURTHER ORDERED THAT CTS 4 6 9 CONSECUTIVE TO CTS 12 AND 13  CT 12 CONCECUTIVE
... 6 AND 9 AND CONCECUTIVE 13 CT 13 CPMSECITOVE TO CTS 4 6 AND 9   _____
... CUTIVE TO CT 12 _____

IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff
... the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take
... into custody and confine him/her in a manner provided by law until the above sentence is fulfilled.

ENTERED
TIME ____ PM   ENTER: 04/21/04

... TED    APRIL 21, 2004

... RTIFIED BY  M MARYANN REYES
       DEPUTY CLERK

JUDGE
Dorothy Brown
Clerk of the Circuit Court
Criminal Division
Deputy Clerk Signature

APR 21 2004

JUDGE: BOWIE, JR., PRESTON L.    1516
GCPD 04/21/04 14:47:52

(Rev. 10/30/01) CCCR 0603

TO THE ___*APPELLATE*___ COURT OF ILLINOIS
IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL BUREAU

| | |
|---|---|
| ~~P~~LE OF THE STATE OF ILLINOIS | Case No. _01-CR-18105401_ |
| ~~v~~ | Trial Judge _BOWIE_ |
| | Court Reporter _____ |
| ~~M~~ILTON JONES | Attorney _RAYMOND PRUSAK_ |
| | Appeal Check Date _N/A_ |
| | Appeal Bond _N/A_ |

*FILED APR 2 1 2004 DOROTHY BROWN CLERK OF CIRCUIT COURT*

### NOTICE OF APPEAL

~~Ap~~peal is taken from the order or judgment described below:

~~Appell~~ant's Name: _MILTON JONES_

~~Appell~~ant's Address: _COOK COUNTY DEPARTMENT OF CORRECTIONS_

~~Appell~~ant's Attorney: _STATE APPELLATE DEFENDER_

~~Addre~~ss: _100 W. RANDOLPH — CHGO IL_

~~Charg~~e: _MURDER KIDNAPING (x2)_

~~Judgm~~ent: Guilty of _MURDER OF PATRICK BANKS, KIDNAPING OF_
_T. JONES, KIDNAPING OF LOLITA SIERRA_
Date: _2/27/04_

~~Senten~~ce: _20 YEARS IDOC + 6 YEARS + 6 YEARS_

~~Notice~~ Notice Filed: _4/21/04_

*Appellant TRIAL COUNSEL*

### VERIFIED PETITION FOR REPORT OF PROCEEDINGS AND COMMON LAW RECORD

~~Under~~ Supreme Court Rules 605-608 Appellant ask the Court to order; (1) the Official Court Reporter to transcribe an ~~origin~~al and the copy of the proceedings, file the original with the Clerk and deliver a copy to the Appellant, or upon ~~Appell~~ant's written request to the Appellant's attorney of record, and (2) the Clerk to prepare the Record on Appeal.

~~A~~ppellant, being duly sworn, says that at the time of his/her conviction he/she was and he/she now is unable to ~~pay for~~ the Record or an appeal lawyer.

_____ Appellant

~~SUBS~~CRIBED and SWORN TO before me this _____ day of _____

_____ Notary public

### ORDER

~~IT IS~~ ORDERED; 1. _____
~~Appoin~~ted as counsel on appeal, and 2. the record and Report of Proceedings be furnished appellant free.

_____ , _____   _____ , _____   _____ , _____

_____ , _____   _____ , _____   _____ , _____

_____ , _____ ENTER: _____

| | |
|---|---|
| | Judge _____ Judge' No. |

~~Ackno~~wledge receipt: _____ Court Reporter

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

NO. 04-1359

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

vs.

MILTON JONES,

Defendant-Appellant.

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **Preston L. Bowie**, Judge Presiding.

BRIEF AND ARGUMENT FOR
PLAINTIFF-APPELLEE

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Plaintiff-Appellee

JAMES E. FITZGERALD,
JANET C. MAHONEY,
Assistant State's Attorneys,
Of Counsel.

EXHIBIT C

T.C-M-866

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS

Plaintiff-Appellee

vs.

MILTON JONES,

Defendant-Appellant.

## POINTS AND AUTHORITIES

### I.

**DEFENDANT WAS NOT DENIED THE RIGHT TO A FAIR TRIAL BY THE STATE'S CROSS-EXAMINATION OF HIM OR BY THE STATE'S CLOSING ARGUMENT**................................................... **18**

People v. Enoch, 122 Ill. 2d 176,
     522 N.E.2d 1124 (1988) ................................................... 20

People v. Mullen, 141 Ill. 2d 394,
     566 N.E.2d 222 (1990) ................................................... 20

People v. Lucas, 88 Ill. 2d 245,
     430 N.E.2d 1091 (1981) ................................................... 20

Strickland v. Washington, 466 U.S. 668,
     104 S. Ct. 2052 (1984)................................................... 24

People v. Coleman, 168 Ill. 2d 509,
     660 N.E.2d 919 (1995) ................................................... 24

1

People v. Hall, 195 Ill. 2d 1,
    743 N.E. 2d 126 (2000) ................................................................... 25

People v. Stack, 311 Ill. App. 3d 162,
    724 N.E.2d 79 (1st Dist. 1999) ...................................................... 25

People v. Terrell, 185 Ill. 2d 467,
    708 N.E. 309 (1998) ................................................................ 25, 26

People v. Lowe, 153 Ill. 2d 195,
    606 N.E.2d 1167 (1992) .................................................................. 25

People v. Hall, 194 Ill. 2d 305,
    743 N.E.2d 521 (2001) .................................................................... 26

People v. Enis, 139 Ill. 2d 264,
    564 N.E. 2d 1155 (1990) ................................................................. 26

People v. Kliner, 185 Ill. 2d 81,
    705 N.E.2d 850 (1998) .................................................................... 27

People v. Wood, 341 Ill. App. 3d 599,
    793 N.E.2d 91 (2003) ..................................................................... 27

## II.

### THE COURT ACTED PROPERLY WHEN IT DID NOT APPOINT COUNSEL TO REPRESENT DEFENDANT ON HIS MOTION FOR NEW TRIAL WHERE HIS CLAIM OF INEFFECTIVE ASSISTANCE LACKED MERIT

THE COURT ACTED PROPERLY WHEN IT
DID NOT APPOINT COUNSEL TO REPRESENT
DEFENDANT ON HIS MOTION FOR NEW TRIAL
WHERE HIS CLAIM OF INEFFECTIVE
ASSISTANCE LACKED MERIT ....................................... 28

People v. Towns, 174 Ill. 2d 453,
    675 N.E.2d 614 (1996) ............................................................. 29, 30

People v. Moore, 207 Ill. 2d 68,
    797 N.E. 2d 631 (2003) ............................................................ 29, 30

People v. Bull, 185 Ill. 2d 179,
    705 N.E.2d 824 (1998) .................................................................... 29

People v. Kidd, 175 Ill. 2d 1,
    675 N.E.2d 910 (1996) .................................................................... 29

<u>People v. Chapman</u>, 194 Ill. 2d 186,
        743 N.E.2d 48 (2000) ................................................................ 30

## III.

**DEFENDANT WAS NOT ENTITLED TO A FITNESS HEARING BEFORE THE COURT PROCEEDED WITH THE POST-TRIAL MOTION AND SENTENCING HEARING BECAUSE THE TRIAL COURT DID NOT HAVE A BONA FIDE DOUBT AS TO DEFENDANT'S FITNESS ................... 32**

<u>People v. Johnson</u>, 183 Ill. 2d 176,
        700 N.E.2d 996 (1998) ................................................................ 34

<u>People v. Moore</u>, 189 Ill. 2d 521,
        727 N.E.2d 348 (2000) ................................................................ 34

<u>People v. Haynes</u>, 174 Ill. 2d 204,
        673 N.E.2d 318 (1996) ................................................................ 34

<u>People v. Eddmonds</u>, 143 Ill. 2d 501,
        578 N.E.2d 952 (1991) ................................................................ 34, 35

<u>People v. Murphy</u>, 72 Ill. 2d 421,
        381 N.E.2d 677 (1978) ................................................................ 34

725 ILCS 5/104-10 ............................................................................. 33

725 ILCS 5/104-11(a) ......................................................................... 33-34

3

## ISSUES PRESENTED FOR REVIEW

Whether defendant was denied the right to a fair trial by the State's cross-examination of him and the State's closing argument.

Whether the court erred when it did not appoint counsel to represent defendant on his pro se motion for new trial alleging ineffective assistance of trial counsel.

Whether the court should have held a fitness hearing when defendant stated, at the sentencing hearing, that he stopped taking his medication as prescribed.

## STATEMENT OF FACTS

Patrick Banks and his fiancé, Lolita Sierra left a hotel at 83rd and Stony Island on June 25, 1999 between 8:30 and 9:30 a.m. (R. 339-340) They decided to go to their friend's, M.C. Jones, at 72nd and Constance to get some cocaine. (R. 340, 377-378) As they approached Jones' house, Patrick observed a white Blazer parked in front of Jones' house that had some deejay equipment in it. (R. 341-342)

Patrick broke the back window of the Blazer and took the equipment. (R. 342, 378-379) Patrick would break into cars and steal things to make money to buy cocaine. (R. 379) Lolita stood and watched for police and people. (R. 379-380) Patrick and his friend Leo brought the equipment to Jones' house. (R. 342-342, 380, 472-473) After the equipment was in the house, Patrick and Lolita were on their way to 71st and Bennett when they ran into a guy named Black Ant. (R. 343) Patrick told Black Ant about the equipment. (R. 343) Black Ant returned to 72nd and Constance

4

with Patrick and Lolita to check out the equipment. (R. 343) Lolita stated that Black Ant

determined that he did not want the equipment but directed Patrick to a friend who bought the

equipment in exchange for six bags of rock cocaine. (R. 344, 381) M.C. stated that Black Ant

bought the items for eight bags of cocaine. (R. 455)

M.C. Jones stated that on June 25, 1999, he was at home at 7270 South Constance sleeping

and when he woke up he observed cds and boxes in his home. (R. 416-417, 435) M.C. walked

outside for air and started to talk to the man who lived in the basement. (R. 417-418) Defendant

walked out of the building and saw M.C. and the man talking. (R. 418, 435-436) Defendant said,

"What mother fucker broke in my van and stole my shit." (R. 418, 454) Defendant got in the van

and said, "I'll be back mother fucker." (R. 418, 443)

Patrick, Lolita, M.C., Joyce, Leo and Billy Ray were in the apartment. (R. 345) Everyone

except Billy Ray was smoking Patrick's rock cocaine. (R. 383-384, 455-456, 480-481) Leo left the

house around 11:00 or 11:45 a.m. and went to the liquor store. (R. 473-474, 479) While the others

were in the apartment, there was a loud knock at the door and then the door was kicked in. (R. 345,

419) Lolita and M.C. observed defendant and nine other people, all of whom had guns, enter the

apartment and begin searching. (R. 346-347, 419-420, 440) Defendant informed his group to get

the people who broke into his truck. (R. 347-348)

M.C. tried to go out the back door but defendant grabbed him by the collar. (R. 349, 420,

461) Defendant, who now had M.C., walked up to Lolita and told her, "Get the fuck up." (R. 348-

349) Defendant took a rope and tied one end around Lolita's neck and the other end around M.C.'s

neck. (R. 348, 420-421, 441, 461) Defendant put a gun to M.C.'s head, pulled back the trigger and

5

said, "Mother fucker, I should throw you-your fucking body in the fucking lake and kill you mother fucking bitches right now." (R. 420, 439-440)

Defendant led Lolita and M.C. downstairs. Leo, who was on his way back from the liquor store, observed M.C. and Lolita on the street with ropes around their necks. (R. 474-475) A black man was holding the rope and there were five to six other guys on the street with bats and sticks. (R. 475-476) Leo stated that he saw the man pull Lolita and M.C. into a white truck. (R. 476)

Lolita stated that defendant led them to a four-door white Blazer or van parked on 72nd and Constance. (R. 351, 395, 405) She did not know if one of the windows was broken so she did not know if this was the same truck Patrick broke into because he had broken a window on that truck. (R. 398-399) Lolita stated that at the time, she was not really concerned with whether the window on the car was broken or not. (R. 406) M.C. stated that one of the windows was broken. (R. 447-448)

Lolita stated that there were two men, a driver and passenger in the back seat, already in the car. (R. 351-352) M.C. stated that there were three men and defendant in the van but then stated that there was a driver, a man between him and Lolita in the back and defendant. (R. 421, 448-449) M.C. noticed a brown car behind the van. (R. 421, 450-451) Patrick was in the brown car and the men in the brown car were beating him. (R. 421)

Defendant pulled Lolita and M.C. by the rope to the car and put them on either side of the man in the back seat. (R. 351-352, 448-449) Defendant then sat in the front passenger seat and the driver drove the group to the housing project parking lot at 35th and State. (R. 352-353, 356, 422)

Lolita stated that as they drove, the man between Lolita and M.C. started to choke M.C. with two hands. (R. 353-354) The man thought Lolita was going for his gun so he elbowed her in

6

the face giving her two black eyes. (R. 353-354) The man said he should just kill M.C. now and throw him in the lake. (R. 353) Defendant asked Lolita and M.C. who took the deejay equipment and they told him it was Patrick. (R. 354)

M.C. stated that as they drove, defendant told Lolita, "I will take a knife and stick it in your pussy." (R. 422-423, 450) Another man put a gun to M.C.'s head and told M.C. not to say anything. (R. 423) Defendant then began choking M.C. with both his hands. (R. 423)

Lolita stated that fifteen to twenty minutes after defendant's car arrived in the parking lot, a brown Buick pulled up next to the white Blazer. (R. 355-356) M.C. stated that the brown car pulled into the projects at the same time as their white van. (R. 423, 425) Lolita stated that there were several men and Patrick in the Buick. (R. 356) The men were hitting Patrick. (R. 356) Patrick and the men exited the car and started to walk toward the projects. (R. 356) Patrick saw a police car, ran and tried to flag it down. (R. 356, 423, 452) Defendant told the men to get Patrick. (R. 356) The men caught him and started to beat him. (R. 356) The men, all of whom had guns, kicked Patrick about the head and face. (R. 356-358)

After the men beat Patrick for fifteen to twenty minutes, defendant led Patrick into the building at the location. (R. 358) The other men, following defendant and Patrick, led Lolita and M.C. into the building and up the stairs to the second or third floor. (R. 358-359) As they walked up the stairs, Lolita lost sight of Patrick. (R. 360) M.C., however, saw the men, including defendant, beat Patrick with a tire iron, stone him and throw water on him. (R. 423-424, 426, 453) Defendant turned to the men who had Lolita and M.C. and told them to let Lolita and M.C. go. (R. 360, 426)

7

Lolita was placed in a white truck that was different from the truck in which she arrived. (R. 360-361) The driver who had taken her to 35th and State was now the driver of this second white truck. (R. 360-361) Lolita identified People's Exhibit 5 as a photo of the second truck in which she rode and further identified the person in the photo as the driver of both the first and second car in which she drove. (R. 393-395) M.C. identified the person in People's Exhibit 5 as the person who drove him from 72nd and Constance to 35th and State. (R. 462-463) M.C. further stated that he was never in the car in the photo. (R. 463) Lolita stated that the driver did not give orders, beat Patrick or threaten Lolita. (R. 403) A second man got into the truck with Lolita. (R. 361) They drove Lolita to 72nd and Constance but the police were there so they dropped her at 71st and Jeffrey. (R. 360-361, 400) Lolita did not run to the police after she was dropped off. (R. 408) She had been told by the men to forget everything and she did not feel safe running to the police. (R. 408)

M.C. told the men that "Ant" had their stuff. (R. 428, 454) Three men drove M.C. to "Ant's" house in the same van in which they had driven to 35th and State. (R. 428, 458) Lolita was not in the van with M.C. (R. 457) When the men let M.C. out of the car and untied him, M.C. ran. (R. 428, 458)

Lolita eventually spoke to Detectives Szudarski and Kuczinski on July 18, 1999. (R. 522) During the conversation, Detective Szudarski noticed ligature marks on Lolita's left side. (R. 523) She told the officers that she believed the offender was Deejay Milton. (R. 410-412, 523) Lolita knew defendant's name because Black Ant had told her they had stolen from him. (R. 390-391) Lolita described defendant as twenty-six years old or older, with a brown complexion, short hair, around five feet eight inches to five feet ten inches tall, 155 to 160 pounds and a muscular build. (R. 410-412)

8

On August 3, 1999, Detective Szudarski showed Lolita photographs of five men and defendant at the police station. (R. 362-363, 366, 524) Lolita identified defendant and indicated defendant was the person who gave the orders and who kidnapped her and M.C. and who killed Patrick. (R. 363-364, 525-527)

M.C. spoke to Detective McNally on June 7, 2001. (R. 428, 539-540) Detective McNally showed M.C. six photographs and he identified defendant as the person who put a rpe around his neck, kidnapped him at gunpoint and beat Patrick to death. (R. 430, 540-541)

On June 29, 2001, Officer Claeson contacted Lolita and brought her to the police station to view a line-up. (R. 364, 548-549) Lolita identified defendant in the five person line-up as the person who kidnapped her, M.C. and Patrick and who beat Patrick. (R. 365, 550)

Officer Claeson located M.C. Jones on June 30, 2001 and brought him to the police station to view a line-up. (R. 430, 552-553) M.C. identified defendant in the line-up as the person who kidnapped him, Lolita and Patrick. (R. 431, 553)

Lolita testified that in 1999, she and Patrick lived at 71st and Jeffrey above Patrick's mother and that they would see her on a daily basis. (R. 339, 372-373, 401-402) Patrick's mother, Roberta Banks, however, testified that she lived at 1957 East 72nd Street, Patrick did not live with her and that she did not know where he was living but knew it was with Lolita some place. (R. 335-336) Lolita stated that she and Patrick used drugs at the time. (R. 371) They would smoke crack cocaine. (R. 371-374) Prior to the June 25, 1999, Lolita and Patrick had been in a hotel for two days getting high. (R. 374-375)

Capatoria Wilson, a chaplain with the Chicago Police Department, testified that on June 25, 1999 she received a call at 12:55 about a man being beaten at 3544 South State. (R. 486-487) She

9

went to the location which was a CHA high rise and looked around the building, inside and out, but did not find anyone. (R. 488-490) Wilson returned to her routine patrol. (R. 490)

About thirty minutes later, Wilson received a call to go to 3542 South State, the same building from her previous call. (R. 490) Wilson went to the rear courtyard area where she observed paramedics with a young man who appeared beaten. (R. 490-491) The man was unconscious. (R. 492)

Dr. Edmond Donoghue, an expert in the field of forensic and anatomic pathology, reviewed the autopsy Dr. Barry Lifshulz performed on Patrick Banks on July 2, 1999. (R. 507-508) Dr. Lifshulz was retired. (R. 507-508) Dr. Donoghue explained that nineteen areas of injury or therapy were discovered. (R. 508) The autopsy revealed a curved, stapled surgical incision eleven inches long on the right side of the head. (R. 508) The incision had been done at the hospital. (R. 508) Patrick had arrived at the hospital in a coma with a subdural hematoma and a craniotomy was performed. (R. 508-509) There was an incision three inches long in the groin area. (R. 509) The incision was made at the hospital to obtain an IV line. (R. 510) There was a bandaged needle puncture to the right upper chest that was done in the hospital. (R. 510) Patrick had a hospital band on his left wrist. (R. 511)

The autopsy revealed a curved abrasion or scrape on Patrick's left shoulder, a large abrasion on the back of Patrick's right shoulder, two abrasions to the back of Patrick's right elbow, an abrasion on the posterior of Patrick's right forearm, and two abrasions on the outside of Patrick's right hip. (R. 510-511) There was a bite mark on the left side of Patrick's tongue. (R. 513)

The autopsy revealed a craniotomy defect on the right side of the head where the surgeons took out a piece of bone to remove the hematoma and decompress the brain. (R. 511) The brain

10

was so swollen that it started to press through the defect. (R. 517) There was a hemorhage in the subgaleal area on the right side of the head. (R. 511) There was another subgaleal hemorhage on the left side of the head toward the back. (R. 511-512) There was a small amount of clotted subdural blood on the left side of the brain and three ounces of residual clotted subdural blood beneath the skull flap on the right side of the brain. (R. 512) There was massive swelling and softening of the brain and accumulation of the subdural hematoma as the result of the blunt trauma. (R. 512, 516-517) There was massive contusion or bruising to the frontal lobe directly above the eye. (R. 513)

Dr. Donoghue concluded that in his expert opinion, Patrick Banks died of cerebral injuries to the brain due to blunt trauma. (R. 517) Dr. Donoghue further stated that the manner of death was homicide. (R. 517)

Defendant testified that he was a deejay. (R. 569) Defendant would work events all over the country but mostly worked in Chicago. (R. 570) Defendant was in Chicago every week or every other week. (R. 600) He would travel from his home in Cedar Rapids, Iowa in his 1996 Blazer which he used to move his equipment from place to place. (R. 570-571) At times, defendant would work with his partner and mentor, Dion Boyd, and Dance Media Records, a record company. (R. 573, 575)

On June 24, 1999, he left home in his Blazer loaded with deejay equipment valued between $10,000 and $15,000. (R. 571-573, 575, 613, 617) He stopped in Lombard where he purchased 1750 tapes he had made which were worth between $10,000 and $15,000 also. (R. 572-573, 613) Defendant planned to sell the tapes and cds in Chicago in one day. (R. 572-573, 613-614) Defendant paid for the order and expected to be reimbursed by the record company. (R. 573-574) Defendant stated that he expected to make around $8,000 and $10,000 from the sales but later

11

stated that he only expected to make $3000. (R. 614, 641) Because the company was late in processing his order, defendant was unable to begin selling the tapes that day. Defendant went to his sister's house on 72nd and Constance where he planned to spend the night and wait for the stores to open in the morning. (R. 576-577)

Defendant parked his car in front of his sister's house. (R. 578) Defendant returned to the car around 11:00 a.m. the next day. (R. 580) Defendant noticed the passenger side window on the car was broken. (R. 580-581) There were people on the street at the time and defendant asked if anyone had seen the break-in or the equipment. (R. 606-607) Defendant indicated that he would pay for the return of his equipment. (R. 607) Defendant stated that no one knew anything about the equipment. (R. 607)

Defendant denied telling Detective Claeson that an old man on the street nodded toward Patrick. (R. 623) Detective Claeson provided those words and defendant only repeated them after he had been handcuffed to a pipe in a freezer or a room as cold as a freezer and developed frostbite. (R. 623, 641-642) Defendant, however, never mentioned the frostbite injury when he was being evaluated for admittance into the jail because he had defrosted by then. (R. 624)

Defendant did not call the police about the break-in. (R. 619, 645) Instead, he called Dion and told him that someone had broken into the truck. (R. 581, 625) They arranged to meet at 72nd and Constance. (R. 625) Defendant called Dion first because half of the items that were stolen belonged to Dion. (R. 582) Defendant claimed that he was only concerned with finding the equipment and not the people who did it. (R. 620-622)

Defendant denied telling the police that he called his cousin to meet him at 72nd and Constance. (R. 629) While defendant admitted telling Detective Claeson that he called his cousin, a

12

ranking member of the gangster Disciples, to meet him at 35th and State, defendant stated that he simply repeated the words given to him by Detective Claeson. (R. 629-630)

Defendant drove around looking to see if he could find his equipment or tapes. (R. 581-582, 605) He asked people on the streets and checked the record stores to see if anyone had sold his tapes. (R. 582) After driving around for twenty to thirty minutes, defendant drove to a gas station where he vacuumed the broken glass out of his truck. (R. 582, 605)

While defendant was at the gas station vacuuming his car, defendant stated that Dion and his boys came to 72nd and Constance. (R. 625, 627) Defendant denied being present and pointing to 7207 Constance and telling Dion that the equipment was up there. (R. (R.627) Defendant thought Dion came to that location because Dion thought defendant was keeping the money from the sale of the cds and tapes for himself. (R. 626)

Defendant was returning to 72nd and Constance when he received a call from Dion. (R. 582-583, 626) Defendant met Dion, who was in his white Suburban, at either 37th and Federal or 35th and Dearborn. (R. 583, 626, 632, 636) A man, whom defendant did not know, and M.C. exited Dion's car and walked toward defendant's car. (R. 584, 637) M.C. did not have a rope around his neck, he was not bleeding and he did not look beaten. (R. 585) Dion told defendant that M.C. was going to take defendant to the missing cds and tapes. (R. 584-585, 595, 608, 632) Defendant did not force M.C. to be in the car with him. (R. 608)

M.C. directed defendant to Black Ant's house. (R. 585) M.C. walked with defendant to an apartment across the street from defendant's sister's house. (R. 585-586, 637) Defendant did not have a gun pressed against M.C.'s head nor did he have a rope around M.C.'s neck. (R. 586)

13

Defendant and M.C. went to the door but the person who answered stated that Black Ant was not home. (R. 586) Defendant was told he could find Black Ant at a liquor store on 71st Street. (R. 587)

Defendant and M.C. drove to the liquor store. (R. 587) When they went inside the liquor store, no one was there. (R. 588) They returned to the car, drove around the block and when they came around the corner, they saw men coming out of an apartment behind the liquor store. (R. 588) M.C. identified which man was Anthony. (R. 588)

Defendant spoke to Anthony about the deejay equipment and tapes and cds. (R. 589) Anthony told defendant he bought the deejay equipment and paid for it with crack cocaine. (R. 589) Anthony told defendant that if defendant reimbursed Anthony, Anthony would return the equipment. (R. 589)

Defendant drove to Anthony's apartment to retrieve his equipment. (R. 596-597) Anthony and M.C. walked to Anthony's apartment. (R. 597, 637) The police pulled defendant over on his way to Anthony's. (R. 597-598, 634) The officer ran defendant's plates and asked him to step to the back of his car. (R. 598, 634) The officer searched defendant and asked if he knew anything about people breaking into an apartment or a kidnapping and beating. (R. 598, 634, 638) The officer placed defendant in his squad car and drove around the corner to the front of defendant's sister's apartment. (R. 598-599, 635) The officer spoke to a lady or two people and then walked the lady or two people over to the police car where she or they looked at defendant. (R. 599, 635) The people were not M.C. Jones or Lolita. (R. 636) The officer then returned defendant to where he was going. (R. 599) Defendant told the officer that someone had broken into his van and stolen his equipment. (R. 599) Defendant explained that he had found the person who had the equipment and that he was going to get it. (R. 599-600)

14

Defendant bought his equipment back from Anthony. (R. 589) However, Anthony did not have the cds and tapes. (R. 590) Defendant spoke to Dion again at 35th and Dearborn. (R. 590) They decided that they would have the cds and tapes remade and that defendant would have to pay for it. (R. 591) Defendant also learned during this conversation that someone had been beaten at 72nd and Constance. (R. 594, 632) Dion did not tell defendant who had been beaten, who had done the beating or why the person had been beaten. (R. 595)

Defendant left for Iowa so he could gather the original recordings for the cds and tapes. (R. 593, 633) On his way home, defendant dropped M.C. off near his home. (R. 594)

Subsequently, defendant's mother-in-law called defendant in Iowa and told him the Chicago police were looking for him. (R. 602) Defendant called the number and the police informed defendant they were looking for him in connection with a murder that happened in 1999. (R. 602-603) Defendant went to the police station the next morning where he was arrested for murder. (R. 604)

Defendant spoke to Detective Claeson on June 29, 2001. (R. 609) Defendant denied stating that the murder was his fault, that he was responsible for Patrick dying and that he would accept the consequences for it. (R. 610) Defendant, however, did state that his equipment was not worth anyone dying for it. (R. 640)

Sergeant Dean Claeson testified that he and Assistant State's Attorney Curran interviewed defendant at 9:10 p.m. on June 29, 2001. (R. 649) They asked defendant about the kidnapping of Patrick Banks, Lolita Sierra and M.C. Jones and the beating death of Patrick Banks. (R. 649) Defendant denied being involved in kidnapping or beating death. (R. 663)

15

Following this first conversation, Lolita and M.C. identified defendant in separate line-ups. (R. 662) Sergeant Claeson, along with Assistant State's Attorney Ertler, then spoke to defendant again on July 1, 2001 at 2:25 p.m. and confronted him with the line-up identifications. (R. 650, 663) Defendant told Claeson that it was his fault, that he was responsible for Patrick dying and that he would accept the consequences. (R. 649, 663) Defendant told Sergeant Claeson that after he realized his car had been broken into and his deejay equipment was missing from his truck, he observed an old guy standing on the corner. (R. 650, 663-664) The old man nodded at Patrick Banks indicating that Patrick was the one who broke into the car and took the equipment. (R. 650, 663-664)

Sergeant Claeson stated that defendant never stated that he beat or killed Patrick Banks or that he told others to kidnap Lolita and M.C. or beat Patrick. (R. 652-653, 664, 667) Defendant, however, admitted that he was present when Dion and his boys arrived at 72nd and Constance and that he pointed to the window where the victims' lived. (R. 651, 664) Defendant was present when Dion brought Patrick and two other victims down from the apartment. (R. 664-665) Defendant believed that they were going to beat Patrick and get his deejay equipment back. (R. 664)

Defendant later met Dion and M.C. in the area of 37th and Federal. (R. 665) Dion told defendant that M.C. would be able to show defendant where the deejay equipment was. (R. 665) Dion put M.C. in defendant's car and defendant drove to 72nd and Constance. (R. 665-666) While defendant and M.C. were driving around looking for defendant's cds and tapes, defendant stopped at a light or a sign and M.C. jumped out of the car and ran. (R. 666-667)

16

Defendant told Claeson that after he realized that his equipment had been stolen, he also called his cousin who was a ranking member of the Gangster Disciples at 35th and State. (R. 650) Defendant did not give his cousin's name. (R. 650, 660)

Sergeant Claeson stated that he never told defendant to make these statements. (R. 651) He never told defendant that if he made these statements, he could go home. (R. 651) When Claeson interviewed defendant, defendant was not handcuffed. (R. 651, 657) Defendant also never complained that he was cold or that he was frostbitten. (R. 651)

Yolanda Richards, a correctional medical technician, was working in receiving at Cook County Jail on July 2, 2001 when defendant was brought in for processing. (R. 685-687) Defendant told Richards that he was in good health. (R. 686-687) Defendant did not complain about any part of his body and Richards did not notice any abnormality. (R. 687) Her report did not indicate that defendant had any bruising, cutting, swelling, soreness, amputation, bandages, scabs, scars, tattoos, birthmarks or any similar mark. (R. 690)

Following the trial, the jury found defendant guilty of the aggravated kidnapping of Lolita Sierra and M.C. Jones and guilty of the murder of Patrick Banks. (R. 803-804) Subsequently, the court sentenced defendant to 25 years for the murder of Patrick Banks, 6 years for the aggravated kidnapping of Lolita Sierra and 6 years for the aggravated kidnapping of M.C. Jones, the sentences to run consecutively. (R. 849) From this order, defendant now appeals.

17

# ARGUMENT

## I.

### DEFENDANT WAS NOT DENIED THE RIGHT TO A FAIR TRIAL BY THE STATE'S CROSS-EXAMINATION OF HIM OR BY THE STATE'S CLOSING ARGUMENT.

Defendant contends that he was denied the right to a fair trial where the Assistant State's Attorney impeached defendant's testimony with personal opinion and facts not in evidence. (Deft. Br. 13-15) Defendant further contends that he was denied the right to a fair trial by the State's improper arguments to the jury. (Deft. Br. 13, 15-17) Initially, the People maintain that defendant has waived review of these claims.

During cross-examination, the State asked defendant how he felt when he noticed that his car had been broken into and his equipment was gone. (R. 617) Defendant stated that he was upset. (R. 617) The State asked defendant how upset he was and defendant evaded the question. (R. 617) After the court instructed defendant to answer the question, defendant asked the State if the State wanted him to label his feelings on a scale of one to ten. (R. 617) Defendant stated that he would categorize his anger as a three or four. (R. 617) The State responded, "So you are saying you weren't angry?" and defendant stated, "Yes, three or four. I would even give a five." (R. 618) When the State responded, "I would hate to see if it was a ten," the court sustained defendant's objection. (R. 618)

Later during the cross-examination, the State asked defendant about his testimony that police officers pulled him over while he was driving around looking for his equipment. (R. 634) Defendant stated that the police pulled him over and then poignantly asked the State, "They should

18

have it on record, shouldn't they?" (r. 634) The State responded to defendant's question, "No, we don't" and then continued with their cross-examination. (R. 634) Defendant did not object. (R. 634)

The State asked defendant about what occurred during this encounter with the police. (R. 634-635) Defendant stated that the officers took him to 72nd and Constance where there were two people standing on the corner. (R. 635) One of the officers spoke to the people on the corner. (R. 635) The people walked up to the car. (R. 635) When the officer returned to the car, the officers drove defendant back to his car. (R. 635) The State asked defendant what the officer looked like and defendant stated that he was a black male. (R. 635) The State asked defendant what the two people on the corner looked like and defendant stated that one was a male and one was a female but he did not know what they looked like. (R. 635) The State asked defendant if he did not know what the people looked like because the event never took place. (R. 635) The court sustained defendant's objection to this question. (R. 635-636)

The State presented closing argument to the jury. The State asked the jury to picture themselves in their home, with their family when an intruder and nine others, broke into their home armed with a handguns. (R. 692) The State asked the jury to imagine the intruders grabbing their loved ones as the loved ones tried to hide, putting ropes around their necks and forcing them to against their will to another place where they encountered additional offenders who threatened them and then beat one of their loved ones to death. (R, 692-693)

Defendant objected to the personalization of the argument. (R. 692) The court overruled the objection. (R. 692)

After the jury found defendant guilty of aggravated kidnapping of Lolita Sierra and M.C. Jones and guilty of the murder of Patrick Banks, defense counsel filed a motion for judgment

19

notwithstanding the verdict or alternatively, a motion for new trial. (R. C 169) Defendant also filed a pro se motion for new trial. (R. C 172-178) Neither defense counsel nor defendant raised an error with the State's cross-examination of defendant or the State's closing argument in their motions. (R. C 169, 172-178)

In order to preserve an issue for review, a defendant must object both at trial and in a written post-trial motion. People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). Defendant, in this case, only objected to two of the three complained of comments or questions made by the State during cross-examination. (R. 617-618, 634-636) Defendant also did not include any of the complained of comments or questions made during cross-examination or in closing argument in defense counsel's or his pro se motion for new trial. (R. C 169, 172-178) Thus, any issues concerning the State's cross-examination and closing argument have been waived.

This Court should not review the errors pursuant to the plain error rule. The plain error rule only applies where the evidence is closely balanced or when the error is of such a magnitude that the defendant was denied a fair trial. People v. Mullen, 141 Ill. 2d 394, 402, 566 N.E.2d 222 (1990); People v. Lucas, 88 Ill. 2d 245, 251, 430 N.E.2d 1091 (1981). Neither of these prerequisites has been met here.

The evidence of defendant's guilt was overwhelming. Shortly after Patrick Banks and Lolita Sierra stole deejay equipment and cds from defendant's car, ten men broke into the apartment where Patrick, Lolita, M.C., Joyce, and Billy Ray were hanging out. (R. 341-347, 377-379, 419-420, 440) Lolita and M.C. identified defendant as one of the men and the one who informed the other men to get the people who broke into his truck. (R. 345-347, 419-420, 440)

20

M.C. identified defendant as the person who grabbed him by the collar, walked him over to Lolita and placed a rope around M.C.'s and Lolita's neck. (R. 348, 420-421, 441, 461) Defendant put a gun to M.C.'s head, pulled back the trigger and threatened to kill M.C. (R. 420, 439-440)

Defendant led Lolita and M.C. downstairs. Leo Johnson, who earlier was in the apartment with M.C., Lolita and Patrick, was outside when he observed M.C. and Lolita on the street with ropes around their necks. (R. 474-475) A black man was holding the rope and there were five to six other guys on the street with bats and sticks. (R. 475-476) Leo stated that he saw the man pull Lolita and M.C. into a white truck. (R. 476)

Defendant led Lolita and M.C. to a four-door white Blazer or van parked on 72nd and Constance. (R. 351-352, 395, 405, 448-449) There were either two or three men and defendant in the car. (R. 351-352, 421, 448-449) M.C. noticed a brown car behind the van. (R. 421, 450-451) Patrick was in the brown car and the men in the brown car were beating him. (R. 421)

Defendant put Lolita and M.C. in the car on either side of a man in the back seat. (R. 351-352, 448-449) Defendant then sat in the front passenger seat and the driver drove the group to the housing project parking lot at 35th and State. (R. 352-353, 356, 422) Around the same time as the car in which Lolita and M.C. were riding arrived in the parking lot at the projects, a brown Buick with Patrick in it arrived. (R. 355-356, 423, 425) The men were hitting Patrick. (R. 356) Patrick and the men exited the car and started to walk toward the projects. (R. 356) Patrick saw a police car, ran and tried to flag it down. (R. 356, 423, 452) Defendant told the men to get Patrick. (R. 356) The men caught him and started to beat him. (R. 356) The men, all of whom had guns, kicked Patrick about the head and face. (R. 356-358)

21

After the men beat Patrick for fifteen to twenty minutes, defendant led Patrick into the building at the location. (R. 358) The other men followed defendant and Patrick and led Lolita and M.C. into the building and up the stairs to the second or third floor. (R. 358-359) As they walked up the stairs, Lolita lost sight of Patrick. (R. 360) M.C., however, saw the men, including defendant, beat Patrick. (R. 423-424, 426, 453) Defendant turned to the men who had Lolita and M.C. and told them to let Lolita and M.C. go. (R. 360, 426)

The police found an unconscious and beaten Patrick Banks around 1:30 at 3542 South State on June 25, 1999. (R. 486-487, 490-492) Patrick Banks was brought to the hospital where he died a few days later. (R. 507, 509)

An autopsy revealed an eleven inch surgical incision on the right side of the head. (R. 508) Patrick had arrived at the hospital in a coma with a subdural hematoma and a craniotomy was performed. (R. 508-509) When the surgeon removed a piece of bone, the brain was so swollen that it started to press through the space. (R. 517) There was a curved abrasion on Patrick's left shoulder, a large abrasion on the back of Patrick's right shoulder, two abrasions to the back of Patrick's right elbow, an abrasion on the posterior of Patrick's right forearm, and two abrasions on the outside of Patrick's right hip. (R. 510-511) There was a bite mark on the left side of Patrick's tongue. (R. 513) There was a subgaleal hemorhage on the right side of the head and another on the left side of the head toward the back. (R. 511-512) There was massive swelling and softening of the brain and a massive contusion to the frontal lobe directly above the eye as the result of the blunt trauma. (R. 512-513, 516-517) The autopsy revealed that Patrick Banks died of cerebral injuries to the brain due to blunt trauma and that the manner of death was homicide. (R. 517)

22

Lolita spoke to the police about what happened to Patrick Banks on July 18, 1999. (R. 522) During the conversation, Detective Szudarski noticed ligature marks on Lolita's left side. (R. 523) She told the officers that she believed the offender was Deejay Milton. (R. 410-412, 523) Lolita described defendant as twenty-six years old or older, with a brown complexion, short hair, around five feet eight inches to five feet ten inches tall, 155 to 160 pounds and a muscular build. (R. 410-412)

A police officer showed Lolita photographs of six men at the police station on August 3, 1999. (R. 362-363, 366, 524) Lolita identified defendant's photo and indicated defendant was the person who gave the orders, who kidnapped her and M.C. and who killed Patrick. (R. 363-364, 525-527) A police officer showed M.C. six photographs on June 7, 2001. (R. 428, 539-540) M.C. identified defendant's photo and indicated defendant was the person who put a rope around his neck, kidnapped him at gunpoint and beat Patrick to death. (R. 430, 540-541)

On June 29, 2001, the police contacted Lolita and brought her to the station to view a line-up. (R. 364, 548-549) Lolita identified defendant as the person who kidnapped her, M.C. and Patrick and who beat Patrick. (R. 365, 550) The police brought M.C. to the station on June 30, 2001 to view a line-up. (R. 430, 552-553) M.C. identified defendant in the line-up as the person who kidnapped him, Lolita and Patrick. (R. 431, 553)

Lolita's and M.C.'s testimony established that defendant took Lolita, M.C. and Patrick from one place to another at gunpoint and against their wishes. Lolita's and M.C.'s testimony established that defendant beat Patrick. An autopsy revealed that Patrick died from the injuries he sustained in that beating. Lolita's and M.C.'s testimony was corroborated by Leo Johnson who observed a man taking Lolita and M.C. from the apartment on 72nd and Constance bound by rope and against their

23

will. Lolita's and M.C.'s testimony was corroborated by the police officer who noticed ligature marks on Lolita's neck just days after the kidnapping and murder. Clearly, the evidence of defendant's guilt of aggravated kidnapping and murder was overwhelming.

In addition to the overwhelming evidence of guilt, any error with the cross-examination and closing argument, as discussed within this argument, was not of such a magnitude that it denied defendant the right to a fair trial. Thus, the plain error rule does not apply here.

Defendant contends that if this Court refuses to consider the issues pursuant to the plain error rule, then this Court should grant a new trial because he was denied the effective assistance of counsel based on counsel's failure to properly preserve this issue for appeal. To establish a claim of ineffective assistance of counsel, a defendant must prove that his counsel's representation fell below an objective standard of competence and that, but for that failure, the outcome of his trial would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, (1984). Accordingly, if the underlying claim has no merit, no prejudice resulted, and petitioner's claims of ineffective assistance of counsel must fail. People v. Coleman, 168 Ill. 2d 509, 523, 660 N.E.2d 919 (1995).

In this case, defendant's underlying claims of prosecutorial misconduct, as discussed within this Argument, lack merit. Moreover, as discussed within this Argument, the evidence of defendant's guilt was overwhelming and the impact of any error, if there was any impact at all, was minimal and did not affect the outcome of the trial. Thus, counsel was not ineffective for failing to preserve issues that lacked merit and would not compel or warrant reversal.

Notwithstanding the waiver, the People maintain that defendant was not denied the right to a fair trial by the State's cross-examination of him. In general, any permissible kind of impeaching

24

matter may be developed on cross-examination since one of the purposes of cross-examination is to test the credibility of the witness. People v. Hall, 195 Ill. 2d 1, 23, 743 N.E. 2d 126 (2000). The scope of cross-examination is a matter within the discretion of the trial court, and a court of review will not find error unless the trial court abused that discretion. People v. Stack, 311 Ill. App. 3d 162, 177, 724 N.E.2d 79 (1st Dist. 1999). A trial court's ruling regarding the scope of cross-examination will not be disturbed on appeal unless the ruling resulted in manifest prejudice to the defendant. People v. Terrell, 185 Ill. 2d 467, 498, 708 N.E. 2d 309 (1998).

In this case, the State sought to discredit defendant's testimony that he was not that angry with the people who stole his deejay equipment and cds. After defendant attempted to identify his level of anger on a one to ten scale, the State properly elicited testimony that defendant's anger only measured a three, four or five. The State simply prefaced the ensuing series of questions regarding defendant's anger with the simple statement that the State would hate to see a ten. The line of cross-examination being pursued by the State was proper and any prefacing comment was minimal and therefore, not error.

The State sought to discredit defendant's claim that he was driving around alone looking for his equipment and while he was driving, the police pulled him over. During the portion of the cross-examination addressing this claim, defendant asked the State a question. The State briefly responded and then continued with their cross-examination. Generally, a defendant may not complain of error which he invited or in which he acquiesced. People v. Lowe, 153 Ill. 2d 195, 199, 606 N.E.2d 1167 (1992). Defendant asked the question and invited the response. Thus, defendant cannot now complain about that which he invited.

25

Finally, the State sought to discredit defendant's claim that when the police pulled him over, the police had two individuals on the street look at defendant in a street identification process. The State merely asked defendant what these people looked like and when he could only state that one was male and one was female, the State asked defendant whether this event even took place.

It is proper for the State to question defendant's credibility on cross-examination. People v. Terrell, 185 Ill. 2d 467, 498, 708 N.E.2d 309 (1998). The State, here, simply asked defendant a question that was directed at the credibility of his incredible testimony.

Defendant overlooks that his objections to the State's cross-examination which questioned how angry he was when his equipment was stolen and which questioned whether the police pulled him over were sustained by the trial court. (R. 618, 635-636) The jury was instructed to disregard questions where the objections had been sustained or answers stricken. (R. C 131) Thus, these claimed errors were cured by the trial court's ruling and later instruction to the jury. People v. Hall, 194 Ill. 2d 305, 345-46, 743 N.E.2d 521 (2001) (error cured when trial court sustains objection and instructs jury to disregard).

Moreover, improper cross-examination is not reversible error if it can be considered harmless. People v. Enis, 139 Ill. 2d 264, 296, 564 N.E. 2d 1155 (1990). As just discussed, the evidence of defendant's guilt in this case was overwhelming. Also, the alleged improper cross-examination did not elicit any useful testimony. Rather, it consisted of three minimal and meaningless questions and comments. Thus, any error with the State's cross-examination was harmless.

The People further maintain that defendant was not denied the right to a fair trial when the State told the jury to place themselves in the shoes of the victims in this case. (Deft. Br. 15-17)

26

Even though these remarks were improper, reversal is not warranted because the remarks were not so prejudicial as to deprive defendant of a fair trial. A prosecutor's allegedly improper remarks must be reviewed within the context of the entire closing arguments. People v. Kliner, 185 Ill. 2d 81, 705 N.E.2d 850 (1998); People v. Wood, 341 Ill. App. 3d 599, 793 N.E.2d 91 (2003). While it is improper for the prosecutor to ask jurors to identify with the victim, a jury's verdict will not be reversed on review unless the improper comment caused substantial prejudice to the defendant. Wood, 341 Ill. App. 3d 599.

Here, having considered the State's remarks in context, it is clear that the comments were not so inflammatory as to cause substantial prejudice to defendant. As just stated, the evidence of defendant's guilt was overwhelming. Moreover, the State briefly asked the jury to imagine themselves in the shoes of the victim and then concentrated the remainder of their argument on what happened to the victims in the case. (R. 692- 721, 750-766) Defendant used the State's argument asking the jurors to identify with the victims to his advantage and asked the jury to identify with defendant. (R. 721-722) because defendant was not prejudiced by the State's comments in closing, defendant is not entitled to a new trial.

## II.

### THE COURT ACTED PROPERLY WHEN IT DID NOT APPOINT COUNSEL TO REPRESENT DEFENDANT ON HIS MOTION FOR NEW TRIAL WHERE HIS CLAIM OF INEFFECTIVE ASSISTANCE LACKED MERIT.

Defendant contends that the trial court erred when it did not appoint new counsel to represent him at the motion for new trial where defendant raised a colourable claim of ineffective assistance of trial counsel in his pro se motion for new trial. (Deft. Br. 20-25) The People maintain that the court acted properly when it did not appoint new counsel to represent defendant on his claim of ineffective assistance of counsel where the court reviewed defendant's written and oral claims of ineffective assistance and determined they lacked merit.

After defendant was found guilty of aggravated kidnapping and murder, defense counsel filed and argued a motion for judgment notwithstanding the verdict or alternatively, a motion for new trial. (R. 803-804, 810, 816); (R. C 169) On the same day, the court considered defendant's pro se motion for "post-trial relief." (R. C 172-178) In the motion, defendant alleged that he had been denied the effective assistance of counsel during the trial because counsel failed to properly investigate the case, failed to investigate or interview any witnesses for the defense, and failed to retain an investigator to interview witnesses or investigate statements in the police reports. (R. C 172-174) Defendant claimed counsel failed to give any meaningful consultation during the two years prior to trial, failed to show or review the discovery with defendant, failed to visit defendant to prepare defendant or discuss the defense strategy for trial, failed to discuss character witnesses with defendant, failed to keep defendant informed of the status or information of the case, and failed to keep defendant's family informed about the case. (R. C 172-174) Defendant claimed that

28

counsel failed to prepare and present pre-trial motions requested by defendant, failed to return phone calls from material witnesses for the defense, failed to subpoena people involved in the case for trial, failed to use information provided by defendant in motions or at trial, failed to investigate the facts of the case, failed to discuss the pros and cons of a possible plea agreement and failed to present character witnesses at sentencing. (R. C 172-174) Defendant listed five potential witnesses, evidence he possessed pertaining to each witness, possible places to contact each witness and the reason why each witness was relevant. (R. C 175)

Defendant argued his claim of ineffective assistance to the court. (R. 835-846) Defendant reiterated many of the points raised in his written motion. (R. 835-846) Defendant also claimed that he was not proven guilty beyond a reasonable doubt and challenged the statements he made to the police. (R. 835-846) After listening to defendant's argument, the court denied defendant's motion stating that defendant received a very fair trial, that the evidence of his guilt was overwhelming and that defendant's attorney did a good job defending defendant to the best of his ability based on what he had to work with. (R. 846-847)

The court has never held that new counsel must be appointed when a defendant presents a pro se post-trial motion alleging ineffective assistance of counsel. People v. Towns, 174 Ill. 2d 453, 466, 675 N.E.2d 614 (1996). Rather, when a defendant presents a pro se post-trial claim of ineffective assistance of counsel, the trial court should first examine the factual basis for the defendant's claim. People v. Moore, 207 Ill. 2d 68, 77-78, 797 N.E. 2d 631 (2003). If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then new counsel need not be appointed, and the trial court may deny the pro se motion. People v. Bull, 185 Ill. 2d 179, 210-11, 705 N.E.2d 824 (1998); People v. Kidd, 175 Ill. 2d 1, 44-45, 675 N.E.2d 910 (1996).

29

The operative concern for the reviewing court is whether the trial court conducted an inquiry into the pro se defendant's allegations of ineffective assistance of counsel. People v. Moore, 207 Ill. 2d 68, 78-79, 797 N.E. 2d 631 (2003). A brief discussion between the trial court and the defendant may be sufficient. Id. People v. Chapman, 194 Ill. 2d 186, 228-229, 743 N.E. 2d 48 (2000). Also, the trial court can base its evaluation of the defendant's pro se allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. Id.; People v. Towns, 174 Ill. 2d 453, 466, 675 N.E.2d 614 (1996).

In this case, the court adequately inquired about defendant's allegations. The court accepted and acknowledged the contents of defendant's pro se motion for a new trial. (R. 839); (R. C 172) The court allowed defendant to argue his claims of ineffective assistance of counsel. (R. 835-846) A simple review of defendant's written motion and oral argument reveals that all of defendant's allegations consisted of bare assertions that lacked support in the record or by affidavit. The court was satisfied with the manner in which counsel investigated and presented a defense for defendant even stating that counsel did the best he could based on the facts with which he had to work.

Contrary to defendant's claims, defense counsel could not have called the witnesses defendant claimed counsel should have investigated and whose testimony defendant claimed would have changed the outcome of the trial. (R. C 175) Defendant accused three of the witnesses, "Deeon" Boyd, Allan Shanklin and Draino, of participating in the aggravated kidnapping and murder. (R. C 175) Another witness was defendant's sister and while she may have lived in the building from which the victims were kidnapped, there is nothing in the record or motion which suggests that she was even present when it occurred. (R. C 175) While it is not clear from the

30

record or motion as to whether the last witness, Melinda Latham, was present and witnessed the beating and that she may have been able to testify that defendant was not present when the beating occurred, the State argued throughout the trial that defendant ordered the beating and as a result of this order, was guilty of murder. (R. 692-766) Also, there is nothing in the record which indicates that defense counsel never spoke to these witnesses. Regardless, the decision as to whether to call certain witnesses is a matter of trial strategy, generally reserved to the discretion of trial counsel. People v. Kidd, 175 Ill. 2d 1, 44-45, 675 N.E. 2d 910 (1996)(holding that the trial court did not err in failing to appoint new counsel to represent the defendant on his pro se post-trial motion, which alleged that trial counsel was ineffective for failing to call certain alibi witnesses).

Finally, the evidence of defendant's guilt was overwhelming. See, Argument I. This was a factor considered by the court when it evaluated and rejected defendant's pro se claim of ineffective assistance of counsel.

The trial court adequately inquired into defendant's allegations of ineffective assistance of trial counsel. The matters about which defendant complained lacked support and merit and involved a question of trial strategy. The trial court reviewed counsel's performance as well as the overwhelming evidence of guilt introduced at trial. The trial court concluded that counsel provided effective representation. Therefore, the trial court did not err in failing to appoint counsel to assist defendant in presenting the pro se post-trial motion.

31

## III.

**DEFENDANT WAS NOT ENTITLED TO A FITNESS HEARING BEFORE THE COURT PROCEEDED WITH THE POST-TRIAL MOTION AND SENTENCING HEARING BECAUSE THE TRIAL COURT DID NOT HAVE A BONA FIDE DOUBT AS TO DEFENDANT'S FITNESS.**

Defendant contends that this Court should vacate the order denying his motion for new trial and vacate his sentence and remand his case for a fitness hearing because defendant was not taking his medication as prescribed during the proceedings. (Deft. Br. 26) The People maintain that the court acted properly when it continued with the proceedings where the court did not have a bona fide doubt as to defendant's fitness.

Defendant was arrested on June 29, 2001 for the aggravated kidnapping of Lolita Sierra and M.C. Jones and the murder of Patrick Banks. (R. C 9-14) Defendant attempted suicide several times while he was in jail. (R. 47) As a result, a behavioral clinical examination was ordered on September 20, 2001. (R. C 4) Dr. Pan examined defendant and concluded that defendant was "fit to stand trial with medication." (R. C 72) Dr. Pan stated that defendant was alert, oriented, and able to assist counsel in his own defense. (R. C 72) Dr. Pan listed defendant's medication and stated, "Although it appears that Mr. Jones may be experiencing some mild sedation, during the course of the clinical interview, it was not apparent that he was suffering from side effects from this medication regimen to the extent that it would adversely interfere with his ability to stand trial." (R. C 73)

After a jury convicted defendant of the aggravated kidnapping of Lolita Sierra and M.C. Jones and the murder of Patrick Banks on February 27, 2004, the court ordered a pre-sentence

32

investigation report. (R. C 3, 9-13) At the time the report was compiled, defendant was talking his medication. (R. C 85)

The motion for new trial and sentencing hearing was originally set for April 6, 2004. (R. 810) Defense counsel asked for a continuance and the court set the case for April 21, 2004. (R. 810) Before concluding the appearance, defendant informed the court he wanted to see the discovery in the case. (R. 811) The court informed defendant that he could not see it because he was represented by an attorney. (R. 811) When the court indicated that he would be entitled to see the discovery if he represented himself, defendant informed the court he wanted to file his own motion for new trial. (R. 811-812) The court instructed defendant and defense counsel to discuss the situation and return to court on April 21st. (R. 812-813)

On April 21, 2004, defendant filed his own motion for new trial. (R. C 172-178); (R. 816) In the motion, defendant claimed that he was denied the effective assistance of counsel. (R. C 172-178) Defendant argued his motion before the court. (R. 816, 835-846) During his argument, defendant informed the court that after speaking to his attorney on April 6th and learning that his lawyer did not believe defendant had any grounds for a new trial, defendant began taking only half of his medication. (R. 841-842) Defendant continued to criticize the representation he received from his attorney. (R. 841-845) When defendant again raised the issue of his medication, defense counsel objected and questioned whether continuing with the proceedings was proper since defendant was not taking his medication as prescribed. (R. 845) The court continued with the proceedings ultimately denying defendant's motion for new trial and sentencing him. (R. 845-849)

In Illinois, a defendant is presumed fit to stand trial. 725 ILCS 5/104-10. A defendant is entitled to a fitness hearing only when a bona fide doubt of the defendant's fitness is raised. 725

33

ILCS 5/104-11(a); People v. Johnson, 183 Ill. 2d 176, 700 N.E.2d 996 (1998). A defendant is considered unfit to stand trial if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. People v. Moore, 189 Ill. 2d 521, 535, 727 N.E. 2d 348 (2000); People v. Haynes, 174 Ill. 2d 204, 226, 673 N.E.2d 318 (1996). Evidence that a defendant is mentally unsound does not necessarily establish that he or she is unfit to stand trial because the fitness standard only concerns defendant's ability to understand the proceedings and assist counsel, not mental fitness in other areas of life. People v. Easley, 192 Ill. 2d 307, 322, 736 N.E. 2d 975 (2000); People v. Eddmonds, 143 Ill. 2d 501, 519, 578 N.E. 2d 952 (1991). Whether a bona fide doubt as to a defendant's fitness has arisen is generally a matter within the discretion of the trial court. People v. Murphy, 72 Ill. 2d 421, 431, 381 N.E.2d 677, (1978).

In this case, defendant's sole basis for contending that an inquiry should have been made into his fitness is that he told the court he had only been taking half of his medication for two weeks. (Deft. Br. 26-28) The examining psychiatrist's conclusion that defendant was fit for trial while on medication did not mean that defendant was fit because of the medication. Dr. Pan's report clearly indicates that he was assessing whether the medication rendered defendant unfit for trial not whether the medication rendered him fit for trial and that he concluded that defendant was fit even while on medication. (R. C 73)

Moreover, defendant's claim that there was a bona fide doubt that he was not fit without his medication is not supported by the record. The trial record belies any claim that defendant did not understand the nature of the proceedings or was unable to assist in his defense. Defendant exhibited rational and competent behavior at the hearings. Defendant's argument at the motion for new trial

34

was detailed, coherent and responsive to questions. Defendant also engaged in colloquies with the trial judge in which he was responsive and appropriately acknowledged certain rights. For example, defendant was arguing his ineffective assistance of counsel claim to the court. When the court indicated that defendant's attorney was not at issue, defendant set the court straight by stating, "He's a big issue. Because I didn't have a fair trial because I received ineffective assistance of counsel, because he didn't hire an investigator. He didn't do nothing for me to help me. Right now, he didn't put any witnesses on my behalf because he failed to investigate..." (R. 837) Later, defendant reiterated that he wanted to present his motion for new trial and even asked for permission to hand the court the written copy before giving it to the court. (R. 839) Defendant also had a copy for the State. (R. 839) Such exchanges do not display any confusion about the nature of the proceedings. The trial court had the opportunity to observe defendant's conduct and demeanor firsthand during the proceedings, yet expressed absolutely no concerns about defendant's ability to understand the nature of the proceedings.

While defense counsel asserted the court should not continue with the motion for new trial and sentencing hearings because defendant was not taking his medication, defense counsel never stated that there was a bona fide doubt as to whether defendant was able to understand the nature and purpose of the proceedings against him and assist in his defense. "An assertion by counsel that a defendant is unfit does not, of itself, raise a bona fide doubt of competency." People v. Eddmonds, 143 Ill. 2d 501, 519, 578 N.E. 2d 952 (1991). More importantly, counsel did not provide any facts to substantiate his concern that defendant's failure to be properly medicated rendered defendant unfit for trial. Finally, there is nothing in the record which substantiates defendant's claim that he was not taking his medication.

35

The court did not have a bona fide doubt as to defendant's fitness at the motion for new trial or the sentencing hearing despite defendant's unsupported statement that he stopped taking his medication. Thus, the court acted properly when it continued with proceedings and this Court should not remand this case for further fitness and sentencing proceedings.

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's convictions for murder and aggravated kidnapping.

Pursuant to <u>People v. Nicholls</u>, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(West 2004) and 55 ILCS 5/4-2002.1 (West 2004), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to <u>People v. Agnew</u>, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (West 2004), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.Respectfully Submitted,

> RICHARD A. DEVINE,
> State's Attorney,
> County of Cook,
> Room 309 - Richard J. Daley Center,
> Chicago, Illinois 60602
>
> <u>Attorney for Plaintiff-Appellee</u>

JAMES E. FITZGERALD,
JANET C. MAHONEY,
Assistant State's Attorneys.
<u>Of Counsel</u>.

No. 1-04-1359

### IN THE

### APPELLATE COURT OF ILLINOIS

### FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 01 CR 18654 (01). |
| | ) | |
| MILTON JONES, | ) | Honorable |
| | ) | Preston L. Bowie, |
| Defendant-Appellant. | ) | Judge Presiding. |

### REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

STEPHEN L. GENTRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

EXHIBIT D

No. 1-04-1359

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 01 CR 18654 (01). |
| | ) | |
| MILTON JONES, | ) | Honorable |
| | ) | Preston L. Bowie, |
| Defendant-Appellant. | ) | Judge Presiding. |

**REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

I.    **MILTON JONES WAS DENIED A FAIR TRIAL (A) WHEN THE PROSECUTOR
ATTEMPTED TO IMPEACH HIS TESTIMONY WITH PERSONAL OPINION
AND ALLEGED FACTS NOT PROPERLY IN EVIDENCE, AND (B) WHEN THE
PROSECUTOR ASKED THE JURORS TO PUT THEMSELVES IN THE
VICTIMS' POSITION AND IMAGINE THEIR "WORST NIGHTMARE."**

The State argues initially that Milton Jones has waived review of his prosecutorial

misconduct claims by failing to include them in a post-trial motion, and, in one of the three cited

instances of misconduct, failing to object at trial. (St. Br. 19-20)  The State argues that waiver

applies because that the evidence in this case is not closely balanced, and because the misconduct

did not deprive Jones of a fair trial. (St. Br. 20)  The State argues that this court should therefore

decline to review this issue as either plain error, or as ineffective assistance of counsel. (St. Br.

20, 24)  However, as Milton Jones noted in his opening brief, the evidence against Milton Jones

was far from overwhelming.  The State's case relied on the identification testimony of two

-1-

eyewitnesses, Lolita Sierra and M.C. Jones, each of whom admitted to having impaired their

memories by smoking crack cocaine on numerous occasions, including, significantly, the

morning of the incident, which took place over four years prior to the trial. (R. 345, 381-384,

397, 439, 446, 456) Lolita Sierra was further impeached with her prior inconsistent statement

concerning the incident, and M.C. Jones testified inconsistently about whether or not he was high

on cocaine at the time of the incident. (R. 396, 455) Milton Jones testified on his own behalf

that, although he did seek out the return of his stolen equipment with the assistance of his partner

Dion Boyd, as well as M.C. Jones, he did not participate in any kidnapings or beatings in the

course of so doing. (R. 581, 589-590, 595-596) The case was thus closely balanced, and this

court should therefore review, as plain error or ineffective assistance of counsel, the foregoing

pattern of prosecutorial misconduct which deprived Milton Jones of a fair trial.

In addressing the substance of Jones' allegations, the State concedes that the prosecutor

improperly requested the jury to identify themselves with the victims in this case and imagine

experiencing their "worst nightmare," stating "these remarks were improper." (St. Br. 27) The

State nevertheless argues that this error should not be cause for reversal because the comment did

not cause substantial prejudice to Jones, citing *People v. Wood*, 341 Ill. App. 3d 599, 793 N.E.2d

91 (2003). However, in *Wood*, the evidence against the defendant was overwhelming, including

a written confession to the offense. *Id.* Here, by contrast, the case was closely balanced, as

discussed above. The instant case is further distinguished from *Wood* in that the defendant in

*Wood* did not object to the prosecutor's invitation to the jury to identify themselves with the

victim, whereas Jones did object.

With reference to the prosecutor's statement to the jury that the State did not have records

-2-

of the traffic stop to which Jones testified, the State argues that Jones is precluded from complaining of this error because he invited it by asking the prosecutor if "they" had any record of the stop, citing in support of this argument only *People v. Lowe*, 153 Ill.2d 195, 199, 606 N.E.2d 1167 (1992). (St. Br. 25) However, the *Lowe* Court did not address any issue involving improper prosecutorial testimony, and the State's reliance on it is wholly misplaced.

Jones also raised issue with prosecutor Farmakis' response to his statement that he couldn't give a description of the people to whom police had shown him, wherein Farmakis had exclaimed, "Because it didn't happen, right? That's why you don't know what they look [like], because it didn't happen?" (R. 635) Although the trial court sustained defense counsel's objection to the prosecutor's argumentative interrogation, the State nevertheless asserts that the prosecutor was merely engaging in proper examination of Jones' credibility, citing to *People v. Terrell*, 185 Ill.2d 467, 498, 708 N.E.2d 309 (1998). (St. Br. 26) However, the *Terrrell* Court did not uphold argumentative badgering and accusatory insinuation, such as that complained of here, as a proper method of impeaching a witness' credibility, and the State's reliance on it is therefore inapposite. Rather, the *Terrell* Court upheld the trial court's limitation, in that case, of the scope of cross-examination. *Id*. The instant case is not one of a proper examination of a witness' credibility, but rather an improper statement of prosecutorial opinion that the defendant is lying not based on the evidence. *People v. Tiller*, 94 Ill. 2d 303, 319, 447 N.E.2d 174 (1982)

The State contends that the prosecutor's improper testimony that it would hate to see Jones' anger at level ten was "minimal and therefore, not error." (St. Br. 25) The State further argues that, because the trial court sustained defense counsel's objection to the prosecutor's improper statement regarding Jones' level of anger and improper prosecutorial testimony

-3-

regarding whether Jones had been pulled over by police, and because the jury was instructed at the end of the case to disregard all questions to which objections had been sustained, the errors were cured of any prejudice to him. (St. Br. 26)  The State cites, in support of this argument, *People v. Hall*, 194 Ill.2d 305, 345-46, 743 N.E.2d 521 (2001).

The defendant in *Hall* raised issue with a question posed by the prosecutor asking a witness if he had been a gang member. *Id.*  The question was never answered by the witness, and the trial court sustained defense counsel's objection and instructed the jury, at the close of the case, to disregard all questions to which objections had been sustained. *Id.*  The *Hall* Court cited to *People v. Coleman,* 158 Ill. 2d 319, 343, 633 N.E.2d 654 (1994), which hold that where the question was answered by the witness prior to the court sustaining the objection, the jury must be instructed to disregard the testimony at the time the objection is sustained. *Id.*

Here, unlike in *Hall*, there was improper testimony put before the jury, not by the witness, but by the prosecutor, who went beyond asking questions, and affirmatively testified to the jury that police had no record of the traffic stop testified to by Jones.  Although the trial court did sustain defense counsel's objection, and, at the close of the trial, instruct the jury to disregard questions to which the court had sustained objections, the trial court did not instruct the jury to disregard the prosecutor's improper testimony at the time it was put before them.  The trial court's actions were therefore insufficient to alleviate the impact of the prosecutor's misconduct.

There is little doubt that the misconduct outlined above deprived Milton Jones of a fair trial.  Accordingly, this court should review the prosecutorial misconduct issues raised herein as plain error, reverse Milton Jones' convictions, and remand this cause for a new trial.

-4-

II.   **THE TRIAL COURT ERRED WHEN IT DID NOT APPOINT NEW COUNSEL TO REPRESENT MILTON JONES ON HIS POST-TRIAL MOTION AFTER MR. JONES ALLEGED A COLORABLE CLAIM OF HIS TRIAL COUNSEL'S INEFFECTIVENESS AND NEGLECT.**

The State argues that the trial court did not err by failing to appoint new counsel to represent Jones on his post-trial claim of ineffective assistance of counsel because "the court reviewed his written and oral claims of ineffective assistance and determined they lacked merit." (St. Br. 28) However, a *pro se* defendant does not have to show that he would succeed on an ineffective assistance of counsel claim, but rather that such a claim has "potential merit." *People v. Brandon*, 157 Ill. App. 3d 835, 847, 510 N.E.2d 1005 (1st Dist. 1987) When a defendant claims in a post-trial motion that his counsel provided ineffective trial assistance, the reviewing court must determine whether the trial court conducted an adequate inquiry into the *pro se* defendant's allegations of ineffective assistance of counsel so as to determine whether the allegations have potential merit. *People v. Johnson*, 159 Ill. 2d 97, 125, 636 N.E.2d 485, 197 (1994). The court here did not address Mr. Jones' specific allegations of ineffectiveness, and denied Mr. Jones' request for a new trial and/or new counsel. (R. 846) The court instead stated that defense counsel did a good job with what he had to work with, and found that the evidence was overwhelming. (R. 847)

The State asserts that "defense counsel could not have called the witnesses defendant claimed counsel should have investigated and whose testimony defendant claimed would have changed the outcome of the trial." (St. Br. 30) The State supports this argument by stating that Jones had accused three of the witnesses–Boyd, Allan Shanklin, and Draino–of participating in the incident, but it fails to support its conclusion with a citation to any legal authority.

-5-

Furthermore, the State fails to offer an explanation as to why counsel could not have called the other two named witnesses, Ketrena Jones and Melinda Latham. (St. Br. 30) Notably, the trial court asked defense counsel no questions concerning his failure to investigate witnesses.

The State further notes that there is nothing in the record or motion which suggests that neither Ketrena Jones nor Melinda Latham witnessed any of the relevant events in the case. (St. Br. 30-31) However, the record likewise does not indicate that they did not witness the incident, or otherwise possess relevant information, and therefore the trial court's inquiry was insufficient to establish that Jones' claim of ineffectiveness was without merit regarding counsel's failure to interview these witnesses. Likewise, the State's argument that the record does not demonstrate that counsel never spoke with these individuals also points out the failure of the court to adequately inquire as to the potential merit of Jones' claims of ineffective assistance of counsel. (St. Br. 31)

The State argues that the trial court did not err in failing to appoint new counsel to represent Jones on his motion because the decision to call witnesses is a matter of trial strategy, generally reserved for the discretion of trial counsel, citing to *People v. Kidd*, 175 Ill. 2d 1, 44-45, 675 N.E.2d 910 (1996). However, unlike in *Kidd*, Jones allegation here, which is unrebutted by the record, is that his attorney failed even to investigate the purported exculpatory witnesses. (R. 837) *Kidd* is thus inapplicable to the instant case. The instant case is further distinguished from *Kidd* because the court in *Kidd* relied in part on the fact that the record there indicated that the testimony would not have been likely to be of much help to the defendant, whereas the record here fails to make a similar showing. *Id.*

Accordingly, Milton Jones respectfully requests that this court remand the cause for

-6-

appointment of counsel and an inquiry into Mr. Jones' claims of ineffective assistance of trial

counsel.

-7-

III.   **THE TRIAL COURT ERRED BY FAILING TO CONDUCT A FITNESS HEARING AFTER MILTON JONES RAISED A *BONA FIDE* DOUBT OF HIS FITNESS WHEN HE REVEALED THAT HE WAS NOT TAKING HIS PRESCRIBED MEDICATIONS, WHICH WERE NECESSARY TO HIS FITNESS.**

The State argues that there was no *bona fide* doubt of Jones' fitness because, while he had been found to be fit with medication, and had informed the court that he was only taking half of his prescribed medications, the forensic clinical services report had not specifically stated that Jones was unfit without the prescribed medication. (St. Br. 34) However, the State fails to acknowledge, as Jones noted in his opening brief, that where Mr. Jones was determined by the examining psychiatrist to be fit with medication, he could very likely have been unfit without this medication. *See People v. Jones,* 349 Ill. App. 3d 255, 812 N.E.2d 32 (3rd Dist. 2004) (defendant fit with medication may be unfit without medication).

The State argues that defense counsel's objection to continuing with the proceedings due to Jones' failure to take his medication was insufficient to raise a *bona fide* doubt of his fitness because counsel did not elaborate on his reasons for objecting, and because the record does not demonstrate that Jones was unable to assist in his own defense or understand the proceedings. (St. Br. 34) However, it is disingenuous to suggest that the court did not understand the nature of counsel's objection, given the history of the case, and the court's previous order that Jones be examined as to his fitness for trial after a suicide attempt. (R. 47) Furthermore, Jones' ineffective assistance of counsel claims demonstrate that the attorney-client relationship had broken down, which indicates that Jones was not able to effectively assist counsel in his defense. The State further notes that "an assertion by counsel that a defendant is unfit does not, of itself, raise a *bona fide* doubt of competency" quoting from *People v. Edmonds,* 143 Ill. 2d 501, 519,

-8-

578 N.E.2d 952 (1991). The State's reliance on *Edmonds* is misplaced, because Jones relies not only on counsel's objection, but also on forensic clinical services' previous determination that Jones is fit for trial while on medication, and on the fact that Jones informed the court that he was not taking the full dosage of his medications, but, rather, only half of that dosage. The State asserts that "there is nothing in the record which substantiates defendant's claim that he was not taking his medication," but there is likewise nothing in the record which contradicts Jones' assertion. (St. Br. 35)

Because Mr. Jones' reported failure to take his medication as prescribed raised a *bona fide* doubt of his fitness, the trial court erred by not conducting a fitness hearing before proceeding on post-trial motions and sentencing. This court should therefore vacate the trial court's dismissal of Mr. Jones' post-trial motion and the sentencing order, and remand this cause for a hearing on Mr. Jones fitness.

## CONCLUSION

For the foregoing reasons, Milton Jones, Defendant-Appellant, respectfully requests that this court reverse his convictions and remand this cause for a new trial, or that it remand this cause for hearings on Mr. Jones' fitness and/or ineffective assistance of counsel.


Respectfully submitted,


MICHAEL J. PELLETIER
Deputy Defender


STEPHEN L. GENTRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

-10-

File Date: _6-27-2008_

Case No: _08cv2057_

ATTACHMENT # _____

EXHIBIT _E through G_

TAB (DESCRIPTION)

_____

*affirmed*
*6-9-06*

◢ NOTICE ◣

This text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

SIXTH DIVISION
June 9, 2006

WP
KH

MB

No. 1-04-1359

JANET MAHONEY

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

06·587

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee | ) ) | No. 01 CR 18654(01) |
| v. | ) ) | Honorable |
| MILTON JONES, | ) ) | Preston L. Bowie, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

<u>ORDER</u>

Defendant, Milton Jones, was convicted of three counts of first degree murder and two counts of aggravated kidnaping following a jury trial. The circuit court sentenced him to 25 years' imprisonment for the murder convictions and two concurrent terms of six years' imprisonment for the aggravated kidnaping convictions, to be served consecutive to the sentence for the murder convictions. Defendant appeals arguing that the circuit court erred by not appointing new counsel following claims that his counsel was ineffective, conducting a fitness hearing after defendant allegedly reduced his medications and that he was denied a fair trial as a result of improper statements made by

1-04-1359

the prosecutor.

For the reasons that follow, we affirm the judgment of the circuit court.

### BACKGROUND

The following facts are taken from the testimony of witnesses in the proceedings in the circuit court. In June 1999, Lolita Sierra and Patrick Banks were engaged to be married and lived together in an apartment in Chicago, Illinois. Sierra testified that she and Banks were unemployed, but that Banks would steal items from others' cars to buy cocaine.

On the morning of June 25, 1999, Sierra and Banks were staying at a hotel where they smoked crack cocaine. They decided to go to M.C. Jones' apartment to buy more crack cocaine.[1] When they arrived at Jones' apartment, Banks saw a white sport utility vehicle filled with disc jockey equipment parked near Jones' apartment. Banks broke the window of the vehicle and with help from his friend, Leo Johnson, carried the equipment to Jones' apartment.

Jones testified that he woke up on June 25, 1999, and found disc jockey equipment in his apartment which he had never seen before. Jones stepped outside and saw a man that he did not know who asked Jones if he knew who broke the window of his vehicle and took his equipment. Jones did not answer. Jones later identified defendant in court as the man he saw outside.

------

[1]M.C. Jones is not related to defendant Milton Jones.

2

1-04-1359

Defendant then drove off in his vehicle.

Sierra testified that Banks found a purchaser for the equipment with the assistance of an individual by the name of Black Ant. The equipment was sold and taken out of the back door of Jones' apartment. Sierra further testified that around 9:00 or 10:00 a.m., Banks returned with six bags of crack he received in exchange for the disc jockey equipment. Sierra stated that she, Jones, Johnson, and another individual named Joyce smoked the crack cocaine in Jones' apartment. Jones testified consistently except that he stated Banks returned with eight bags of crack cocaine.

Sierra and Jones testified that after they smoked the crack cocaine, approximately ten men armed with guns, including defendant, kicked in the front door and entered the apartment. Sierra testified that she had not seen defendant before he entered Jones' apartment, but she identified him in court as one of the men who kicked in Jones' door. Sierra stated that defendant told others to "get those mother fuckers that broke into my truck." Sierra and Jones testified that defendant tied a rope around each of their necks in Jones' apartment. They also testified that they were taken to a vehicle Sierra described as a white Blazer with a broken window. Sierra testified that the vehicle was occupied by a driver and another unknown individual. Johnson testified that upon his return from the liquor store that morning, he observed Sierra and Jones with ropes around their

3

1-04-1359

necks being held by a black man accompanied by approximately six
others who were armed with bats and sticks.

Jones and Sierra were questioned by their abductors
regarding the stolen equipment. They indicated that Banks broke
into defendant's vehicle and took the equipment. The abductors
took Jones and Sierra to a Chicago Housing Authority project
parking lot at 35th and State Streets in Chicago. Upon arriving
at the parking lot, Sierra testified that a brown Buick arrived
carrying Banks and other unknown men. She testified that others
were hitting Banks in the brown Buick. Banks attempted to run
away from the men in the car, but defendant told others to "get
that motherfucker." Banks was caught and further beaten and
kicked in the head. Jones also testified that Banks was beaten
while they were present at the housing project parking lot.
Jones and Sierra both testified that they were led by defendant
and others to a second or third floor apartment in the housing
project where Banks' beating resumed. Sierra and Jones testified
that defendant told others present at the housing project
apartment to let them go. The two were taken to 71st and Jeffery
Streets in a different white sport utility vehicle where they
released. Sierra testified that she did not feel safe reporting
the occurrence to police immediately following the incident.
Neither she nor Jones notified the police of their abduction or
Banks' abduction and beating.

Detective Allen Szudarski of the Chicago Police Department,

4

1-04-1359

testified that he interviewed Sierra on July 18, 1999. He observed ligature marks on Sierra's neck. Sierra identified defendant as the man who abducted her and Jones from a series of photographs shown to her at the police station on August 3, 1999. On June 29, 2001, Sierra identified defendant in a line-up at the police station. On June 7, 2001, Jones identified defendant in a photographic array as the man who kidnaped him and Sierra and beat Banks. On June 30, 2001, Jones identified defendant in a police line-up. Both Jones and Sierra testified to using drugs and that their drug use may have affected their ability to remember certain aspects of the incident.

Defendant testified in his own behalf. He stated that prior to his arrest, he lived in Cedar Rapids, Iowa with his wife and three children. He worked at the local Boys and Girls Club in addition to working as a disc jockey for weddings, parties, radio broadcasts and recorded releases. Defendant and his partner, Dion Boyd, owned the recording equipment that was stolen by Banks. Defendant, Boyd and a record company were also part of a partnership which produced defendant's albums in Lombard, Illinois.

On June 24, 1999, defendant drove to Chicago in a 1996 Chevrolet Blazer which contained more than $10,000 of recording and disc jockey equipment. Defendant intended to pick up and distribute his newest recorded release, however, due to an unexpected delay in production, he had to spend the night with

5

1-04-1359

his sister who lived at 72nd and Constance streets in Chicago.
On June 25, 1999, defendant awoke to find that the passenger side
window to his vehicle had been broken and his equipment, tapes
and compact discs had been stolen.  As defendant cleaned his
vehicle, he questioned passers-by about the theft of his
equipment.

Defendant testified that he contacted Boyd and later met him
at housing project at 37th and Federal Streets in Chicago.  Boyd
introduced defendant to Jones and indicated that Jones would lead
defendant to the stolen equipment.  Jones told defendant that an
individual named "Black Ant" had his equipment.  Defendant
testified that he and Jones went to Black Ant's apartment and
spoke to an unknown person who indicated that Black Ant was at a
nearby liquor store.  Defendant testified that Jones willingly
accompanied him to the liquor store and searched for Black Ant,
but they did not find him.  As the two left the liquor store,
Black Ant and others were seen leaving an apartment behind the
liquor store.  Defendant testified that he spoke to Black Ant
briefly and agreed to pay him approximately $150 for the return
of his equipment.  Defendant testified that Jones appeared to be
scared while in his vehicle, but defendant did not know why Jones
was afraid and stated that Jones voluntarily accompanied him.

Jones, Black Ant and others walked to the location where
defendant's equipment was located while defendant drove there in
his truck.  While on route to recover the equipment, defendant

6

1-04-1359

testified that he was stopped by a police officer who was
investigating a residential "break-in." He testified that the
police officer ran his license plates and took him to 72nd and
Constance Streets near his sister's house. Two witnesses were
waiting on the curb on 72nd street when the officer arrived with
defendant and viewed defendant through the window of the police
car. The witnesses indicated that defendant was not the
perpetrator. Defendant testified that he was allowed to leave,
but first, he told that officer about the theft of his equipment
and indicated that he was going to retrieve it. During cross-
examination, the following colloquy occurred between defendant
and the Assistant State's Attorney:

"[ASSISTANT STATE'S ATTORNEY]: Q. All right. Now after -
on this day after your car had been broken into, were you
still driving around in that car?

A. Yeah.

Q. Okay. So it was still drivable [sic]?

A. Yes it was.

Q. And you said that the police officers pulled you over?

A. Yes they did.

Q. All right.

A. They should have it on record, shouldn't they?

Q. No we don't. What did they tell you when they pulled
you over?

A. He pulled me out of the car and had be put my hands on

7

1-04-1359

the back of the glass on the back of the car and asked me
did I know about somebody breaking into a house or
something, a burglary, or whatever.

Q. And they didn't even know your name, did they?

A. No, he ran my plates and knew my name. He said
"Somebody pointed out this white truck." That's why he
pulled me over.

Q. And you are saying that they just let you go?

A. No, he took me to 72nd and Constance which was right
down the street, and it was two people standing there on the
corner on the sidewalk, and he got out and talked to them,
and they walked up to the car; and once the had left - - I
mean, once he got back in the car, he drove me back to my
vehicle and then - -

Q. Could you tell us what did this police officer look
like?

A. It's [sic] a black male.

Q. What else?

A. I don't know.

Q. You don't know anything about this guy who stopped you
and was questioning you?

A. No. No.

Q. What did these other people look like that were
standing on this corner?

A. It [sic] was a male and a female.

8

1-04-1359

> Q. What did they look like?
>
> A. I don't know.
>
> Q. Because it didn't happen, right?  That's why you don't
> know what they look like because it didn't happen?
>
> [DEFENDANT'S ATTORNEY]: Objection, Judge.
>
> [THE WITNESS]: A. Well wouldn't the - -
>
> [THE COURT]: Sustained.  Ask another question."

Defendant returned to the projects to meet Boyd after recovering his equipment.  During this meeting, defendant stated that he was informed by Boyd the "someone had been beat-up." Defendant testified that he returned home to Iowa following his meeting with Boyd to begin re-mastering the tapes and CD's that were stolen from his vehicle.

Detective Cleason of the Chicago Police testified on behalf of the State during the State's case-in-chief and in its case-in-rebuttal.  Cleason testified that he interviewed defendant on June 29, 2001.  Cleason stated that defendant told him that the beating and kidnapings were his fault and that he was responsible for the man's death.  Cleason also said that defendant called his cousin, a high ranking member of the Gangster Disciples, after learning of the theft.  Defendant, according to Cleason, told him that he saw Banks on the street and asked him what happened to his car, but Banks ignored him.  Defendant also stated that he was outside waiting outside while Boyd and his associates arrived at Jones' apartment and when the three victims were brought down

9

1-04-1359

the stairs.  Cleason testified on cross-examination that
defendant did not admit to beating or kidnaping anyone and did
not order anyone to do the same.  Cleason testified that he
offered defendant the chance to make a written statement, but
defendant declined and Cleason did not attempt to locate
defendant's cousin.

In its closing argument, the State made the following
statements:

"[T]ake a minute and picture something in your mind.
Picture in your mind your own home; where you live with your
family and your friends.  Now think of your worst nightmare.
A violent intruder breaks down the door of your home.  He
forces his way into your home, armed with a handgun, giving
orders; giving orders to nine or ten other intruders.  Nine
- - giving orders to nine or ten other intruders, ordering
them to get you.

[DEFENDANT'S ATTORNEY]: Judge, I object to the
personalization of this argument.

[THE COURT]: Overruled.

[ASSISTANT STATE'S ATTORNEY]: Ordering them to get you
and your family.  You try to play run and hide, but this
person, this leader who comes in ordering people around,
grabs you; pulls you back; puts ropes around your neck.  And
- - or otherwise forces you to be taken to another place
against your will.  And the place that he takes you to is an

10

1-04-1359

      unknown, unfamiliar building where you are forced inside to
a hallway.  And inside there, there are more ruffians inside
waiting for you to confront you.  To threaten you.  And by
the order of this boss man, the leader of the pack, you are
beaten; or one of your loved ones is beaten, beaten to
death."

Following the evidence and arguments, the jury returned a verdict
of not guilty of first degree murder while armed with a firearm
and the aggravated kidnaping of Banks.  Defendant was found
guilty of the aggravated kidnapings of Sierra and Jones and the
first degree murder of Banks.

      Post trial motions were heard on April 6, 2004.  Defense
counsel submitted a motion for judgment notwithstanding the
verdict or, in the alternative, a new trial.  Defendant indicated
that he wished to present a motion for a new trial and that he
wanted to see copies of the discovery in his case.  Defendant
stated: "[m]y attorney fails to cooperate with the things that I
ask him to do before trial and no and after trial and I would
like to present this motion for unofficial - - unofficial [sic]
assistance of counsel."  The circuit court continued the post-
trial motion and gave defense counsel instructions to meet with
defendant prior to the next court date to discuss the issues that
he raised.  Defense counsel promised the court that he would do
so.

      On April 21, 2004, the circuit court heard defendant's post-

1-04-1359

trial motion which was argued by defense counsel.  Defendant
requested that he be given an opportunity to be heard before
counsel's argument on the post-trial motion.  The circuit court
allowed defendant to address the court following arguments on the
motions.  Defendant proceeded to apologize to the family and
denied having any part in the incident, complained about his
attorney, indicated the dosages of his prescription medication,
stated that he gave proof to his attorney that he was not
involved Banks' death, accused his attorney of incompetence,
provided the circuit court with what he referred to as motion for
post-trial relief which contained "the truth about everything.
Everything that happened."  Defendant claimed that he reduced the
amount of his medication by one half after the first scheduled
sentencing hearing on April 6, 2004.  Defendant asserted that he
was not found guilty beyond a reasonable doubt, that his attorney
did not return phone calls to his mother and sister and that the
attorneys only contacted his family members when payment was due.
Defendant complained that counsel failed to "find Dion [Boyd] and
them and straighten this out *** put these people where they was
[sic] [a]nd [] clear me."  Defendant further stated the his
attorneys should go to prison for taking his family's money.

        Defense counsel objected arguing that defendant was only fit
to stand trial with medication.  The court asked defendant to
bring his argument to a conclusion.  Defendant requested a new
trial and asked the court to "bring in the other guys that was

1-04-1359

involved in this case to justice and clear me from kidnaping.
The circuit court reviewed defendant's medical and psychological
history, denied defendant's motion for a new trial and sentenced
him.

ANALYSIS

I. Improper Comments by the State

Defendant first contends that he was denied a fair trial
when the State attempted to impeach his testimony with personal
opinion, asked the jury to put themselves in the victim's
position during closing arguments and alleged facts not in
evidence. Specifically, defendant identifies the statement made
by the Assistant State's Attorney who stated "I would hate to see
if it was a ten" when cross-examining defendant about his
contention that he was not very angry about the theft of his
equipment. The State also asked defendant if he could not
describe the police offices who pulled him over because the stop
never occurred. Defendant objected to the statement relative to
his level of anger and the question about whether he was ever, in
fact, stopped by the police. The circuit court sustained both
objections and cross-examination continued. Defendant also
objected to, and the circuit court overruled, the State's
argument where it asked the jury to imagine itself as the victims
in this case. Defendant did not include any reference to these
errors in either his pro se motion for a post-trial relief or in
the post-trial motion filed by defense counsel. Defendant,

13

1-04-1359

however, has waived any claims of error relative to the
statements of which he now complains.

In order to preserve an issue for review, a defendant must
object both at trial and in a written post-trial motion. People
v. Enoch, 122 Ill. 2d 176, 186 (1988). Since defendant failed to
file a post-trial motion, these issues have been waived. The
general rule in Illinois is that the failure to raise an issue in
a written motion for a new trial results in a waiver of that
issue on appeal. Enoch, 122 Ill. 2d at 186 (1988); People v.
Shum, 117 Ill. 2d 317, 340 (1987); People v. Szabo, 113 Ill. 2d
83, 93 (1986); People v. Porter, 111 Ill. 2d 386, 399 (1986);
People v. Caballero, 102 Ill. 2d 23, 31 (1984). Our Supreme
Court stated the reasons for the waiver rule in Enoch, quoting
Caballero:

> "Failure to raise issues in the trial court denies that
> court the opportunity to grant a new trial, if warranted.
> This casts a needless burden of preparing and processing
> appeals upon appellate counsel for the defense, the
> prosecution, and upon the court of review. Without a post-
> trial motion limiting the consideration to errors considered
> significant, the appeal is open-ended. Appellate counsel
> may comb the record for every semblance of error and raise
> issues on appeal whether or not trial counsel considered
> them of any importance." Caballero, 102 Ill. 2d at 31-32.

Notwithstanding defendant's failure to reference these

14

1-04-1359

errors in his post-trial motion for relief, he urges this court
to review the claims pursuant to the plain error rule. The plain
error rule may be invoked in criminal cases when a defendant has
not properly preserved an error for review, where the evidence is
closely balanced, or where the error adversely affected the
defendant's right to a fair trial. People v. Mullen, 141 Ill. 2d
394, 401-02 (1990), citing People v. Carlson, 79 Ill. 2d 564,
576-77 (1980). The main purpose of the plain error rule, if the
evidence is closely balanced, is to protect against the
"possibility that an innocent person may have been convicted due
to some error which is obvious from the record, but not properly
preserved" for appellate review. Carlson, 79 Ill. 2d at 576. In
cases where the evidence is closely balanced, the probability
that a defendant's conviction was caused by even a minor trial
error is greatly enhanced. Therefore, in those cases, the court
will invoke the plain error rule so that it can determine whether
an error, which was not objected to at trial and in post-trial
motions, raises doubt as to the validity of the jury's verdict.
Mullen, 141 Ill. 2d at 401-02; Carlson, 79 Ill. 2d at 576. After
reviewing the record, we can neither conclude that the evidence
was closely balanced nor the error of such magnitude as to
deprive defendant of a fair trial.

The evidence presented at trial, although contradicted by
defendant, was overwhelming. Sierra and Jones testified that it
was defendant who entered Jones' apartment by force with others,

15

1-04-1359

tied a rope around their necks and forced them into a vehicle.
Johnson corroborated Sierra and Jones' testimony when he
testified that he observed an individual taking the two against
their will out of the apartment with a rope around their necks.
Sierra and Jones testified that Banks arrived at the housing
projects in a brown car with others who were beating him and that
Banks attempted to escape. Sierra told police that she believed
that the offender was D.J. Milton (defendant) and then identified
defendant along with Jones, three times subsequently in a photo
array, a police line-up and in court during the trial. Both
Sierra and Jones testified that defendant not only participated
in Banks' beating, but ordered others to beat Banks.

As an aside, we note that despite defendant's contentions
that the evidence was far from overwhelming, he does not argue
here that the evidence at trial was insufficient to prove him
guilty beyond a reasonable doubt.

Even if waiver is not applicable here and assuming the
questions were not proper, our supreme court has held that
improper cross-examination is not reversible error if it can be
considered harmless. People v. Enis, 139 il2d 264, 296 (1990);
J.L. Simmons Co. v. Firestone Tire & Rubber Co., 108 Ill. 2d 106,
114-15 (1985); People v. Kirkwood, 17 Ill. 2d 23, 30 (1959). In
J.L. Simmons, our supreme court stated:

"[n]ew trials can be ordered only when the evidence
improperly admitted appears to have affected the outcome

16

1-04-1359

[Citations]. While we would like all trials to be conducted
error free, no useful purpose would be served by granting a
new trial when the record reveals that the errors did not
change the result reached by the jury. 'It is not every
error, of course, that will require a reversal. Where it
appears that an error did not affect the outcome below, or
where the court can see from the entire record that no
injury has been done, the judgment or decree will not be
disturbed. [Citations.]' " J.L. Simmons, 108 Ill. 2d at 114-
15.

Similarly, we have held that improper comment will not require
reversal unless it caused substantial prejudice to the defendant.
People v. Wood, 341 Ill. App. 3d 599, 612 (2003). After
carefully reviewing the record in this case, we cannot say that
the errors of which defendant complains cause substantial
prejudice or affected the outcome of the trial.

## II. Failure to Appoint New Counsel

Defendant next claims that the circuit court erred when it
did not appoint new counsel th represent defendant in his post-
trial motion after he alleged that defense counsel was
ineffective. In support of this proposition, defendant cites to
People v. Krankel, 102 Ill. 2d 181, 189 (1984). However, Krankel
did not announce a rule that automatically requires the
appointment of new counsel to argue a defendant's claim of
ineffective assistance of trial counsel. (E.g., People v.

17

1-04-1359

Johnson 159 Ill. 2d 97, 124-25 (1994) (finding no reversible
error by the circuit court for failing to appoint separate
counsel when "none of defendant's stated allegations, singly or
in combination, raise a colorable claim of ineffective assistance
of counsel"); People v. Nitz, 143 Ill. 2d 82, 135 (1991)
(concluding that "trial court's failure to appoint new counsel *
* * was harmless beyond a reasonable doubt"); People v. Crane,
145 Ill. 2d 520, 533 (1991) (holding that defendant's claim was
without merit; defense counsel's strategy was based on
defendant's desires, and, therefore, no additional hearing with
new defense counsel was required); People v. Williams, 147 Ill.
2d 173, 252 (1991) (finding that "trial court conducted the
necessary examination of the factual matters underlying
defendant's claim" and defendant was not entitled to an
evidentiary hearing on ineffective assistance of counsel).   In
Williams, 147 Ill. 2d at 251, our supreme court explained that "
'the trial court should examine the factual matters underlying
the defendant's claim, and, if the claim lacks merit or pertains
to matters of trial strategy, then no new counsel need be
appointed.  Only if the allegations show possible neglect of the
case * * * should new counsel be appointed.' " Williams, 147
Ill. 2d at 251, quoting People v. Washington, 184 Ill. App. 3d
703, 711 (1989).

The operative concern for the reviewing court is whether the
trial court conducted an adequate inquiry into the pro se

18

1-04-1359

defendant's allegations of ineffective assistance of counsel.
<u>Johnson</u>, 159 Ill. 2d at 125.  In the case at bar, the court was
presented with a lengthy argument at the post-trial hearing, on
the issue of ineffective assistance of counsel.  We have reviewed
the record, including the transcript of the post-trial hearing,
and we find that the trial court allowed defendant substantial
latitude to explain, in great detail, the matters raised in his
motion.  We conclude that under the circumstances of this case,
the trial court's failure to appoint new counsel based on
defendant's request for a new trial was not error.  The majority
of defendant's claims of ineffectiveness are based upon counsel's
failure to contact certain individuals who would be able to
"clear" defendant of any participation in the crime.  However,
defendant testified in his own behalf and never mentioned the
allegedly exculpatory evidence when he was asked about the
individuals and events during his testimony.  In addition, the
allegations that counsel failed to share discovery with defendant
and only met with his family members when payment was due, do
not, either singly or in combination with the other claims, raise
a colorable claim of ineffective assistance of counsel that would
require a further hearing with different counsel.  Lastly,
despite his claims that counsel did not meet with him except in
court, the record reveals that counsel and co-counsel met with
defendant prior to and following court dates and in jail, albeit
not as often as defendant desired.  Accordingly, we hold that the

19

1-04-1359

trial court did not commit reversible error in failing to appoint
a new attorney for defendant, for purposes of presenting the
post-trial motion based on ineffective assistance of counsel.

### III. Failure to Order a Fitness Hearing

Defendant claims that the circuit court erred by failing to
conduct a fitness hearing after he raised a _bona fide_ doubt
relative to his fitness. Defendant contends that his admission
to the court that he reduced his medication by half of the
specified dosage following the April raised such a _bona fide_
doubt. Defendant alleges that he was found fit to stand trial
only with the assistance of medication. We disagree.

A defendant is presumed fit to stand trial unless he cannot
understand the nature and purpose of the proceedings against him
or assist in his own defense. 725 ILCS 5/104-10 (West 2004);
_People v. Moore_, 189 Ill. 2d 521, 535 (2000). A defendant is
entitled to a fitness hearing only when a _bona fide_ doubt of the
defendant's fitness is raised. 725 ILCS 5/104-11(a) (West 2004);
_People v. Johnson_, 183 Ill. 2d 176, 193-94 (1998).

On October 8, 2001, defendant was examined by a licensed
clinical psychologist to "determine his fitness to stand trial,
fitness to stand trial with medication, sanity and his ability to
understand Miranda." Defendant was diagnosed with alcohol
dependence, a learning disorder and a possible psychotic
disorder. The psychologist noted that defendant was taking
Risperdal 1 mg in the morning and 2 mg at night, Cogetin 1mg

20

1-04-1359

twice daily, Depakote 250 mg in the morning and 500 mg at night,
Trazodone 100 mg at night, Effexor 100 mg twice daily, and
Thorazine 50 mg if necessary. Following a thorough examination,
defendant was found "currently fit to stand trial[,]" "legally
sane at the time of the alleged offense" and "was capable of
comprehending his Miranda warnings."

On November 20, 2001, defendant was examined by a
psychiatrist who found that defendant had alcohol dependence, a
learning disorder, a possible psychotic disorder and malingering.
The psychiatrist made the following findings: Defendant is "fit
to stand trial with medication. Although [defendant] appears to
be exaggerating his psychopathology and distorting his knowledge
regarding the legal system, I believe he has an adequate
understanding of the charges against him, the possible
consequences if found guilty, legal procedure, and the roles of
the various members of the court. He is alert, oriented, and
able to assist counsel in his own defense."

Based on the evidence that we have before us, we find that
defendant did not raise a bona fide doubt as to his fitness. The
sole basis for his claim is the statement that he reduced his
medication by one-half sometime after April 6, 2004, and prior to
April 21, 2004. Defendant exhibited no unusual behavior at any
point during trial. He gave lengthy, coherent and relevant
testimony both on direct and on cross-examination in his own
behalf without any apparent difficulty. Defendant further

21

1-04-1359

submitted a neatly printed, 18 count, hand-written, <u>pro</u> <u>se</u> motion
for post-trial relief following his alleged reduction in his
medication.  Moreover, defendant was allowed to fully argue his
claims and the bases therefore to the court.  In fact, during
defendant's 13-page argument, he indicated that the reason he
reduced his medication due to the effects of the drugs.
Defendant stated: "But my lawyer told me back on April 6 that it
[<u>sic</u>] was no grounds for me to have a new trial.  That's when I
knew it was time for me to bring my medication I have and start
taking half of it instead of all of it.  Because something was
wrong here."

Although the specific finding was made by the medical
examiners that defendant was fit to stand trial while on
medication, we do not agree with defendant that he is
automatically deemed unfit if that dosage is alleged to have been
modified.  Under the facts and circumstances presented here,
defendant failed to raise a <u>bona</u> <u>fide</u> doubt as to his fitness.
The circuit court, as a result, did not err by failing to conduct
an additional fitness hearing prior to sentencing defendant.

For the foregoing reasons, we affirm the judgment of the
circuit court.

Affirmed.

O'MALLEY, J., with McNULTY, P.J., and Tully, J., concurring.

22

No.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Petition for Leave to Appeal from the |
| | ) | Appellate Court of Illinois, First District, |
| Respondent-Appellee, | ) | No. 04-1359 |
| | ) | |
| | ) | There heard on Appeal from the Circuit |
| -vs- | ) | Court of Cook County, Illinois, |
| | ) | No. 01 CR 18654 (01). |
| | ) | |
| MILTON JONES, | ) | Honorable |
| | ) | Preston L. Bowie, |
| Petitioner-Appellant. | ) | Judge Presiding. |

PETITION FOR LEAVE TO APPEAL

MICHAEL J. PELLETIER
Deputy Defender

STEPHEN L. GENTRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

EXHIBIT F

No.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Petition for Leave to Appeal from the |
| | ) | Appellate Court of Illinois, First District, |
| Respondent-Appellee, | ) | No. 04-1359 |
| | ) | |
| | ) | There heard on Appeal from the Circuit |
| -vs- | ) | Court of Cook County, Illinois, |
| | ) | No. 01 CR 18654 (01). |
| | ) | |
| MILTON JONES, | ) | Honorable |
| | ) | Preston L. Bowie, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

## PRAYER FOR LEAVE TO APPEAL

Milton Jones, petitioner-appellant, hereby petitions this Court for leave to appeal, pursuant to Supreme Court Rules 315 and 612, from the judgment of the Appellate Court, First District, affirming his conviction for 3 counts of first degree murder and 2 counts of aggravated kidnaping and his sentence of 3 concurrent terms of 25 years consecutive to 2 concurrent terms of 6 years imprisonment.

-1-

## PROCEEDINGS BELOW

The appellate court affirmed Milton Jones's conviction on June 9, 2006. Mr. Jones filed a

Petition for Rehearing on April 20, 2006. The appellate court denied the Petition for Rehearing

on July 26, 2006. A copy of the appellate court's judgment is appended to this petition.

## COMPELLING REASONS FOR GRANTING REVIEW

This Court should grant leave to appeal in order to clarify for the lower courts whether a trial court may satisfy the "adequate inquiry" requirement of *Krankel* and its progeny by simply allowing a defendant to state his *pro se* allegations of ineffective assistance of counsel without asking a single question aimed at clarifying, confirming, or debunking those allegations, where the record does not demonstrate the allegations to be without merit. The appellate court here found the trial court's actions to be sufficient, based on (1) the fact that Mr. Jones' testimony did not set forth facts that supported his allegations, and (2) the fact that the trial court allowed Mr. Jones to speak about his allegations. (Rule 23 Order at 19)

This Court has held that a trial court is required to conduct an adequate inquiry into a defendant's *pro se* allegations of ineffective assistance of counsel. *E.g. People v. Moore*, 207 Ill. 2d 68, 78-79, 797 N.E.2d 631 (2003); *People v. Nitz*, 143 Ill. 2d 82, 705 N.E.2d 895 (1991); *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). Based on this inquiry, a trial court must determine whether the claims lack merit, pertain only to matters of trial strategy, or whether the claims show possible neglect, requiring the appointment of new counsel. *Id.* The actions of the trial and appellate courts here do not square with the standards that have been set forth by this Court.

In the case at bar, after rebuffing the defendant's attempts to raise issues of his attorney's ineffectiveness, the trial court allowed the defendant a limited opportunity to state his claims, before stating, "I'm going to ask Mr. Jones to bring his argument to a conclusion." Milton Jones stated a claim of neglect and ineffective assistance of counsel insofar as he alleged that his attorney failed to investigate exculpatory witnesses who were in the van with Mr. Jones and the

-3-

State's witnesses on the way to the crime scene. However, without addressing the merits of Mr. Jones' specific claims, the trial court stated that defense counsel did a good job with what he had to work with, and stated that the evidence was overwhelming, before denying new counsel for Mr. Jones. The appellate court's decision that this opportunity to speak constituted an "adequate inquiry" reflects an unduly deferential view, such that the burden is shifted to the defendant to fully explain his claim without the assistance of the court's inquiry. This approach is inconsistent with the principles that this Court has previously established.

Milton Jones respectfully requests that this Court grant leave to appeal so as to clarify for the lower courts that their duty to inquire into the allegations of the neglect and ineffective assistance of counsel requires more than an open-ended, limited opportunity to state the defendant's claims, but instead requires that the court either appoint new counsel or inquire sufficiently to enable it to determine that those claims are not potentially meritorious.

## STATEMENT OF FACTS

Milton Jones was charged with the first degree murder of Patrick Banks and the aggravated kidnaping of Patrick Banks, Lolita Sierra, and M.C. Jones, based on events that occurred on June 25, 1999. (C. 18-33) After a jury trial, Milton Jones was found guilty of first degree murder of Patrick Banks and aggravated kidnaping of Lolita Sierra and M.C. Jones, and he was sentenced to consecutive terms of 25 years, 6 years, and 6 years, respectively. (C. 170)

After being notified on June 28, 2001, that he was being sought by police, Milton Jones turned himself in on June 29, 2001. (R. 40, C. 10) On September 20, 2001, the court was informed that Milton Jones had attempted to hang himself, and the court ordered that he be evaluated. (R. 47) Forensic Clinical Services' report of November 20, 2001, prepared by Staff Psychiatrist Philip Pan, M.D., stated that Mr. Jones was fit for trial with medication. (C. 72)

At trial, the State relied on the eyewitness identification testimony of Lolita Sierra and M.C. Jones. The State first presented the testimony of Roberta Banks, who testified that she was the decedent Patrick Banks' mother, and that Patrick Banks was not living with her at the time of his death. (R. 332-335) Rather, he was moving around at that time. (R. 335)

Lolita Sierra testified that, in June 1999, she was Patrick Banks' fiancé. (R. 339) Sierra testified that, in June of 1999, she and Patrick Banks were living in an apartment above that of his mother, who Patrick Banks saw every day. (R. 371, 401) Sierra and Patrick Banks spent the couple of days prior to the incident in a hotel Sierra described as a "pit," smoking crack cocaine. (R. 375) Sierra testified that, although both she and Patrick Banks were unemployed, she only smoked crack on the weekends. (R. 372) Patrick Banks broke into people's cars and stole their property for a living, so that he could buy cocaine. (R. 379)

-5-

On the morning of June 25, 1999, Sierra and Patrick Banks left the hotel to go to Patrick Banks' mother's house, but then decided instead to go to the home of M.C. Jones to get more cocaine. (R. 377)  Upon their arrival at M.C. Jones' home, Patrick Banks saw a parked white sport utility vehicle full of disk jockey equipment. (R. 341)  Using a tool he carried for such purposes, Patrick Banks broke a window in the SUV and, with help from his friend Leo Johnson, carried the equipment up to the apartment of M.C. Jones. (R. 342-343, 379)  Leo Johnson testified that he assisted Banks in moving the equipment. (R. 473)

M.C. Jones testified that on June 25, 1999, after he woke up and found some disk jockey equipment and compact discs in his home which he had not seen before, he went outside. (R. 417, 435)  Outside he saw a man he did not know, who M.C. Jones identified in court as Milton Jones. (R. 418)  Milton Jones asked M.C. Jones who had broken into his vehicle and taken his things. (R. 418)  Milton Jones then drove off in his vehicle. (R. 418)

Lolita Sierra testified that, with the assistance of an individual called "Black Ant," Patrick found a buyer for the stolen equipment, and the equipment was taken out the back door of M.C. Jones' home. (R. 343-344)  Sierra further testified that, at 9:00 or 10:00 a.m., Patrick Banks returned with six bags of cocaine he had received in exchange for the equipment, and Banks and Sierra, along with M.C. Jones, Leo, and Joyce, smoked the cocaine. (R. 381-384)  M.C. Jones testified that Banks returned with eight bags of cocaine, and also testified that he and the others smoked it. (R. 455-456)  M.C. Jones also testified that he did not get high. (R. 455)

Sierra and M.C. Jones testified that after they smoked the cocaine, approximately ten men, including Milton Jones, each armed with a gun, kicked in the front door and entered the apartment. (R. 345, 420)  Sierra stated that she had not seen Milton Jones before, but identified him in court as one of the men. (R. 346-347)  According to Sierra, Milton Jones, said, "get those

-6-

motherfuckers that broke into [my] truck." (R. 348) Both Sierra and M.C. Jones testified that

Milton Jones tied a rope to each of their necks in the apartment. (R. 348, 420-422, 447) On

cross-examination, Sierra admitted that she had previously told detectives that the rope had been

placed around her neck in the truck, rather than the apartment. (R. 396) Leo Johnson testified

that, upon his return that morning from the liquor store, he saw Sierra and M.C. Jones being held

by a black man who had rope around their necks and was accompanied by five or six other men

armed with bats or sticks. (R. 475-476) Johnson also stated that none of the men had guns. (R.

481) Sierra and M.C. Jones testified that they were taken downstairs to a vehicle which Sierra

described as a white Blazer and which M.C. Jones noted was white and had a broken window.

(R. 348, 420-422, 447) Sierra testified that the vehicle was occupied by a driver and another

unknown individual. (R. 351)

　　Sierra testified that Milton Jones asked Sierra and M.C. Jones who took the DJ

equipment, and they said that Patrick Banks had done so. (R. 354) They drove off and arrived at

a parking lot at the Chicago Housing Authority projects at 35th and State. (R. 355) Sierra

testified that, after their arrival at 35th and State, a brown Buick arrived carrying Patrick Banks

and some other individuals who were hitting Banks. (R. 355-356) Sierra testified that Banks

started to run, and Milton Jones said, "Get that motherfucker." (R. 356) Sierra further testified

that some other men caught Banks and, along with Milton Jones, began kicking him in the head.

(R. 356) M.C. Jones also testified that Milton Jones and the others were beating Banks. (R. 423)

Sierra and M.C. Jones both testified that the men then led Banks, Sierra, and M.C. Jones to the

second or third floor of the projects, where M.C. Jones stated the men continued to beat Banks,

(R. 358-359, 423) Sierra testified that Milton Jones told the others to let Sierra and M.C. Jones

go, and the man who drove them to the projects drove them to 71st and Jeffrey in a second white

-7-

truck. (R. 360-361) M.C. Jones likewise testified that they were then allowed to leave. (R. 427)

Detective Allen Szudarski testified that he interviewed Lolita Sierra on July 18, 1999, at which time he observed a ligature mark on her neck. (R. 522-523) On August 3, 1999, Sierra picked Milton Jones as the man who kidnaped her out of a series of photos she was shown at the police station. (R. 363, 366, 524-526) On June 29, 2001, she picked Milton Jones out of a lineup at the police station. (R. 364-365, 549-550) Sierra stated that her use of cocaine may have affected her memory. (R. 397)

On June 7, 2001, M.C. Jones picked Milton Jones out of a series of photographs he was shown at the police station and identified him as the man who had kidnaped Sierra and him and who had beat Patrick Banks. (R. 428-431) On June 30, 2001, M.C. Jones picked Milton Jones out of a lineup. (R. 540-541, 552-553) M.C. Jones admitted that he used drugs, most recently one month before the trial, and he stated that he had trouble remembering what happened on the day of the incident. (R. 439, 446)

Milton Jones testified that prior to his arrest he lived in Cedar Rapids, Iowa, with his wife and three children. (R. 568) He worked at the local Boys and Girls Club, and also as a disk jockey for weddings, parties, radio broadcast, and on recorded releases. (R. 569) He frequently performed and sold tapes and compact discs in Chicago, where he had previously grown up and lived. (R. 569-571) He had his own recording equipment, and had a partner named Dion Boyd, who shared an interest in a sound system. (R. 569) He also had a three-way partnership with Boyd and a record company, which produced Milton Jones' albums, which were manufactured in Lombard. (R. 572) On June 24, 1999, Milton Jones drove to Chicago in a 1996 Blazer loaded with $10,000 worth of recording equipment, planning to pick up and distribute the his newest recorded release. (R. 571-576) On account of a delay in the manufacturing, he unexpectedly had

-8-

to wait an extra day to distribute a shipment of tapes and compact discs, and he stayed at his sister's home at 72nd and Constance, parking the Blazer in front. (R. 576-577)

On the morning of June 25, 1999, Milton Jones observed that the passenger-side door window was broken and his recording equipment, tapes, and compact discs had been stolen. (R. 580) He telephoned his partner Dion Boyd, as well as his mother and sister. (R. 581) He then cleaned the glass out of his car and asked passers-by if they knew about the stolen items. (R. 582) He later met Dion Boyd at 37th and Federal, where Boyd introduced him to M.C. Jones, who Boyd said would be able to lead him to the stolen items. (R. 582-584) M.C. Jones had a rope around his neck at the time. (R. 585) In the vehicle, M.C. Jones seemed scared, but Milton Jones did not know why. (R. 608)

On the way to picking up the equipment, Milton Jones was pulled over by police who were investigating a residential break-in. (R. 598-599) The police showed Milton Jones to a witness and was then allowed to go. (R. 599) Before leaving, Milton Jones told the officer about theft from his car, and informed the officer that he was going to retrieve the equipment. (R. 599)

Milton Jones and M.C. Jones then located Black Ant, who returned Milton Jones' recording equipment in exchange for approximately $150 from Milton Jones. (R. 589-590) Black Ant told Milton Jones that he had purchased the equipment in exchange for crack cocaine. (R. 589) Having been unable to find the missing tapes and compact discs, Milton Jones went to 35th and Dearborn to again meet with Dion Boyd and arrange to replace the tapes and compact discs. (R. 590) At the time, Boyd mentioned that someone had been beaten up. (R. 594) After meeting with Boyd, Milton Jones returned to his home in Iowa. (R. 594)

Milton Jones denied that he had carried a gun, ridden with anyone carrying a gun, or put a noose around anyone's neck, on June 25, 1999. (R. 595-596) He denied having seen M.C. Jones

-9-

on the street near where his car had been parked outside his sister's home. (R. 606)  When Milton

Jones found out from his mother-in-law that the police were looking for him regarding this case,

he made arrangements to meet with police in Chicago the next day. (R. 604)  Milton Jones

related that when he met with police, Detective Claeson wanted him to say that he had a cousin

who was a ranking member of the gangster disciples, but there was no such cousin. (R. 629-630)

Milton Jones told the police that he felt bad to hear about and be accused of the murder. (R. 640)

Sergeant Dean Claeson testified in rebuttal that he interviewed Milton Jones on June 29,

2001. (R. 648)  Claeson related that Milton Jones told him that the beating and kidnapings were

his fault and that he was responsible for a man's death. (R. 649)  Claeson further related that

Milton Jones had stated that he called a cousin who was a ranking member of the gangster

disciples. (R. 650)  Claeson denied telling Milton Jones what to say. (R. 651)  Claeson related

that Milton Jones had stated that he saw Patrick Banks on the street, and asked him what had

happened to his car, but that Banks ignored him. (R. 663)  Claeson further stated that Milton

Jones told him that he was present outside when Dion Boyd and his associates arrived and

brought the three victims down the stairs. (R. 664)  On cross-examination, Claeson stated that

Milton Jones did not tell him that he beat or killed Patrick Banks, that he kidnaped Banks, Sierra,

or M.C. Jones, that he had a gun, or that he told anyone else to do any of these things. (R. 653)

Claeson stated that Milton Jones was offered the chance to make a written statement, but he

declined. (R. 653)  Claeson stated that this should have been put in his police report, but that it

was not. (R. 654)  Claeson also stated that he made no attempt to locate the cousin of Milton

Jones. (R. 660)

The jury returned a verdict of guilty of first degree murder of Patrick Banks and

aggravated kidnaping of Lolita Sierra and M.C. Jones. (R. 803-804)  The jury also found that

-10-

Milton Jones was not armed with a firearm during the commission of the first-degree murder. (R. 803)

On April 6, 2004, the case came up for post-trial motions, and Milton Jones informed the court that he wished to present a motion alleging ineffective assistance of counsel. (R. 812)  Mr. Jones stated that he had eighteen issues involving counsel's failure to prepare for the trial which Mr. Jones believed would have changed the outcome of the case. (R. 813)  The court informed Mr. Jones that he could file that motion on the next date. (R. 812)

The post-trial motion was continued to April 21, 2004, at which time Mr. Jones again requested to address the court "before anything further." (R. 816)  The court told Mr. Jones that he would be given an opportunity to address the court at a later time. (R. 816)  After defense counsel rested on his motion, which alleged that Mr. Jones had not been proven guilty beyond a reasonable doubt and the erroneous denial of the motion for a directed verdict, the court denied the motion. (R. 816, C. 169)  Mr. Jones twice again attempted to present his own motion to the court, and the court proceeded to sentencing, telling Mr. Jones, "Your attorney is not at issue at this point." (R. 816, 837)  Mr. Jones stated that his attorney had failed to hire an investigator or investigate witnesses, including the occupants of the Suburban allegedly used to transport M.C. Jones and Lolita Sierra to the site of the beating of Patrick Banks. (R. 837, 840)

Mr. Jones also stated that he was not taking the prescribed doses of his medication, and defense counsel Breen objected to the proceedings, stating that Mr. Jones is only fit when on his medication. (R. 845)  The trial court responded by stating, "I'm going to ask Mr. Jones to bring his argument to a conclusion." (R. 846)  The court then denied Mr. Jones' request for a new trial and/or new counsel. (R. 846)  The court stated that defense counsel did a good job with what he had to work with, and found that the evidence was overwhelming. (R. 847).  The court then

-11-

sentenced Mr. Jones to consecutive terms of 25, 6, and 6 years. (R. 849)

The appellate court affirmed Milton Jones's conviction on June 9, 2006. Mr. Jones filed a Petition for Rehearing on April 20, 2006. The appellate court denied the Petition for Rehearing on July 26, 2006. A copy of the appellate court's judgment is appended to this petition.

## ARGUMENT

**THIS COURT SHOULD GRANT LEAVE TO APPEAL TO CLARIFY WHETHER A TRIAL COURT MAY SATISFY THE "ADEQUATE INQUIRY" REQUIREMENT OF *KRANKEL* AND ITS PROGENY BY SIMPLY ALLOWING A DEFENDANT TO STATE HIS *PRO SE* ALLEGATIONS INEFFECTIVE ASSISTANCE OF COUNSEL WITHOUT ASKING A SINGLE QUESTION AIMED AT CLARIFYING, CONFIRMING, OR DEBUNKING THESE ALLEGATIONS, WHERE THE RECORD DOES NOT DEMONSTRATE A LACK OF MERIT.**

A trial court is required to conduct an adequate inquiry into a *pro se* defendant's allegations of ineffective assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 78-79, 797 N.E.2d 631 (2003); *People v. Nitz*, 143 Ill. 2d 82, 705 N.E.2d 895 (1991); *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). This Court has held that, based on this inquiry, a trial court must determine whether the claims lack merit, pertain only to matters of trial strategy, or whether the claims show possible neglect, requiring the appointment of new counsel. *Id.* However, this Court has not precisely defined what constitutes an "adequate inquiry."

In the instant case, the appellate court held that the "adequate inquiry" requirement can be satisfied by allowing the defendant to state his allegation, without asking a single question aimed at clarifying, confirming, or debunking the allegation, even though the defendant's statement does not demonstrate that the allegation is without merit. Even though this Court has not given a precise definition of "adequate inquiry," previous decisions have suggested that more significant action is required than was done by the trial court here. This Court has upheld trial courts' inquiries as adequate where it could say that these courts "made a *significant* effort to explore the

-13-

matters raised in the defendant's motion." (Emphasis added.) *People v.* Chapman, 194 Ill. 2d 186, 230, 743 N.E.2d 48 (2000); People v. *Johnson,* 159 Ill. 2d 97, 125, 636 N.E.2d 485 (1994). The trial court here has failed to do so. The appellate court's overly deferential view of the adequate inquiry requirement is inconsistent with the purpose of the rule insofar as it puts the burden on the defendant to set forth his allegations specifically and completely without the trial court's effort to explore the matters raised by asking questions aimed at clarifying, confirming, or debunking them.

Milton Jones informed the trial court that his attorney had failed to investigate witnesses, including the occupants of the Suburban which was allegedly used to transport eyewitnesses M.C. Jones and Lolita Sierra to the site of the beating of Patrick Banks. (R. 837, 840) Milton Jones told the court that these witnesses would have changed the outcome of the case. (R. 813)

The trial court, after first rebuffing Mr. Jones' attempts to speak about his allegations of ineffectiveness, and forcing him to proceed on the post-trial motion with the attorney about whom Mr. Jones was complaining, did eventually allow him some limited degree of latitude to explain his allegations. However, the trial court failed to conduct an adequate inquiry, insofar as the court ended its inquiry and denied Mr. Jones' request for new counsel before even attempting to elicit information from either Mr. Jones or his attorney which could have determined that Mr. Jones' allegations were not potentially meritorious. Instead, the trial court denied Mr. Jones' request for new counsel after simply stating that defense counsel did a good job with what he had to work with, and found that the evidence was overwhelming. (R. 847) The appellate court thereafter found the trial court's actions to be sufficient, based on (1) the fact that Mr. Jones' testimony did not set forth facts that supported his allegations, and (2) the fact that the trial court allowed Mr. Jones to speak about his allegations. (Rule 23 Order at 19) This Court should grant

-14-

leave to appeal in order to clarify for the lower courts that simply allowing a defendant to state his allegations, belatedly, and then dismissing those allegations, without asking a single question aimed at confirming or debunking those allegations, cannot meet the adequate inquiry requirement.

Here, at the proceedings on post-trial motions, Milton Jones informed the court that he wished to present a motion alleging ineffective assistance of counsel. (R. 812) Mr. Jones stated that he had eighteen issues involving counsel's failure to prepare for the trial which would have changed the outcome of the case. (R. 813) The court informed Mr. Jones that he could file that motion on the next date. (R. 812) The post-trial motion was continued to April 21, 2004, at which time Mr. Jones again requested to address the court "before anything further." (R. 816) The court told Mr. Jones that he would be given an opportunity to address the court at a later time. (R. 816) After defense counsel rested on his motion, which alleged that Mr. Jones had not been proven guilty beyond a reasonable doubt and erroneous denial of the motion for a directed verdict, the court denied the motion. (R. 816, C. 169) Mr. Jones twice again attempted to present his motion to the court, but the court again rebuffed him and proceeded to sentencing, telling Mr. Jones, "Your attorney is not at issue at this point." (R. 816, 837) Mr. Jones expressed disagreement and stated that his attorney had failed to hire an investigator or investigate witnesses, including the occupants of the Suburban. (R. 837, 840) Rather than inquiring about Mr. Jones allegations, the court instead stated, "I'm going to ask Mr. Jones to bring his argument to a conclusion." (R. 846)

This Court has established that when a defendant claims in a post-trial motion that his counsel provided ineffective trial assistance, the reviewing court must determine whether the trial court conducted an adequate inquiry into the *pro se* defendant's allegations of ineffective

-15-

assistance of counsel. *People v. Johnson*, 159 Ill. 2d 97, 125, 636 N.E.2d 485, 197 (1994). First, the trial court should examine the factual matters underlying the defendant's claims. *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). Based on the defendant's examination, a trial court must then determine whether the claims lack merit, pertain only to matters of trial strategy, or whether the claims show possible neglect, requiring the appointment of new counsel. *People v. Moore*, 207 Ill. 2d 68, 78-79, 797 N.E.2d 631 (2003); *People v. Nitz*, 143 Ill. 2d 179, 705 N.E.2d 895 (1991). While the trial court is not required to appoint counsel in every case, a sufficient showing of a conflict of interest requires that trial counsel withdraw, and that new counsel be appointed. *Krankel*, 102 Ill. 2d at 188-89, 464 N.E.2d at 1084-49. Counsel should be appointed if the defendant's claim of ineffectiveness has "potential merit." *See People v. Brandon*, 157 Ill. App. 3d 835, 847, 510 N.E.2d 1005 (1ˢᵗ Dist. 1987).

In the instant case, Milton Jones' allegation that his attorney failed to investigate witnesses, including the occupants of the Suburban, raised an colorable claim of his trial counsel's failure to investigate. In *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), the United States Supreme Court held that with respect to claims that counsel was ineffective as a result of a failure to investigate, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

To investigate these potentially exculpatory witnesses would have been the duty of Mr. Jones' counsel. While it was the trial court's duty to ascertain Mr. Jones' exact contention, it was not the trial court's place to speculate as to the possible outcome of such investigation, but rather to evaluate whether the failure to investigate eyewitnesses to the offense for the defense could have been a matter of trial strategy. In the instant case, the judge's comments regarding

-16-

Milton Jones' allegations were dismissive and designed to dissuade Mr. Jones from claiming his

counsel's ineffectiveness, and were thus not sufficient to establish that the eyewitnesses Mr.

Jones wanted his trial counsel to contact were not worth contacting. To the contrary, from Mr.

Jones' account, the information was potentially exculpatory, and there is no suggestion that not

contacting the witness was a reasonable strategic choice on defense counsel's part. The trial

court asked defense counsel no questions about his failure to contact potential witnesses.

The appellate court found that "the trial court allowed defendant substantial latitude to

explain, in great detail, the matters raised in his motion." (Rule 23 Order at 19) The appellate

court also notes that the direct- and cross-examination of Mr. Jones at trial failed to shed light on

Mr. Jones' allegations of ineffectiveness. (Rule 23 Order at 19) However, this absence of

support in Mr. Jones trial testimony, rather than excusing the trial court's failure to inquire into

Mr. Jones allegations, actually demonstrates the necessity that the trial court inquire into them so

as to determine whether or not the allegations were potentially meritorious. The fact that the trial

court, after first rebuffing Mr. Jones' attempts to speak about his allegations of ineffectiveness,

and forcing him to proceed on the post-trial motion with the attorney about whom Mr. Jones was

complaining, did eventually allow him some limited degree of latitude to explain his allegations,

does not constitute an adequate inquiry, since the court did not even attempt to elicit information

which would have determined that Mr. Jones' allegations were not potentially meritorious before

it denied his request for new counsel. Simply allowing a defendant to state his allegations,

belatedly, and then dismissing those allegations, without asking a single question of the

defendant or defense counsel aimed at confirming or debunking those allegations, cannot meet

the adequate inquiry requirement.

As the United States Supreme Court has reiterated, in reviewing a claim of ineffective

-17-

assistance of counsel, the professed "tactical decisions" of trial counsel "must be directly

assessed for reasonableness in all the circumstances." *Wiggins v. Smith*, 539 U.S. 510, 533 (June

26, 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984)); *see also Miller v.*

*Anderson*, 255 F.3d 455, 458 (7th Cir. 2001) (fact that decision was "a tactic" does not immunize

it from review in a challenge to lawyers' ineffectiveness); *See People v. Truly*, 230 Ill. App. 3d

948, 953, 595 N.E.2d 1230 (1st Dist. 1992) (counsel cannot make a strategic decision not to call a

witness when he has had no interaction with the witness and does not know what the witness will

say); *People v. Skinner*, 220 Ill. App. 3d 479, 485-486, 581 N.E.2d 252 (1st Dist. 1991) (same).

In the instant case, the trial court failed to conduct an inquiry which could determine

whether there was a possibility that counsel had neglected Mr. Jones' case by failing to

investigate exculpatory witnesses. While appearing to give the defendant a limited opportunity

to explain his claims, the trial court dissuaded Mr. Jones from further raising a colorable claim,

based on the court's unfounded speculations about the actions of defense counsel. (R. 837, 847)

Instead of his attempts to dissuade Mr. Jones, the trial court should have inquired into his claims

so as to be able to determine whether or not there was potential merit to them, or appointed

counsel for Mr. Jones' motion for a new trial, after he raised a colorable claim of his trial

counsel's neglect and ineffectiveness. *See People v. Robinson*, 157 Ill. 2d 68, 86, 623 N.E.2d 352

(1993) (holding that if allegations suggest "possible neglect" of the case, new counsel should be

appointed).

The appellate court further failed to identify any actions taken by the trial court which

would have enabled it to determine whether there was a potentially meritorious claim amongst

Mr. Jones' allegations. The appellate court instead cited to the fact that Mr. Jones' trial

testimony does not include facts supporting his post-trial claim, and to the fact that the trial court,

-18-

although asking no questions inquiring about the allegations, afforded Mr. Jones an opportunity to speak about his allegations. The appellate court failed to explain, and the record fails to suggest, how these facts could have enabled the trial court to determine whether or not there was potential merit to Mr. Jones' specific allegation that defense counsel failed to investigate exculpatory eyewitnesses. In order to clarify for the lower courts that the trial court must conduct an inquiry adequate to determine whether or not there is potential merit to a defendant's *pro se* allegations of counsel's ineffectiveness and neglect before denying new counsel, Milton Jones respectfully requests that this Court grant leave to appeal.

-19-

## CONCLUSION

Milton Jones, petitioner-appellant, respectfully requests that this Court grant leave to appeal.

Respectfully submitted,


MICHAEL J. PELLETIER
Deputy Defender


STEPHEN L. GENTRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

-20-

# APPENDIX

## Appellate Court Decision

## Order denying petition for rehearing

**NOTICE**

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

GENTRY

SIXTH DIVISION
June 9, 2006

No. 1-04-1359

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee | ) ) | |
| v. | ) ) | No. 01 CR 18654(01) |
| MILTON JONES, | ) ) | Honorable Preston L. Bowie, |
| Defendant-Appellant. | ) ) ) | Judge Presiding. |

ORDER

Defendant, Milton Jones, was convicted of three counts of first degree murder and two counts of aggravated kidnaping following a jury trial. The circuit court sentenced him to 25 years' imprisonment for the murder convictions and two concurrent terms of six years' imprisonment for the aggravated kidnaping convictions, to be served consecutive to the sentence for the murder convictions. Defendant appeals arguing that the circuit court erred by not appointing new counsel following claims that his counsel was ineffective, conducting a fitness hearing after defendant allegedly reduced his medications and that he was denied a fair trial as a result of improper statements made by

1-04-1359

the prosecutor.

For the reasons that follow, we affirm the judgment of the circuit court.

## BACKGROUND

The following facts are taken from the testimony of witnesses in the proceedings in the circuit court. In June 1999, Lolita Sierra and Patrick Banks were engaged to be married and lived together in an apartment in Chicago, Illinois. Sierra testified that she and Banks were unemployed, but that Banks would steal items from others' cars to buy cocaine.

On the morning of June 25, 1999, Sierra and Banks were staying at a hotel where they smoked crack cocaine. They decided to go to M.C. Jones' apartment to buy more crack cocaine.[1] When they arrived at Jones' apartment, Banks saw a white sport utility vehicle filled with disc jockey equipment parked near Jones' apartment. Banks broke the window of the vehicle and with help from his friend, Leo Johnson, carried the equipment to Jones' apartment.

Jones testified that he woke up on June 25, 1999, and found disc jockey equipment in his apartment which he had never seen before. Jones stepped outside and saw a man that he did not know who asked Jones if he knew who broke the window of his vehicle and took his equipment. Jones did not answer. Jones later identified defendant in court as the man he saw outside.

---

[1] M.C. Jones is not related to defendant Milton Jones.

2

1-04-1359

Defendant then drove off in his vehicle.

Sierra testified that Banks found a purchaser for the equipment with the assistance of an individual by the name of Black Ant. The equipment was sold and taken out of the back door of Jones' apartment. Sierra further testified that around 9:00 or 10:00 a.m., Banks returned with six bags of crack he received in exchange for the disc jockey equipment. Sierra stated that she, Jones, Johnson, and another individual named Joyce smoked the crack cocaine in Jones' apartment. Jones testified consistently except that he stated Banks returned with eight bags of crack cocaine.

Sierra and Jones testified that after they smoked the crack cocaine, approximately ten men armed with guns, including defendant, kicked in the front door and entered the apartment. Sierra testified that she had not seen defendant before he entered Jones' apartment, but she identified him in court as one of the men who kicked in Jones' door. Sierra stated that defendant told others to "get those mother fuckers that broke into my truck." Sierra and Jones testified that defendant tied a rope around each of their necks in Jones' apartment. They also testified that they were taken to a vehicle Sierra described as a white Blazer with a broken window. Sierra testified that the vehicle was occupied by a driver and another unknown individual. Johnson testified that upon his return from the liquor store that morning, he observed Sierra and Jones with ropes around their

3

1-04-1359

necks being held by a black man accompanied by approximately six
others who were armed with bats and sticks.

Jones and Sierra were questioned by their abductors
regarding the stolen equipment. They indicated that Banks broke
into defendant's vehicle and took the equipment. The abductors
took Jones and Sierra to a Chicago Housing Authority project
parking lot at 35th and State Streets in Chicago. Upon arriving
at the parking lot, Sierra testified that a brown Buick arrived
carrying Banks and other unknown men. She testified that others
were hitting Banks in the brown Buick. Banks attempted to run
away from the men in the car, but defendant told others to "get
that motherfucker." Banks was caught and further beaten and
kicked in the head. Jones also testified that Banks was beaten
while they were present at the housing project parking lot.
Jones and Sierra both testified that they were led by defendant
and others to a second or third floor apartment in the housing
project where Banks' beating resumed. Sierra and Jones testified
that defendant told others present at the housing project
apartment to let them go. The two were taken to 71st and Jeffery
Streets in a different white sport utility vehicle where they
released. Sierra testified that she did not feel safe reporting
the occurrence to police immediately following the incident.
Neither she nor Jones notified the police of their abduction or
Banks' abduction and beating.

Detective Allen Szudarski of the Chicago Police Department,

4

1-04-1359

testified that he interviewed Sierra on July 18, 1999. He
observed ligature marks on Sierra's neck. Sierra identified
defendant as the man who abducted her and Jones from a series of
photographs shown to her at the police station on August 3, 1999.
On June 29, 2001, Sierra identified defendant in a line-up at the
police station. On June 7, 2001, Jones identified defendant in a
photographic array as the man who kidnaped him and Sierra and
beat Banks. On June 30, 2001, Jones identified defendant in a
police line-up. Both Jones and Sierra testified to using drugs
and that their drug use may have affected their ability to
remember certain aspects of the incident.

Defendant testified in his own behalf. He stated that prior
to his arrest, he lived in Cedar Rapids, Iowa with his wife and
three children. He worked at the local Boys and Girls Club in
addition to working as a disc jockey for weddings, parties, radio
broadcasts and recorded releases. Defendant and his partner,
Dion Boyd, owned the recording equipment that was stolen by
Banks. Defendant, Boyd and a record company were also part of a
partnership which produced defendant's albums in Lombard,
Illinois.

On June 24, 1999, defendant drove to Chicago in a 1996
Chevrolet Blazer which contained more than $10,000 of recording
and disc jockey equipment. Defendant intended to pick up and
distribute his newest recorded release, however, due to an
unexpected delay in production, he had to spend the night with

5

1-04-1359

his sister who lived at 72nd and Constance streets in Chicago.
On June 25, 1999, defendant awoke to find that the passenger side
window to his vehicle had been broken and his equipment, tapes
and compact discs had been stolen. As defendant cleaned his
vehicle, he questioned passers-by about the theft of his
equipment.

Defendant testified that he contacted Boyd and later met him
at housing project at 37th and Federal Streets in Chicago. Boyd
introduced defendant to Jones and indicated that Jones would lead
defendant to the stolen equipment. Jones told defendant that an
individual named "Black Ant" had his equipment. Defendant
testified that he and Jones went to Black Ant's apartment and
spoke to an unknown person who indicated that Black Ant was at a
nearby liquor store. Defendant testified that Jones willingly
accompanied him to the liquor store and searched for Black Ant,
but they did not find him. As the two left the liquor store,
Black Ant and others were seen leaving an apartment behind the
liquor store. Defendant testified that he spoke to Black Ant
briefly and agreed to pay him approximately $150 for the return
of his equipment. Defendant testified that Jones appeared to be
scared while in his vehicle, but defendant did not know why Jones
was afraid and stated that Jones voluntarily accompanied him.

Jones, Black Ant and others walked to the location where
defendant's equipment was located while defendant drove there in
his truck. While on route to recover the equipment, defendant

6

1-04-1359

testified that he was stopped by a police officer who was investigating a residential "break-in." He testified that the police officer ran his license plates and took him to 72nd and Constance Streets near his sister's house. Two witnesses were waiting on the curb on 72nd street when the officer arrived with defendant and viewed defendant through the window of the police car. The witnesses indicated that defendant was not the perpetrator. Defendant testified that he was allowed to leave, but first, he told that officer about the theft of his equipment and indicated that he was going to retrieve it. During cross-examination, the following colloquy occurred between defendant and the Assistant State's Attorney:

"[ASSISTANT STATE'S ATTORNEY]: Q. All right. Now after - on this day after your car had been broken into, were you still driving around in that car?

A. Yeah.

Q. Okay. So it was still drivable [sic]?

A. Yes it was.

Q. And you said that the police officers pulled you over?

A. Yes they did.

Q. All right.

A. They should have it on record, shouldn't they?

Q. No we don't. What did they tell you when they pulled you over?

A. He pulled me out of the car and had be put my hands on

7

1-04-1359

the back of the glass on the back of the car and asked me
did I know about somebody breaking into a house or
something, a burglary, or whatever.

Q. And they didn't even know your name, did they?

A. No, he ran my plates and knew my name. He said
"Somebody pointed out this white truck." That's why he
pulled me over.

Q. And you are saying that they just let you go?

A. No, he took me to 72nd and Constance which was right
down the street, and it was two people standing there on the
corner on the sidewalk, and he got out and talked to them,
and they walked up to the car; and once the had left - - I
mean, once he got back in the car, he drove me back to my
vehicle and then - -

Q. Could you tell us what did this police officer look
like?

A. It's [sic] a black male.

Q. What else?

A. I don't know.

Q. You don't know anything about this guy who stopped you
and was questioning you?

A. No. No.

Q. What did these other people look like that were
standing on this corner?

A. It [sic] was a male and a female.

8

1-04-1359

    Q. What did they look like?

    A. I don't know.

    Q. Because it didn't happen, right?  That's why you don't know what they look like because it didn't happen?

    [DEFENDANT'S ATTORNEY]: Objection, Judge.

    [THE WITNESS]: A. Well wouldn't the - -

    [THE COURT]: Sustained.  Ask another question."

Defendant returned to the projects to meet Boyd after recovering his equipment.  During this meeting, defendant stated that he was informed by Boyd the "someone had been beat-up." Defendant testified that he returned home to Iowa following his meeting with Boyd to begin re-mastering the tapes and CD's that were stolen from his vehicle.

    Detective Cleason of the Chicago Police testified on behalf of the State during the State's case-in-chief and in its case-in-rebuttal.  Cleason testified that he interviewed defendant on June 29, 2001.  Cleason stated that defendant told him that the beating and kidnapings were his fault and that he was responsible for the man's death.  Cleason also said that defendant called his cousin, a high ranking member of the Gangster Disciples, after learning of the theft.  Defendant, according to Cleason, told him that he saw Banks on the street and asked him what happened to his car, but Banks ignored him.  Defendant also stated that he was outside waiting outside while Boyd and his associates arrived at Jones' apartment and when the three victims were brought down

9

1-04-1359

the stairs.  Cleason testified on cross-examination that
defendant did not admit to beating or kidnaping anyone and did
not order anyone to do the same.  Cleason testified that he
offered defendant the chance to make a written statement, but
defendant declined and Cleason did not attempt to locate
defendant's cousin.

In its closing argument, the State made the following
statements:

"[T]ake a minute and picture something in your mind.
Picture in your mind your own home; where you live with your
family and your friends.  Now think of your worst nightmare.
A violent intruder breaks down the door of your home.  He
forces his way into your home, armed with a handgun, giving
orders; giving orders to nine or ten other intruders.  Nine
- - giving orders to nine or ten other intruders, ordering
them to get you.

[DEFENDANT'S ATTORNEY]: Judge, I object to the
personalization of this argument.

[THE COURT]: Overruled.

[ASSISTANT STATE'S ATTORNEY]: Ordering them to get you
and your family.  You try to play run and hide, but this
person, this leader who comes in ordering people around,
grabs you; pulls you back; puts ropes around your neck.  And
- - or otherwise forces you to be taken to another place
against your will.  And the place that he takes you to is an

10

1-04-1359

unknown; unfamiliar building where you are forced inside to
a hallway.  And inside there, there are more ruffians inside
waiting for you to confront you.  To threaten you.  And by
the order of this boss man, the leader of the pack, you are
beaten; or one of your loved ones is beaten, beaten to
death."

Following the evidence and arguments, the jury returned a verdict
of not guilty of first degree murder while armed with a firearm
and the aggravated kidnaping of Banks.  Defendant was found
guilty of the aggravated kidnapings of Sierra and Jones and the
first degree murder of Banks.

Post trial motions were heard on April 6, 2004.  Defense
counsel submitted a motion for judgment notwithstanding the
verdict or, in the alternative, a new trial.  Defendant indicated
that he wished to present a motion for a new trial and that he
wanted to see copies of the discovery in his case.  Defendant
stated: "[m]y attorney fails to cooperate with the things that I
ask him to do before trial and no and after trial and I would
like to present this motion for unofficial - - unofficial [sic]
assistance of counsel."  The circuit court continued the post-
trial motion and gave defense counsel instructions to meet with
defendant prior to the next court date to discuss the issues that
he raised.  Defense counsel promised the court that he would do
so.

On April 21, 2004, the circuit court heard defendant's post-

11

1-04-1359

trial motion which was argued by defense counsel.  Defendant
requested that he be given an opportunity to be heard before
counsel's argument on the post-trial motion.  The circuit court
allowed defendant to address the court following arguments on the
motions.  Defendant proceeded to apologize to the family and
denied having any part in the incident, complained about his
attorney, indicated the dosages of his prescription medication,
stated that he gave proof to his attorney that he was not
involved Banks' death, accused his attorney of incompetence,
provided the circuit court with what he referred to as motion for
post-trial relief which contained "the truth about everything.
Everything that happened."  Defendant claimed that he reduced the
amount of his medication by one half after the first scheduled
sentencing hearing on April 6, 2004.  Defendant asserted that he
was not found guilty beyond a reasonable doubt, that his attorney
did not return phone calls to his mother and sister and that the
attorneys only contacted his family members when payment was due.
Defendant complained that counsel failed to "find Dion [Boyd] and
them and straighten this out *** put these people where they was
[sic] [a]nd [] clear me."  Defendant further stated the his
attorneys should go to prison for taking his family's money.

Defense counsel objected arguing that defendant was only fit
to stand trial with medication.  The court asked defendant to
bring his argument to a conclusion.  Defendant requested a new
trial and asked the court to "bring in the other guys that was

12

1-04-1359

involved in this case to justice and clear me from kidnaping.
The circuit court reviewed defendant's medical and psychological
history, denied defendant's motion for a new trial and sentenced
him.

ANALYSIS

I. Improper Comments by the State

Defendant first contends that he was denied a fair trial
when the State attempted to impeach his testimony with personal
opinion, asked the jury to put themselves in the victim's
position during closing arguments and alleged facts not in
evidence. Specifically, defendant identifies the statement made
by the Assistant State's Attorney who stated "I would hate to see
if it was a ten" when cross-examining defendant about his
contention that he was not very angry about the theft of his
equipment. The State also asked defendant if he could not
describe the police offices who pulled him over because the stop
never occurred. Defendant objected to the statement relative to
his level of anger and the question about whether he was ever, in
fact, stopped by the police. The circuit court sustained both
objections and cross-examination continued. Defendant also
objected to, and the circuit court overruled, the State's
argument where it asked the jury to imagine itself as the victims
in this case. Defendant did not include any reference to these
errors in either his pro se motion for a post-trial relief or in
the post-trial motion filed by defense counsel. Defendant,

13

1-04-1359

however, has waived any claims of error relative to the statements of which he now complains.

In order to preserve an issue for review, a defendant must object both at trial and in a written post-trial motion. People v. Enoch, 122 Ill. 2d 176, 186 (1988). Since defendant failed to file a post-trial motion, these issues have been waived. The general rule in Illinois is that the failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal. Enoch, 122 Ill. 2d at 186 (1988); People v. Shum, 117 Ill. 2d 317, 340 (1987); People v. Szabo, 113 Ill. 2d 83, 93 (1986); People v. Porter, 111 Ill. 2d 386, 399 (1986); People v. Caballero, 102 Ill. 2d 23, 31 (1984). Our Supreme Court stated the reasons for the waiver rule in Enoch, quoting Caballero:

"Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review. Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended. Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance." Caballero, 102 Ill. 2d at 31-32. Notwithstanding defendant's failure to reference these

14

1-04-1359

errors in his post-trial motion for relief, he urges this court
to review the claims pursuant to the plain error rule. The plain
error rule may be invoked in criminal cases when a defendant has
not properly preserved an error for review, where the evidence is
closely balanced, or where the error adversely affected the
defendant's right to a fair trial. People v. Mullen, 141 Ill. 2d
394, 401-02 (1990), citing People v. Carlson, 79 Ill. 2d 564,
576-77 (1980). The main purpose of the plain error rule, if the
evidence is closely balanced, is to protect against the
"possibility that an innocent person may have been convicted due
to some error which is obvious from the record, but not properly
preserved" for appellate review. Carlson, 79 Ill. 2d at 576. In
cases where the evidence is closely balanced, the probability
that a defendant's conviction was caused by even a minor trial
error is greatly enhanced. Therefore, in those cases, the court
will invoke the plain error rule so that it can determine whether
an error, which was not objected to at trial and in post-trial
motions, raises doubt as to the validity of the jury's verdict.
Mullen, 141 Ill. 2d at 401-02; Carlson, 79 Ill. 2d at 576. After
reviewing the record, we can neither conclude that the evidence
was closely balanced nor the error of such magnitude as to
deprive defendant of a fair trial.

The evidence presented at trial, although contradicted by
defendant, was overwhelming. Sierra and Jones testified that it
was defendant who entered Jones' apartment by force with others,

15

1-04-1359

tied a rope around their necks and forced them into a vehicle.
Johnson corroborated Sierra and Jones' testimony when he
testified that he observed an individual taking the two against
their will out of the apartment with a rope around their necks.
Sierra and Jones testified that Banks arrived at the housing
projects in a brown car with others who were beating him and that
Banks attempted to escape. Sierra told police that she believed
that the offender was D.J. Milton (defendant) and then identified
defendant along with Jones, three times subsequently in a photo
array, a police line-up and in court during the trial. Both
Sierra and Jones testified that defendant not only participated
in Banks' beating, but ordered others to beat Banks.

As an aside, we note that despite defendant's contentions
that the evidence was far from overwhelming, he does not argue
here that the evidence at trial was insufficient to prove him
guilty beyond a reasonable doubt.

Even if waiver is not applicable here and assuming the
questions were not proper, our supreme court has held that
improper cross-examination is not reversible error if it can be
considered harmless. People v. Enis, 139 Ill2d 264, 296 (1990);
J.L. Simmons Co. v. Firestone Tire & Rubber Co., 108 Ill. 2d 106,
114-15 (1985); People v. Kirkwood, 17 Ill. 2d 23, 30 (1959). In
J.L. Simmons, our supreme court stated:

> "[n]ew trials can be ordered only when the evidence
> improperly admitted appears to have affected the outcome

16

1-04-1359

[Citations]. While we would like all trials to be conducted
error free, no useful purpose would be served by granting a
new trial when the record reveals that the errors did not
change the result reached by the jury. 'It is not every
error, of course, that will require a reversal. Where it
appears that an error did not affect the outcome below, or
where the court can see from the entire record that no
injury has been done, the judgment or decree will not be
disturbed. [Citations.]' " <u>J.L. Simmons</u>, 108 Ill. 2d at 114-
15.

Similarly, we have held that improper comment will not require
reversal unless it caused substantial prejudice to the defendant.
<u>People v. Wood</u>, 341 Ill. App. 3d 599, 612 (2003). After
carefully reviewing the record in this case, we cannot say that
the errors of which defendant complains cause substantial
prejudice or affected the outcome of the trial.

         II. Failure to Appoint New Counsel

Defendant next claims that the circuit court erred when it
did not appoint new counsel th represent defendant in his post-
trial motion after he alleged that defense counsel was
ineffective. In support of this proposition, defendant cites to
<u>People v. Krankel</u>, 102 Ill. 2d 181, 189 (1984). However, <u>Krankel</u>
did not announce a rule that automatically requires the
appointment of new counsel to argue a defendant's claim of
ineffective assistance of trial counsel. (E.g., <u>People v.</u>

17

1-04-1359

<u>Johnson</u> 159 Ill. 2d 97, 124-25 (1994) (finding no reversible
error by the circuit court for failing to appoint separate
counsel when "none of defendant's stated allegations, singly or
in combination, raise a colorable claim of ineffective assistance
of counsel"); <u>People v. Nitz</u>, 143 Ill. 2d 82, 135 (1991)
(concluding that "trial court's failure to appoint new counsel *
* * was harmless beyond a reasonable doubt"); <u>People v. Crane</u>,
145 Ill. 2d 520, 533 (1991) (holding that defendant's claim was
without merit; defense counsel's strategy was based on
defendant's desires, and, therefore, no additional hearing with
new defense counsel was required); <u>People v. Williams</u>, 147 Ill.
2d 173, 252 (1991) (finding that "trial court conducted the
necessary examination of the factual matters underlying
defendant's claim" and defendant was not entitled to an
evidentiary hearing on ineffective assistance of counsel). In
<u>Williams</u>, 147 Ill. 2d at 251, our supreme court explained that "
'the trial court should examine the factual matters underlying
the defendant's claim, and, if the claim lacks merit or pertains
to matters of trial strategy, then no new counsel need be
appointed. Only if the allegations show possible neglect of the
case * * * should new counsel be appointed.' " <u>Williams</u>, 147
Ill. 2d at 251, quoting <u>People v. Washington</u>, 184 Ill. App. 3d
703, 711 (1989).

The operative concern for the reviewing court is whether the
trial court conducted an adequate inquiry into the <u>pro</u> <u>se</u>

18

1-04-1359

defendant's allegations of ineffective assistance of counsel.
Johnson, 159 Ill. 2d at 125. In the case at bar, the court was
presented with a lengthy argument at the post-trial hearing, on
the issue of ineffective assistance of counsel. We have reviewed
the record, including the transcript of the post-trial hearing,
and we find that the trial court allowed defendant substantial
latitude to explain, in great detail, the matters raised in his
motion. We conclude that under the circumstances of this case,
the trial court's failure to appoint new counsel based on
defendant's request for a new trial was not error. The majority
of defendant's claims of ineffectiveness are based upon counsel's
failure to contact certain individuals who would be able to
"clear" defendant of any participation in the crime. However,
defendant testified in his own behalf and never mentioned the
allegedly exculpatory evidence when he was asked about the
individuals and events during his testimony. In addition, the
allegations that counsel failed to share discovery with defendant
and only met with his family members when payment was due, do
not, either singly or in combination with the other claims, raise
a colorable claim of ineffective assistance of counsel that would
require a further hearing with different counsel. Lastly,
despite his claims that counsel did not meet with him except in
court, the record reveals that counsel and co-counsel met with
defendant prior to and following court dates and in jail, albeit
not as often as defendant desired. Accordingly, we hold that the

19

1-04-1359

trial court did not commit reversible error in failing to appoint a new attorney for defendant, for purposes of presenting the post-trial motion based on ineffective assistance of counsel.

III. Failure to Order a Fitness Hearing

Defendant claims that the circuit court erred by failing to conduct a fitness hearing after he raised a bona fide doubt relative to his fitness. Defendant contends that his admission to the court that he reduced his medication by half of the specified dosage following the April raised such a bona fide doubt. Defendant alleges that he was found fit to stand trial only with the assistance of medication. We disagree.

A defendant is presumed fit to stand trial unless he cannot understand the nature and purpose of the proceedings against him or assist in his own defense. 725 ILCS 5/104-10 (West 2004); People v. Moore, 189 Ill. 2d 521, 535 (2000). A defendant is entitled to a fitness hearing only when a bona fide doubt of the defendant's fitness is raised. 725 ILCS 5/104-11(a) (West 2004); People v. Johnson, 183 Ill. 2d 176, 193-94 (1998).

On October 8, 2001, defendant was examined by a licensed clinical psychologist to "determine his fitness to stand trial, fitness to stand trial with medication, sanity and his ability to understand Miranda." Defendant was diagnosed with alcohol dependence, a learning disorder and a possible psychotic disorder. The psychologist noted that defendant was taking Risperdal 1 mg in the morning and 2 mg at night, Cogetin 1mg

20

1-04-1359

twice daily, Depakote 250 mg in the morning and 500 mg at night,
Trazodone 100 mg at night, Effexor 100 mg twice daily, and
Thorazine 50 mg if necessary. Following a thorough examination,
defendant was found "currently fit to stand trial[,]" "legally
sane at the time of the alleged offense" and "was capable of
comprehending his Miranda warnings."

On November 20, 2001, defendant was examined by a
psychiatrist who found that defendant had alcohol dependence, a
learning disorder, a possible psychotic disorder and malingering.
The psychiatrist made the following findings: Defendant is "fit
to stand trial with medication. Although [defendant] appears to
be exaggerating his psychopathology and distorting his knowledge
regarding the legal system, I believe he has an adequate
understanding of the charges against him, the possible
consequences if found guilty, legal procedure, and the roles of
the various members of the court. He is alert, oriented, and
able to assist counsel in his own defense."

Based on the evidence that we have before us, we find that
defendant did not raise a bona fide doubt as to his fitness. The
sole basis for his claim is the statement that he reduced his
medication by one-half sometime after April 6, 2004, and prior to
April 21, 2004. Defendant exhibited no unusual behavior at any
point during trial. He gave lengthy, coherent and relevant
testimony both on direct and on cross-examination in his own
behalf without any apparent difficulty. Defendant further

21

1-04-1359

submitted a neatly printed, 18 count, hand-written, pro se motion for post-trial relief following his alleged reduction in his medication. Moreover, defendant was allowed to fully argue his claims and the bases therefore to the court. In fact, during defendant's 13-page argument, he indicated that the reason he reduced his medication due to the effects of the drugs. Defendant stated: "But my lawyer told me back on April 6 that it [sic] was no grounds for me to have a new trial. That's when I knew it was time for me to bring my medication I have and start taking half of it instead of all of it. Because something was wrong here."

Although the specific finding was made by the medical examiners that defendant was fit to stand trial while on medication, we do not agree with defendant that he is automatically deemed unfit if that dosage is alleged to have been modified. Under the facts and circumstances presented here, defendant failed to raise a bona fide doubt as to his fitness. The circuit court, as a result, did not err by failing to conduct an additional fitness hearing prior to sentencing defendant.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

O'MALLEY, J., with McNULTY, P.J., and Tully, J., concurring.

22

GENTRY

04-1359

ORDER

## IN THE APPELLATE COURT OF ILLINOIS
## FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of Cook |
| Plaintiff-Appellee, | ) County, Illinois |
| | ) |
| | ) |
| v. | ) No. 01 CR 18654 (01). |
| | ) |
| Milton Jones, | ) Honorable |
| | ) Preston L. Bowie, |
| Defendant-Appellant. | ) Judge Presiding. |

### O R D E R

This cause coming to be heard on appellant's petition for rehearing and the Court being fully advised in the premises;

IT IS HEREBY ORDERED that the petition is denied.

**ORDER ENTERED**

JUL 2 6 2006

APPELLATE COURT, FIRST DISTRICT

_____
PRESIDING JUSTICE McNulty

_____
JUSTICE Tully

_____
JUSTICE O'MALLEY

RECEIVED

AUG 0 1 2006

DOCKETING DEPARTMENT
State Appellate Defender
1st DISTRICT

103294

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

November 29, 2006

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 103294 - People State of Illinois, respondent, v. Milton
          Jones, petitioner.  Leave to appeal, Appellate
          Court, First District.

    The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.

    The mandate of this Court will issue to the Appellate Court

on January 4, 2007.

EXHIBIT G

File Date: _6-27-2008_____

Case No: _08cv2057_____

ATTACHMENT # _____

EXHIBIT _H to K_____

TAB (DESCRIPTION)

_____



RECEIVED
APR 27 2007
CLERK OF THE CIRCUIT COURT

IN THE
CIRCUIT COURT OF COOK COUNTY

PEOPLE OF THE STATE OF ILLINOIS, )
RESPONDENT )         CIR. CT. NO. I01CR18654
)
)
V. )         HONORABLE
)             PRESTEN L. BOWIE
MILTON JONES R29598 )      PRESIDING JUDGE ROOM 203
PETITIONER )
)

## PETITION FOR POST-CONVICTION RELIEF

Pursuant to 725 ILCS 5/122-1 Petitioner Milton Jones comes before the court and asks that the judgement in Cook County Indictment NO. I01CR18654 be vacated.

**IN SUPPORT OF THIS REQUEST PETITIONER STATE:**

1. On April 21, 2004 petitioner was sentenced by Honorable Presten L. Bowie following a Jury Trial for the offense of three counts of First Degree Murder and two counts of Aggravated Kidnapping in Indictment No. I01CR18654.

2. petitioner filed a notice of Appeal on April 21, 2004 the Appellate court Affirmed Milton Jones Conviction on June 9, 2006 Mr. Jones filed a petition for rehearing on April 20, 2006. The Appellate court denied the petition for rehearing on July 26, 2006. A petition for leave to Appeal to the Illinois Supreme court was denied on November 29, 2006.



FILED
CR-526-3
JUN 0 4 2007
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

1

EXHIBIT H

3. Petitioner's rights under the Constitution of the United
states and the state of Illinois were substantially denied in
that :  Petitioner was denied his right to Ineffective Assistance
of Counsel where defense counsel failed to interview and call as
witnesses five people who could have corroborated petitioner's
alibi. Prior to trial, I informed my trial Attorney that at the
time of my offense I was not the one that kidnap Lolita, and
M.C. Jones, Allen Shanklin was the one. I told my trial Attorney
where Deeon Boyd lived and that Deeon Boyd and Allen Shanklin
were willing to speak with him and testify on my behalf.Trial
counsel never spoke to Deeon Boyd and Allen Shanklin. trial
counsel told me that he had tried to contact them, But that he
was unable to locate them. this explanation is unbelievable
because I told my Attorney where Deeon Boyd lived and also gave
him Ricky Chambers phone No. he talk with Ricky Chambers by phone
and said he didn't think Ricky would be a good witness. The truth
is that Ricky Chambers lived in Cedar Rapids Iowa and had came
to Chicago with petitioner on June 24, 1999 and was with him the
hole time, How is that not a good witness. In 2002 petitioner
gave counsel (4)four pictures and a list of names and what happen
on June 25, 1999. Counsel only used (2)two pictures in trial in
didn't used the statement that I gave him. I was denied equal
protection of the law. I have not had a Attorney visit in 2003,
and 2004 before trial I had no Idea of any information of what
the state was to bring forth.

2

4.   petitioner have tried to obtain an affidavit from witnesses

Deeon Boyd, Allen Shanklin, and Ricky Chambers but have been

unable to do so because petitioner is incarcerated and indigent,

and unable to locate witnesses current address without assistance

from the court; I have also written to my Attorney's and asked

for copies of the Police Reports referenced herein, but they

refuses to send them to me. All three eyewitnesses were on the

scene on June 25, 1999.


5.   It could further show that petitioner did not know about the

Jury note and the court and prosecution discussed the note and

submitted further instructions, without my knowledge and presence

this may contitute a violation of the sixth Amendment right to

counsel at a critical stage of the proceeding, and a violation of

the fifth Amenment to be present.


6.   Counsel failed to give petitioner any meaningful consultation

during the two years he represented petitioner in the above

entitled cause of action and never showed this petitioner any

discovery or went over any discovery at any time in the period of

representation or priop to trial.


7.   Counsel failed to visit with petitioner to prepare him for

trial to discuss a defense strategy or to prepare him to take the

stand in his own behalf. Petitioner was left at a serious

3

disavantage during trial as he knew nothing of what the state was to bring forth nor had any idea of any of the information to be used against him or any of the statements to be used against him.

8.   On April 6, 2004 there was a court order for counsel's to visit the petitioner after trial and before sentencing, with documents, and discovery. After not being able to contact counsel 's, Counsel showed up two days before sentencing with no discovery or documents, So petitioner can assist him to prepere for a new trial. It is unfortunate but undeniable fact that a person of means, by selecting a Lawyer and paying him enough to ensure he prepares thoroughly, Usually can obtain better representation than that available to an indigent defendant, who must rely on appointed counsel's who in turn, has limited time and resources to devote to a given case.

9.   Defense Attorneys provided deficient performance in failing to request renewed fitness examination hearing. Petitioner was taking a number of powerful psychotropic medication prescribed for him by prison doctors. Petitioner was examined by a psychologist before his trial began, and the doctor, while noting several psychological impairments, deemed him fit to stand trial only on medication. Neither defense counsel nor the trial court ever requested a further evaluation to determine if petitioner was competent at the time he went to trial. at the hearing on

4

post-trial motions and sentencing, petitioner and his Attorney informed the court that he was not taking his medication as prescribed. Because petitioner failure to take his medication as prescribed raised a bona fide doubt of his fitness, the trial court erred by not conducting a fitness hearing before proceeding on post-trial motions and sentencing.

this court should therefore vacate the trial court's dismissal of petitioner's post-trial motion and the sentencing order, and remand this cause for a hearing on petitioner fitness. forensic clinical services staff psychiatrist Philip Pan, M.D., examined petitioner and submitted to the court a report, dated November 20 ,2001. In Dr. Pan's report petitioner additional suicide attempts in jail were documented. Dr. Pan diagnosed petitioner as having alcohol dependence and a learning disorder, and stated he could not rule out a diagnosis of psychotic disorder. Dr. Pan noted that petitioner was medicated with Risperdal (an Antipsychotic), 1 mg in the morning and 2 mg at night, Cogentin (for side effects of Antipsychotic), 1 mg twice per day, Depakote (A mood stabilizer), 250 mg in the morning and 500 mg at night, Trazodone (An Antidepressant, Usually used as a sleep agent), 100 mg at night, Effexor (an Antidepressant) 100 mg twice per day, and Thorazine (an Antipsychotic), 50 mg if needed. Dr. Pan concluded that petitioner was fit for trial with medication. Petitioner was not on the same medication at the time he went to trial in 2004.

On April 21, 2004 when the instant case was called for post-trial and sentencing proceedings, petitioner requested to address the court "before anything further" After being initially rebuffed by the court, petitioner informed the court that he was not taking the prescribed doses of his medication, and defense counsel Breen objected to the continuation of the proceeding noting that petitioner was only fit when on his medication. The due process clause of the fourteenth Amendment prohibits the criminal prosecution of an incompetent defendant. A defendant has a constitutional right not to be tried while legally incompetent and a state's failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his Due Process right to a fair trial. A defendant is presumed fit to stand trial, unless he cannot understand the nature and purpose of the proceedings against him or assist in his own defense. If there is a bona fide doubt about the defendant's fitness to stand trial, then the trial court must hold a fitness hearing before proceeding further 725 ILCS 5/104-11(a). Where petitioner was determined by the examining psychiatrist to be fit with medication, he could very likely have been unfit without this medication. Where the court was informed that petitioner was not taking his medication at the prescribed dose, and where petitioner Ineffective Assistance of counsel concerns indicated that the Attorney-Client relationship

6

had broken down, there was a bona fide doubt of petitioner fitness, and the court should have held a fitness hearing before proceeding on sentencing and petitioner motion for a new trial. the fact that petitioner mental problems preceded his trial, and were not something that only arose at the post-trial hearing, further supports petitioner contention that a bona fide doubt existed of his fitness at the hearing on post-trial motions and sentencing, the trial court's failure to conduct a hearing on petitioner fitness requires that this court vacate the trial court's ruling on post-trial motions and the trial court's sentencing order, and remand the cause for a hearing on petitioner fitness.

10.  petitioner is without any income or assets with which to procure counsel. Petitioner therefore desires that counsel be appointed to represent him in his proceeding.

I swear that the facts stated in this petition are true and correct in substance and in fact.

_____

pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief. I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith.

Signed on this  4  day of  APRil  , 2007.

_Milton Jones_
Affiant

7

UNITED STATES OF AMERICA
STATE OF ILLINOIS

# A F F I D A V I T
## OF
## MILTON L. JONES

I, <u>MILTON L. JONES</u>, AFTER FIRST BEING DULY SWORN UPON HIS OATH
DO STATE AS FOLLOW:

1. I Milton Jones was not able to control what had happin on the
day on June 25, 1999.

2. I had to inform my business Partner, Deeon Boyd about the
SOX PARK MOB 19 Hot-mix Tapes that was stoling out of my 1996
white 2 door Blazer.

3. I Milton Jones witness ALLEN SHANKLIN put victims LOLITA
SIERRA,and M.C. JONES in the back seat of Deeon Boyd white 4 door
suberban while held with a rope. ALLEN SHANKLIN than got into the
front seat of Deeon Boyd truck. Deeon Boyd was the driver of his
white 4 door suberban on June 25,1999.

4. FRom the beginning, I told my Retained Attorney Assistant
what had happin and who did what. Doing trial my Attorney told me
to take the stand and I agreed, Doing trial my Attorney did not
bring out the truth and use the Evidence that I gave to his
Assistant.

5. When it was time for me to take the stand, and not knowing
what the state was to bring forth, Because I never had access to
review the Evidence against me, I look up and seen that my family
was in danger, Because of people that had Knowledge of the crime
was in the court at the time that I took the stand.

6. If my Retained Attorney would have Brought out the Evidence
in trial,the truth, I think I wouldn't been so Afraid to tell the
hold truth of what Happin,and who did what.

7. Before trial, I requested that my family move to another
location, and they did so. I believed that my retained Attorney
was going to use the evidence that I presented to him in 2002.
That was the only short time I was able to Communicate with my
Attorney assistant. I never met with my Retained Attorney Raymond
L. Prusak.

8. Doing Sentencing, I told the victims family that I will bring
this case to justice. From that day on I have been investigating
this case.

### MOTIVE OF THE MURDER OF PATRICK BANKS

1. Me and my business partner Deeon Boyd items have been stoling
out of my truck. SOX PARK MOB 19 Hot-mix Tapes was taking out of
my truck on June 25,1999.

2. Deeon Boyd had full control of what had happin that day, and
Brought Beer as a payment for the crime that was committed.

UNITED STATES OF AMERICA

STATE OF ILLINOIS

### A F F I D A V I T
( CONT'D)

3.  In June 1999 SOX PARK MOB 19 Original Dat tape was Mailed
next day Express From Deeon Boyd, on east 47th street, to (me)
Milton Jones 317 16th Street n.e. Cedar Rapids IOWA, By the
U.S. Post Office, So that SOX PARK MOB 19 can be Edit and sent to
Jordan Milevski at A.V.T. 704 Oak Creek DR. Lombard,Ill. 60148
to be copy and pick up.

4.  I Milton Jones have been over medicated in the cook county
Jail, and have been beaten very bad by officers. Now that I'm in
prison my medication has been adjusted, and I have been working
on and Investigating this case every day getting Evidence up with
the help of my family and access to the Law library. Now I'm
looking for a lesser charge or time severed with bringing this ca
case to justice.

I MILTON JONES, So aver and declare that the foregoing is true
and correct in both substance and fact and to the best of this
Affiant's knowledge and Experiences. Affiant has not been
threatened for the making of this statement,Such being of his own
volition, as is here Evidenced by this Affiant's true and correct
signature as is hereby affixed hereto under the penalty of
perjury, pursuant to 28. U.S.C 1746.

---

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of
perjury, that everything contained herein is true and accurate to the best of my knowledge
and belief. I do declare and affirm that the matter at hand is not taken either frivolously or
maliciously and that I believe the foregoing matter is taken in good faith.

Signed on this  22  day of _ JAN. ___, 200 7.

_Milton Jones_
                                              **Affiant**

103294

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

November 29, 2006



DEC - 4 2006

Office of the State Appellate Defender
1ST DISTRICT

Mr. Stephen L. Gentry
Assistant Appellate Defender
203 N. LaSalle St., 24th Floor
Chicago, IL 60601

No. 103294 - People State of Illinois, respondent, v. Milton
Jones, petitioner. Leave to appeal, Appellate
Court, First District.

The Supreme Court today DENIED the petition for leave to appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court on January 4, 2007.

# Office of Adult Education and Vocational Services

This is to certify that

## Milton Jones

Is hereby awarded this

## Certificate of Accomplishment

For successful completion
Of the
Adult Basic Education Program
On this 17th day of January, 2007

_____
Instructor

_____
Education Administrator

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Post-Conviction |
| | ) | 01-CR-18654 (01) |
| v. | ) | |
| | ) | |
| MILTON JONES, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |

## <u>ORDER</u>

Petitioner, Milton Jones, seeks post-conviction relief from the judgment of conviction entered against him on April 21, 2004. Following a jury trial, Petitioner was found guilty of committing three counts of first degree murder and two counts of aggravated kidnapping. Petitioner was subsequently sentenced to twenty-five years of imprisonment for the murder convictions and two concurrent terms of six years imprisonment for the aggravated kidnapping convictions, to be served consecutive to the sentence for the murder convictions. As grounds for post-conviction relief, Petitioner claims that his counsel was ineffective and that additional instructions were given to the jury without Petitioner's knowledge and presence. Petitioner alleges that his counsel was ineffective for: (1) failing to call alibi witnesses; (2) failing to provide meaningful consultation and never showing him any discovery; (3) failing to prepare him for trial; and (4) failing to request a fitness hearing.

EXHIBIT I

## BACKGROUND

Petitioner's conviction stems from his conviction of three counts of first degree murder and two counts of aggravated kidnapping. On June 25, 1999, Patrick Banks broke into Petitioner's white sport utility vehicle filled with disc jockey equipment. *People v. Jones*, No. 1-04-1359, June 9, 2006 (unpublished order under Supreme Court Rule 23). Petitioner testified that prior to his arrest, he lived in Cedar Rapids, Iowa with his wife and three children where he worked at a local Boys and Girls Club, as a disc jockey, and produced albums. *Id.*

On June 24, 1999, Petitioner drove to Chicago to pick up and distribute his newest recorded release in a 1996 Chevrolet Blazer which contained over $10,000 worth of recording and disc jockey equipment. *Id.* Due to an expected delay in production, Petitioner had to spend the night with his sister at 72nd and Constance streets in Chicago. *Id.* On June 25, 1999, Petitioner awoke to find the passenger side window to his vehicle had been broken and his equipment, tapes, and compact discs stolen. *Id.* Shortly thereafter, it is alleged that Petitioner confronted a group of people at M.C. Jones' apartment by breaking in armed with a handgun and nine or ten other intruders where he ordered the other intruders to harm these people and he himself threatened them.

Lolita Sierra alleged that she was at Jones' apartment at the time of the break-in, having arrived earlier to smoke crack cocaine. *Id.* Sierra and Jones alleged that Petitioner tied a rope around each of their necks in Jones' apartment, and that they were taken to a vehicle Sierra described as a white Blazer with a broken window which was occupied by a driver and another unknown individual. *Id.* It is alleged that Sierra and Jones were questioned by their abductors regarding the stolen equipment, and they

2

indicated that Banks broke into Petitioner's vehicle and took the equipment. *Id.* Sierra and Jones were then allegedly driven to a Chicago Housing Authority project parking lot at 35th and State streets in Chicago. *Id.* Upon arriving, a car allegedly pulled up carrying Banks and other unknown men. *Id.* Sierra testified that when Banks attempted to run away from the men in the car, he was caught and beaten to death. *Id.* Petitioner was found guilty of the aggravated kidnappings of Sierra and Jones and the first degree murder of Banks. *Id.*

## PROCEDURAL HISTORY

A direct appeal was taken to the Illinois Appellate Court, First Judicial District, wherein Petitioner contended that the circuit court erred by not appointing new counsel following that his counsel was ineffective, conducting a fitness hearing after Petitioner allegedly reduced his medications, and that he was denied a fair trial as a result of improper statements made by the prosecutor. *Id.* On June 9, 2006, Petitioner's conviction and sentence were affirmed.

Petitioner filed for rehearing on April 20, 2006, which the Appellate Court denied on July 26, 2006. *People v. Jones*, No. 1-04-1359 (unpublished order under Supreme Court Rule 23). Petitioner sought leave to appeal to the Illinois Supreme Court. However, his petition was denied on November 29, 2006. *People v. Jones*, 222 Ill. 2d 588, 588 (2006). The record does not reflect whether Petitioner sought further review in the United States Supreme Court.

## ANALYSIS

The instant petition was filed on June 4, 2007, and is before the court for an initial determination of its legal sufficiency pursuant to Section 2.1 of the Post-Conviction hearing Act. 725 ILCS 5/122-2.1 (West 2002); *People v. Holliday*, 313 Ill.App.3d 1046, 1048 (5th Dist. 2000). A post-conviction petition is a collateral attack on a prior conviction, *People v. Simms*, 192 Ill. 2d 348, 359 (2000), and is limited to constitutional issues which were not and could not have been raised on direct appeal. *People v. King*, 192 Ill. 2d 189, 192-93 (2000). Where the Petitioner raises non-meritorious claims, the court may summarily dismiss them. *People v. Richardson*, 189 Ill. 2d 401, 408 (2000).

Under the Act, a Petitioner enjoys no entitlement to an evidentiary hearing. *People v. Cloutier*, 191 Ill. 2d 392, 397 (2000). In order to obtain a hearing, the Petitioner has "to make a substantial showing of a violation of a constitutional right." *People v. Johnson*, 191 Ill. 2d 257, 268 (2000). However, a *pro se* post-conviction petition may be summarily dismissed as frivolous or patently without merit during the first stage of post-conviction review unless the allegations in the petition, taken as true and liberally construed, present the "gist" of a valid constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).

### I. Ineffective Assistance of Counsel

#### A. Doctrine of <u>Res Judicata</u>

Petitioner has already raised these claims on direct appeal and therefore, they are now barred by the doctrine of <u>res judicata</u>. In Illinois, the law is clear: "Rulings on issues that were previously raised at trial or on direct appeal are <u>res judicata</u>." *People v. Miller*, 203 Ill. 2d 433, 437 (2002). Moreover, summary dismissal of post-conviction petitions based

4

on . . . res judicata is appropriate. *People v. Rogers*, 197 Ill. 2d 216, 221 (2001). The Supreme Court clarified the law and silenced the division among Illinois appellate courts when it concluded, "the legislature intended that trial courts may summarily dismiss post-conviction petitions based on both res judicata and waiver." *People v. Blair*, 215 Ill. 2d 427, 430 (2005).

On April 6, 2004, Petitioner, before the Court, indicated that he wanted to see copies of discovery in his case and that his counsel was ineffective for failing to provide Petitioner meaningful consultation. *People v. Jones*, No. 1-04-1359, June 9, 2006 (unpublished order under Supreme Court Rule 23). The Court continued the post-trial motion and instructed defense counsel to meet with Petitioner. *Id*. On April 21, 2004, the circuit court heard Petitioner's post-trial motion argued by defense counsel. *Id*. Following arguments on the motion, Petitioner addressed the Court by alleging that defense counsel only contacted Petitioner's family when payment was due and failed to call alibi witnesses. *Id*. The trial court denied Petitioner's post-trial motion based on ineffective assistance of counsel. *Id*.

At the appellate level, the court concluded that the Petitioner did not raise a bona fide doubt as to his fitness. *Id*. Furthermore, the Appellate Court affirmed the trial court's denial of Petitioner's post-conviction motion based on ineffective assistance of counsel. *Id*. Therefore, because Petitioner had an opportunity to be heard on his allegation that counsel was ineffective for: (1) failing to call alibi witnesses; (2) failing to provide meaningful consultation and never showing him any discovery; (3) failing to prepare him for trial; and (4) failing to request a fitness hearing, all claims challenging these issues in the instant matter are barred by the doctrine of res judicata.

5

## B. Counsel was Not Ineffective for Failing to Call Alibi Witnesses

In determining whether counsel is ineffective for failing to call alibi witnesses, a Petitioner is entitled to a post-trial hearing, or *Krankel* hearing. *People v. Krankel*, 102 Ill. 2d 181, 189 (1984). After the hearing, if the judge decides that the Petitioner received effective assistance of counsel, he shall deny a new trial and leave standing defendant's conviction and sentence. *Id.* In the instant case, Petitioner, at a post-trial hearing, asserted that his counsel was ineffective for failing to call alibi witnesses. *People v. Jones*, No. 1-04-1359, June 9, 2006 (unpublished order under Supreme Court Rule 23). The Court determined that Petitioner's counsel was not ineffective and denied Petitioner's motion for a new trial. *Id.* Therefore, because Petitioner received a *Krankel* hearing in which his counsel was deemed effective, Petitioner's counsel was not ineffective for failing to call alibi witnesses.

## II. Additional Jury Instructions Given Without Petitioner's Knowledge or Presence

### A. Legally Insufficient Claim

Certain claims raised by Petitioner are not legally sufficient under the Act. Specifically, Petitioner's allegation that additional instructions were given to the jury without his knowledge or presence is entirely conclusory. Indeed, the petition is devoid of any facts supporting Petitioner's contention. The Act requires that a petition be supported by affidavits, records, or other evidence supporting its allegations. *People v. Lemons*, 242 Ill. App. 3d 941 (4th Dist. 1993). The failure to either include these necessary items or explain their absence is "fatal" to a petition for post-conviction relief and may alone justify the summary dismissal of the petition. *People v. Collins*, 202 Ill. 2d 59, 66 (2002).

6

Moreover, petitioner bears the burden in a post-conviction proceeding to establish a substantial deprivation of his constitutional rights. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). While a *pro se* petitioner seeking post-conviction relief is "not expected to construct legal augments, cite legal authority, or draft [his] petition as artfully as would counsel," the *pro se* petitioner must plead sufficient facts to present the "gist" of a valid constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). Here, Petitioner's claim is a merely bald, conclusory allegation, and thus, will not prevail on post-conviction review. *See Collins*, 202 Ill. 2d at 66 (2002); *People v. Jackson*, 213 Ill. App. 3d 806, 811 (2d Dist. 1991) (summarily dismissing Petitioner's post-conviction claims because no factual support).

## CONCLUSION

Based on the above discussion, this Court finds that this post-conviction petition is frivolous and patently without merit. Therefore, Petitioner's post-conviction petition is DENIED.

Judge Michael Brown
Circuit Court of Cook County
Criminal Division

DATE: _____

# CIRCUIT COURT OF COOK COUNTY, ILLINOIS

| BRANCH/BRANCH | | | | ROOM OR BRANCH NO. | | SHEET | DATE | CALL | JUDGE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COUNTY CRIMINAL DIVISION (1713) | | | | 405 | | 2d | 11/16/200? | 0930 AM | | | | |
| CASE NUMBER | DEF. ORG. NO | NAME OF DEFENDANT / BOND NUMBER | | | CURRENT CHARGES | | | | | APPEAL COURT | | | |
| | | | | | | BOND | | | | DISPOSITION | | |

| CASE NUMBER | CHARGE | | DISPOSITION | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CO30 | 720-5/24-1.2A)A(2) | | | 1 | | | | | | | | | |
| CO31 | AGG DISCHARGE FIREARM/OCC | | FINDING OF GUILTY | 3 | | | | | | | | | |
| CO31 | 720-5/24-1.1(A) | | | 4 | | | | | | | | | |
| CO32 | FELON POSS/USE WEAPON/FIR | | DEF SENTENCED ILLINOIS DOC | 6 | | | | | | | | | |
| CO32 | 720-5/24-1.1A) | | | 5 | | | | | | | | | |
| CO33 | FELON POSS/USE WEAPON/FIR | | NOLLE PROSEQUI | 8 | | | | | | | | | |
| CO33 | 720-5/24-1.1(A) | | | 7 | | | | | | | | | |
| CO34 | FELON POSS/USE WEAPON/FIR | | MOTION DIRECT VERD OR FINDING | 9 | | | | | | | | | |
| CO34 | 720-5/24-1.1(A) | | | 10 | | | | | | | | | |
| | FELON POSS/USE WEAPON/FIR | | NOLLE PROSEQUI | 12 | | | | | | | | | |
| | | | | 11 | | | | | | | | | |
| | | | | 14 | | | | | | | | | |
| | | | | 13 | | | | | | | | | |
| 1LCR-18654 01 | JONES, MILTON | | 0981556 PRUSAK & NUDO | 15 | | | | | | | | | |
| CO01 | 720-5/9-1(A)(1) | | MISC. | 16 | | | | | | | | | |
| CO01 | * IN CUSTODY 06/08/07 * | | | 17 | | | | | | | | | |
| CO02 | MURDER/INTENT TO KILL/INJ | | | 18 | | | | | | | | | |
| CO02 | 720-5/9-1(A)(1) | | | 19 | | | | | | | | | |
| CO03 | MURDER/INTENT TO KILL/INJ | | | 20 | | | | | | | | | |
| CO03 | 720-5/9-1.(A)(2) | | 06/20/01 | 21 | | | | | | | | | |
| | MURDER/INTENT TO KILL/INJ | | | 22 | | | | | | | | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

MILTON       JONES

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

Charging the above named defendant with:

| Statute | Class | Description |
|---|---|---|
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/10-2(A)(5) | F | AGGRAVATED KIDNAPING/ARME |
| 720-5/10-2(A)(5) | F | AGGRAVATED KIDNAPING/ARME |
| 720-5/10-2(A)(5) | F | AGGRAVATED KIDNAPING/ARME |
| 720-5/10-1(A)(3) | F | KIDNAPING/DECEIT OR ENTIC |
| 720-5/10-1(A)(3) | F | KIDNAPING/DECEIT OR ENTIC |
| 720-5/10-1(A)(3) | F | KIDNAPING/DECEIT OR ENTIC |

The following disposition(s) was/were rendered before the Honorable Judge(s):

| | | |
|---|---|---|
| 08/08/01 IND/INFO-CLK OFFICE-PRES JUDGE | | 08/16/01 1701 |
| 01CR1865401 ID# CR1000570138 | | |
| 08/16/01 CASE ASSIGNED | | 08/16/01 1720 |
| BIEBEL, PAUL JR. | | |
| 08/16/01 DEFENDANT IN CUSTODY | | 00/00/00 |
| WOOD, WILLIAM S. | | |
| 08/16/01 DEFENDANT IN CUSTODY | | 00/00/00 |
| BOWIE, JR., PRESTON L. | | |
| 08/16/01 PRISONER DATA SHEET TO ISSUE | | 00/00/00 |
| BOWIE, JR., PRESTON L. | | |
| 08/16/01 CONTINUANCE BY AGREEMENT | | 08/21/01 |
| BOWIE, JR., PRESTON L. | | |
| 08/21/01 DEFENDANT IN CUSTODY | | 00/00/00 |
| BOWIE, JR., PRESTON L. | | |

EXHIBIT K

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 002

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

    MILTON      JONES

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | |
|---|---|---|
| 08/21/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 08/21/01 PLEA OF NOT GUILTY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 08/21/01 DEFENDANT ARRAIGNED | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 08/21/01 MOTION FOR BAIL REDUCTION | 00/00/00 D | 2 |
| BOWIE, JR., PRESTON L. | | |
| 08/21/01 CONTINUANCE BY AGREEMENT | 09/20/01 | |
| BOWIE, JR., PRESTON L. | | |
| 09/20/01 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 09/20/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 09/20/01 BEHAVIOR CLINIC EXAM ORDERED | 10/22/01 | |
| BOWIE, JR., PRESTON L. | | |
| 09/20/01 CONTINUANCE BY AGREEMENT | 10/22/01 | |
| BOWIE, JR., PRESTON L. | | |
| 10/22/01 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 10/22/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 10/22/01 CONTINUANCE BY AGREEMENT | 11/26/01 | |
| BOWIE, JR., PRESTON L. | | |
| 11/26/01 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 11/26/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 11/26/01 CONTINUANCE BY AGREEMENT | 01/21/02 | |
| BOWIE, JR., PRESTON L. | | |
| 01/22/02 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/22/02 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/22/02 MOTION TO WITHDRAW AS ATTORNEY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/22/02 ENTERED AND CONTINUED | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 003

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

      MILTON        JONES

         CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION

| | | |
|---|---|---|
| 01/22/02 CONTINUANCE BY AGREEMENT | 01/28/02 | |
| BOWIE, JR., PRESTON L. | | |
| 01/28/02 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/28/02 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/28/02 MOTION TO WITHDRAW AS ATTORNEY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/28/02 APPEARANCE FILED | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/28/02 CONTINUANCE BY AGREEMENT | 01/31/02 | |
| BOWIE, JR., PRESTON L. | | |
| 01/31/02 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/31/02 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 01/31/02 CONTINUANCE BY AGREEMENT | 03/11/02 | |
| BOWIE, JR., PRESTON L. | | |
| 03/11/02 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 03/11/02 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 03/11/02 CONTINUANCE BY AGREEMENT | 04/04/02 | |
| BOWIE, JR., PRESTON L. | | |
| 04/04/02 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 04/04/02 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 04/04/02 CONTINUANCE BY AGREEMENT | 05/23/02 | |
| BOWIE, JR., PRESTON L. | | |
| 05/23/02 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 05/23/02 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |
| 05/23/02 CONTINUANCE BY AGREEMENT | 06/24/02 | |
| BOWIE, JR., PRESTON L. | | |
| 06/24/02 DEFENDANT IN CUSTODY | 00/00/00 | |
| BOWIE, JR., PRESTON L. | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 004

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

    MILTON      JONES

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/24/02 PRISONER DATA SHEET TO ISSUE          00/00/00
        BOWIE, JR., PRESTON L.
06/24/02 CONTINUANCE BY AGREEMENT              06/28/02
        BOWIE, JR., PRESTON L.
06/28/02 PRISONER DATA SHEET TO ISSUE          00/00/00
        BOWIE, JR., PRESTON L.
06/28/02 CONTINUANCE BY AGREEMENT              08/06/02
        BOWIE, JR., PRESTON L.
08/06/02 DEFENDANT IN CUSTODY                  00/00/00
        BOWIE, JR., PRESTON L.
08/06/02 PRISONER DATA SHEET TO ISSUE          00/00/00
        BOWIE, JR., PRESTON L.
08/06/02 CONTINUANCE BY AGREEMENT              09/04/02
        BOWIE, JR., PRESTON L.
09/04/02 DEFENDANT IN CUSTODY                  00/00/00
        BOWIE, JR., PRESTON L.
09/04/02 PRISONER DATA SHEET TO ISSUE          00/00/00
        BOWIE, JR., PRESTON L.
09/04/02 CONTINUANCE BY AGREEMENT              10/15/02
        BOWIE, JR., PRESTON L.
10/15/02 DEFENDANT IN CUSTODY                  00/00/00
        BOWIE, JR., PRESTON L.
10/15/02 PRISONER DATA SHEET TO ISSUE          00/00/00
        BOWIE, JR., PRESTON L.
10/15/02 CONTINUANCE BY AGREEMENT              11/25/02
        BOWIE, JR., PRESTON L.
11/25/02 DEFENDANT IN CUSTODY                  00/00/00
        BOWIE, JR., PRESTON L.
11/25/02 PRISONER DATA SHEET TO ISSUE          00/00/00
        BOWIE, JR., PRESTON L.
11/25/02 CONTINUANCE BY AGREEMENT              12/18/02
        BOWIE, JR., PRESTON L.
12/18/02 DEFENDANT IN CUSTODY                  00/00/00
        BOWIE, JR., PRESTON L.
12/18/02 PRISONER DATA SHEET TO ISSUE          00/00/00
        BOWIE, JR., PRESTON L.
12/18/02 CONTINUANCE BY AGREEMENT              01/07/03
        BOWIE, JR., PRESTON L.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 005

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

        MILTON      JONES

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
01/07/03 DEFENDANT IN CUSTODY                    00/00/00
         BOWIE, JR., PRESTON L.
01/07/03 PRISONER DATA SHEET TO ISSUE            00/00/00
         BOWIE, JR., PRESTON L.
01/07/03 CONTINUANCE BY AGREEMENT                02/10/03
         BOWIE, JR., PRESTON L.
02/10/03 DEFENDANT IN CUSTODY                    00/00/00
         BOWIE, JR., PRESTON L.
02/10/03 PRISONER DATA SHEET TO ISSUE            00/00/00
         BOWIE, JR., PRESTON L.
02/10/03 CONTINUANCE BY AGREEMENT                02/25/03
         BOWIE, JR., PRESTON L.
02/25/03 DEFENDANT IN CUSTODY                    00/00/00
         BOWIE, JR., PRESTON L.
02/25/03 PRISONER DATA SHEET TO ISSUE            00/00/00
         BOWIE, JR., PRESTON L.
02/25/03 CONTINUANCE BY AGREEMENT                04/01/03
         BOWIE, JR., PRESTON L.
04/01/03 DEFENDANT IN CUSTODY                    00/00/00
         BOWIE, JR., PRESTON L.
04/01/03 PRISONER DATA SHEET TO ISSUE            00/00/00
         BOWIE, JR., PRESTON L.
04/01/03 CONTINUANCE BY AGREEMENT                05/01/03
         BOWIE, JR., PRESTON L.
05/01/03 DEFENDANT IN CUSTODY                    00/00/00
         BOWIE, JR., PRESTON L.
05/01/03 PRISONER DATA SHEET TO ISSUE            00/00/00
         BOWIE, JR., PRESTON L.
05/01/03 CONTINUANCE BY AGREEMENT                05/30/03
         BOWIE, JR., PRESTON L.
05/30/03 DEFENDANT IN CUSTODY                    00/00/00
         BOWIE, JR., PRESTON L.
05/30/03 PRISONER DATA SHEET TO ISSUE            00/00/00
         BOWIE, JR., PRESTON L.
05/30/03 CONTINUANCE BY AGREEMENT                06/25/03
         BOWIE, JR., PRESTON L.
06/25/03 DEFENDANT IN CUSTODY                    00/00/00
         BOWIE, JR., PRESTON L.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 006

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

     MILTON      JONES

           CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/25/03 PRISONER DATA SHEET TO ISSUE          00/00/00
         BOWIE, JR., PRESTON L.
06/25/03 CONTINUANCE BY AGREEMENT              07/29/03
         BOWIE, JR., PRESTON L.
07/29/03 DEFENDANT IN CUSTODY                  00/00/00
         BOWIE, JR., PRESTON L.
07/29/03 PRISONER DATA SHEET TO ISSUE          00/00/00
         BOWIE, JR., PRESTON L.
07/29/03 CONTINUANCE BY AGREEMENT              08/05/03
         DEFT TO FILE AN AMENDED ANSWER
         BOWIE, JR., PRESTON L.
08/05/03 DEFENDANT IN CUSTODY                  00/00/00
         BOWIE, JR., PRESTON L.
08/05/03 PRISONER DATA SHEET TO ISSUE          00/00/00
         BOWIE, JR., PRESTON L.
08/05/03 WITNESSES ORDERED TO APPEAR           00/00/00
         BOWIE, JR., PRESTON L.
08/05/03 CONTINUANCE BY AGREEMENT              09/08/03
         BOWIE, JR., PRESTON L.
09/08/03 DEFENDANT IN CUSTODY                  00/00/00
         BOWIE, JR., PRESTON L.
09/08/03 PRISONER DATA SHEET TO ISSUE          00/00/00
         BOWIE, JR., PRESTON L.
09/08/03 CONTINUANCE BY AGREEMENT              09/10/03
         NEW CASE
         BOWIE, JR., PRESTON L.
09/10/03 DEFENDANT IN CUSTODY                  00/00/00
         BOWIE, JR., PRESTON L.
09/10/03 PRISONER DATA SHEET TO ISSUE          00/00/00
         BOWIE, JR., PRESTON L.
09/10/03 WITNESSES ORDERED TO APPEAR           00/00/00
         BOWIE, JR., PRESTON L.
09/10/03 CONTINUANCE BY AGREEMENT              11/03/03
         JRUY TRIAL
         BOWIE, JR., PRESTON L.
11/03/03 DEFENDANT IN CUSTODY                  00/00/00
         OBBISH JAMES M.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 007

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

    MILTON      JONES

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
11/03/03 PRISONER DATA SHEET TO ISSUE            00/00/00
        OBBISH JAMES M.
11/03/03 WITNESSES ORDERED TO APPEAR             00/00/00
        OBBISH JAMES M.
11/03/03 CONTINUANCE BY AGREEMENT                01/26/04
        OBBISH JAMES M.
01/26/04 DEFENDANT IN CUSTODY                    00/00/00
        BOWIE, JR., PRESTON L.
01/26/04 PRISONER DATA SHEET TO ISSUE            00/00/00
        BOWIE, JR., PRESTON L.
01/26/04 WITNESSES ORDERED TO APPEAR             00/00/00
        BOWIE, JR., PRESTON L.
01/26/04 CONTINUANCE BY AGREEMENT                02/23/04
        BOWIE, JR., PRESTON L.
02/23/04 DEFENDANT IN CUSTODY                    00/00/00
        BOWIE, JR., PRESTON L.
02/23/04 PRISONER DATA SHEET TO ISSUE            00/00/00
        BOWIE, JR., PRESTON L.
02/23/04 WITNESSES ORDERED TO APPEAR             00/00/00
        BOWIE, JR., PRESTON L.
02/23/04 CONTINUANCE BY AGREEMENT                02/24/04
        BOWIE, JR., PRESTON L.
02/24/04 DEFENDANT IN CUSTODY                    00/00/00
        BOWIE, JR., PRESTON L.
02/24/04 CONTINUANCE BY AGREEMENT                02/25/04
        BOWIE, JR., PRESTON L.
02/25/04 DEFENDANT IN CUSTODY                    00/00/00
        BOWIE, JR., PRESTON L.
02/25/04 PRISONER DATA SHEET TO ISSUE            00/00/00
        BOWIE, JR., PRESTON L.
02/25/04 CONTINUANCE BY AGREEMENT                02/26/04
        BOWIE, JR., PRESTON L.
02/26/04 DEFENDANT IN CUSTODY                    00/00/00
        BOWIE, JR., PRESTON L.
02/26/04 SPECIAL ORDER                           00/00/00
        JURY TRIAL COMPLETED, JURY IS DELIBERATING
        BOWIE, JR., PRESTON L.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 008

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

    MILTON      JONES

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/26/04 CONTINUANCE BY AGREEMENT                      02/27/04
        BOWIE, JR., PRESTON L.
02/27/04 DEFENDANT IN CUSTODY                          00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 PRISONER DATA SHEET TO ISSUE                  00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 VERDICT OF GUILTY                     C004 00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 VERDICT OF GUILTY                     C006 00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 VERDICT OF GUILTY                     C009 00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 VERDICT OF GUILTY                     C012 00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 VERDICT OF GUILTY                     C013 00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 BAIL REVOKED                                  00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 PRE-SENT INVEST. ORD, CONTD TO                00/00/00
        BOWIE, JR., PRESTON L.
02/27/04 CONTINUANCE BY AGREEMENT                      04/16/04
        BOWIE, JR., PRESTON L.
03/26/04 SPECIAL ORDER                                 00/00/00
        MOTION FOR JUDGMENT OTWITSTANDING VERDICTOR FOR A NEW TRIAL FILED
03/26/04 HEARING DATE ASSIGNED                         04/16/04 1720
04/06/04 DEFENDANT IN CUSTODY                          00/00/00
        BOWIE, JR., PRESTON L.
04/06/04 PRISONER DATA SHEET TO ISSUE                  00/00/00
        BOWIE, JR., PRESTON L.
04/06/04 CONTINUANCE BY AGREEMENT                      04/21/04
        BOWIE, JR., PRESTON L.
04/21/04 DEFENDANT IN CUSTODY                          00/00/00
        BOWIE, JR., PRESTON L.
04/21/04 MOTION DEFENDANT - NEW TRIAL          00/00/00 D        2
        BOWIE, JR., PRESTON L.
04/21/04 DEF SENTENCED ILLINOIS DOC    C004 00/00/00
        CTS 4 6 9   CONSECUTIVE TO CTS 12 & 13
                    25 YRS
        BOWIE, JR., PRESTON L.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 009

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

    MILTON      JONES

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/21/04 DEF SENTENCED ILLINOIS DOC        C006 00/00/00
              25 YRS
      BOWIE, JR., PRESTON L.
04/21/04 DEF SENTENCED ILLINOIS DOC        C009 00/00/00
              25 YRS
      BOWIE, JR., PRESTON L.
04/21/04 DEF SENTENCED ILLINOIS DOC        C012
      CONSECUTIVE TO CTS.4,6 &9 AND CONSECUTIVE TO CT. 13
              6 YRS
      BOWIE, JR., PRESTON L.
04/21/04 DEF SENTENCED ILLINOIS DOC        C013
      CONSECUTIVE TO CTS 4 6 9 AND CONSECUTIVE TO CT 12
              6 YRS
      BOWIE, JR., PRESTON L.
04/21/04 CREDIT DEFENDANT FOR TIME SERV         00/00/00
      CREDIT FOR 1028 DAYS
      BOWIE, JR., PRESTON L.
04/21/04 BLOOD TEST ORDERED                     00/00/00 S      1
      BOWIE, JR., PRESTON L.
04/21/04 COURT COSTS                            00/00/00      200 $     200
      BOWIE, JR., PRESTON L.
04/21/04 ASSESS/FEES/RESTITUTION ETC.           00/00/00           $     200
      BOWIE, JR., PRESTON L.
04/21/04 FINES COSTS FEES NON DRFT ORD          00/00/00           $     200
      BOWIE, JR., PRESTON L.
04/21/04 LET MITTIMUS ISSUE/MITT TO ISS         00/00/00
      BOWIE, JR., PRESTON L.
04/21/04 CHANGE PRIORITY STATUS            M    00/00/00
      BOWIE, JR., PRESTON L.
04/21/04 MOTION TO REDUCE SENTENCE              00/00/00 D      2
      BOWIE, JR., PRESTON L.
04/21/04 NOTICE OF APPEAL FILED, TRNSFR         00/00/00
04/21/04 NOTICE OF NOTICE OF APP MAILED         00/00/00
04/21/04 HEARING DATE ASSIGNED                  04/30/04 1713
04/30/04 ILL STATE APPELLATE DEF APPTD          00/00/00
      BIEBEL, PAUL JR.
04/30/04 O/C FREE REPT OF PROCD ORD N/C         00/00/00
      BIEBEL, PAUL JR.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS     Page 010

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

MILTON     JONES

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
04/30/04 MEMO OF ORDS & NOA PICKED-UP          00/00/00
         BIEBEL, PAUL JR.
05/14/04 APPELLATE COURT NUMBER ASGND          00/00/00 04-1359
05/18/04 COMMON LAW RECORD PREPARED            00/00/00
05/25/04 CLR RECD BY APP COUNSEL               00/00/00
         STATE APPELLATE DEFENDER
06/17/04 REPT OF PRCDS ORD FR CRT RPT          00/00/00
07/01/04 SUPPL REC RECD BY APPL COUNSEL        00/00/00
         STATE APPELLATE DEFENDER
09/07/04 SPECIAL ORDER                                      F        2
         COPY OF CHARGING INSTRUMENTS.
09/07/04 HEARING DATE ASSIGNED                 09/10/04 1720
09/10/04 CONTINUANCE BY ORDER OF COURT         09/13/04
         BOWIE, JR., PRESTON L.
09/13/04 DEFENDANT IN CUSTODY                  00/00/00
         BOWIE, JR., PRESTON L.
09/13/04 PRISONER DATA SHEET TO ISSUE          00/00/00
         BOWIE, JR., PRESTON L.
09/13/04 PUBLIC DEFENDER APPOINTED             00/00/00
         BOWIE, JR., PRESTON L.
09/13/04 WARR RETURNED, EXECUTED, FILED        00/00/00
         BOWIE, JR., PRESTON L.
09/13/04 NO BAIL                               00/00/00
         BOWIE, JR., PRESTON L.
09/13/04 CONTINUANCE BY AGREEMENT              10/25/04
         BOWIE, JR., PRESTON L.
09/13/04 SPECIAL ORDER                         00/00/00
         MOTION DENIED OFF  CALL
         BOWIE, JR., PRESTON L.
10/25/04 DEFENDANT IN CUSTODY                  00/00/00
         BOWIE, JR., PRESTON L.
10/25/04 PRISONER DATA SHEET TO ISSUE          00/00/00
         BOWIE, JR., PRESTON L.
10/25/04 CONTINUANCE BY ORDER OF COURT         10/28/04
         BOWIE, JR., PRESTON L.
10/28/04 DEFENDANT ON BOND                     00/00/00
         BOWIE, JR., PRESTON L.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 011

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

    MILTON      JONES

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
10/28/04 CONTINUANCE BY AGREEMENT                   11/04/04
      BOWIE, JR., PRESTON L.
11/04/04 DEFENDANT ON BOND                          00/00/00
      BOWIE, JR., PRESTON L.
11/04/04 CONTINUANCE BY ORDER OF COURT              11/09/04
      BOWIE, JR., PRESTON L.
11/09/04 SPECIAL ORDER                              00/00/00
      MOTION DENIED OFF CALL
      BOWIE, JR., PRESTON L.
11/19/04 TRANS PROC REC/FILED CLKS OFF              00/00/00
11/22/04 REPORT OF PROCEEDINGS PREPARED             00/00/00
12/09/04 REPRT/PROCDS RECD BY APP ATTRY             00/00/00
      STATE APPELLATE DEFENDER
12/15/04 SUPP TRAN PRO REC/FILE CLK OFF             00/00/00
12/20/04 SPECIAL ORDER                              00/00/00 F        2
      RELIEF OF JUDGEMENT.
12/20/04 HEARING DATE ASSIGNED                      12/23/04 1720
12/20/04 SUPPL REPORT OF PRCD PREPARED              00/00/00
12/23/04 SPECIAL ORDER                              00/00/00
      MOTION DENIED
      BOWIE, JR., PRESTON L.
12/28/04 SUPPL REC RECD BY APPL COUNSEL             00/00/00
      STATE APPELLATE DEFENDER
02/01/05 SUPPL REPORT OF PRCD PREPARED              00/00/00
      EXHIBITS
02/07/05 SUPPL REC RECD BY APPL COUNSEL             00/00/00
      STATE APPELLATE DEFENDER
02/07/05 SUPPL REC RECD BY APPL COUNSEL             00/00/00
      STATE APPELLATE DEFENDER
08/07/06 MANDATE FILED                              08/16/06 1701
08/16/06 REVIEW COURT AFFIRMANCE                    00/00/00
      BIEBEL, PAUL JR.
09/15/06 MANDATE FILED                              09/26/06 1701
09/26/06 SPECIAL ORDER                              00/00/00
      RECALL MANDATED OF7-31-06
      BIEBEL, PAUL JR.
01/24/07 MANDATE FILED                              02/02/07 1701

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 012

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

    MILTON      JONES

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/02/07 SPECIAL ORDER                           00/00/00
        AFFIRMED
        GAINER THOMAS V JR.
06/04/07 POST-CONVICTION FILED                   00/00/00
06/04/07 HEARING DATE ASSIGNED                   06/08/07 1701
06/08/07 CASE ASSIGNED                           06/08/07 1720
        GAINER THOMAS V JR.
06/08/07 DEFENDANT IN CUSTODY                    00/00/00
        BROWN, MICHAEL
06/08/07 PRISONER DATA SHEET TO ISSUE            00/00/00
        BROWN, MICHAEL
06/08/07 CONTINUANCE BY ORDER OF COURT           06/15/07
        BROWN, MICHAEL
06/15/07 DEFENDANT NOT IN COURT                  00/00/00
        BROWN, MICHAEL
06/15/07 CONTINUANCE BY ORDER OF COURT           06/29/07
        BROWN, MICHAEL
06/29/07 CONTINUANCE BY ORDER OF COURT           07/06/07
        BROWN, MICHAEL
07/06/07 DEFENDANT NOT IN COURT                  00/00/00
        BROWN, MICHAEL
07/06/07 CONTINUANCE BY ORDER OF COURT           08/03/07
        BROWN, MICHAEL
08/03/07 DEFENDANT IN CUSTODY                    00/00/00
        BROWN, MICHAEL
08/03/07 PRISONER DATA SHEET TO ISSUE            00/00/00
        BROWN, MICHAEL
08/03/07 CONTINUANCE BY ORDER OF COURT           08/08/07
        BROWN, MICHAEL
08/08/07 DEFENDANT NOT IN COURT                  00/00/00
        BROWN, MICHAEL
08/08/07 POST-CONV PETITION DENIED               00/00/00
        BROWN, MICHAEL
08/16/07 NOTIFICATION SENT TO DEFENDANT          00/00/00
11/08/07 NOTICE OF APPEAL FILED, TRNSFR          08/08/07
11/13/07 NOTICE OF NOTICE OF APP MAILED          00/00/00
11/13/07 HEARING DATE ASSIGNED                   11/16/07 1713

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 013

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 01CR1865401

      MILTON       JONES

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
11/16/07 APPEAL DENIED                        00/00/00
      LATE NOTICE OF APPEAL DENIED
      BIEBEL, PAUL JR.
11/21/07 SPECIAL ORDER                        00/00/00
      LTR TO DEFENDANT DENING APPEAL, LATE NOTICE ////CUR
03/05/08 SPECIAL ORDER                        00/00/00 F      2
      COMMON LAW RECORDS.
03/05/08 HEARING DATE ASSIGNED                03/12/08 1720
03/12/08 M/D PETN FOR TRNSCT,COMLAW RCD              D        2
      PRO SE MOTION-DENIED--CLERK TO NOTIFY DEFT--OFF CALLK.
      BROWN, MICHAEL

                                    hereby certify that the foregoing has
                                    been entered of record on the above
                                    captioned case.
                                    Date 06/23/08

                                    _____
                                            DOROTHY BROWN
                          CLERK OF THE CIRCUIT COURT OF COOK COUNTY